**UNITED STATES DISTRICT COURT**
**For the**
**DISTRICT OF CONNECTICUT**

---

| | |
|---|---|
| **AVERY WATSON,** ) | **Case No.:  3:21-cv-503** |
| **Plaintiff,** | |
| ) | |
| **v.** ) | |
| ) | **TRIAL BY JURY DEMANDED** |
| **Wheeler Clinic, Inc., Lisa Preble is sued in her** | |
| **individual capacity, Erica Baloga is sued in her** ) | |
| **individual capacity, Heather Arduini is sued in** | |
| **her individual capacity, Patricia Speicher Werbner** ) | |
| **Chief of Human Resources, is sued in her individual** | |
| **capacity,** ) | **April 9, 2021** |
| **Defendants.** | |
| ) | |

---

## I.       JURISDICTION AND VENUE

1.  This is an action for damages and other equitable relief arising under 42 United States Code

§ 1981, 42 United States Code § 1988 for attorney's fees, Conn. Gen. Stat. §46a-60(b)(1) *et seq*., and

the common law of the State of Connecticut.

2.  This Court has jurisdiction of this controversy by virtue of 42 United States Code § 1981,

and 42 United States Code § 1988 and by virtue of this Court's powers and authority to hear pendent

state law claims.  Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 and 28 U.S.C.

§1392.

## II.    **PARTIES**

3.  **The Plaintiff, Avery Watson** (hereinafter-the Plaintiff) is an African American female, and for all relevant times, she was a Licensed Clinical Social Worker (hereinafter, LCSW).  **[Emphasis added]**

4.  At all times relevant herein, Ms. Watson has been a resident of Middletown, Connecticut.

5.  On information and belief, Ms. Watson was hired by the Wheeler Clinic (hereinafter-Defendant Wheeler) on or around December 18, 2017, and she worked as a Senior Intake Clinician at Defendant Wheeler's Division of Adult Services, New Britain, Connecticut.

6.  On information and belief, Ms. Watson holds a bachelor's degree in Social Work (BSW) from Johnson C. Smith College, Charlotte, North Carolina, and she also holds a master's degree in Social Work MSW) from Barry University, Miami Shores, Florida. Ms. Watson was also a Licensed Clinical Social Worker (LCSW).

7.  For all times relevant, Ms. Watson possessed approximately four- and one-half years (4 ½) supervisory experience, with approximately two (2) years of which she had prior to her tenure at Defendant Wheeler.  Her employment reviews were good.

8.  Ms. Watson was denied promotion, retaliated against, subjected to unequal pay and unequal duties, discriminatorily denied promotional opportunities, denied vacation time and pay, discriminated against based on her race and color (African American), and the terms and conditions of her employment.

9.  **Defendant, Wheeler Clinic** is a Connecticut Corporation whose business location is 91 Northwest Drive, Plainville, CT 06062. **[Emphasis added]**

10. This defendant provides behavioral health and addiction services to adults and children.

11. The Plaintiff, Ms. Watson's division is Adult Services, which is located in New Britain,

Connecticut.

12. On information and belief, Defendant Wheeler derives part of its revenue/income from "program grants," such as its "Medicated Assisted Treatment," commonly referred to at the Plaintiff's work location as MAT.

13. At all times relevant herein, the named natural person defendants acted in their official capacities in concert with each other, and as agents of Defendant Wheeler.

14. For purposes of this action, all conduct complained of herein began in or around 2017 and continues to present.

15. On information and belief, Defendant Wheeler by and through its officials, managers, and agents subjected Ms. Watson to disparate treatment as to the terms and conditions of her employment.

16. On information and belief, Defendant Wheeler by and through its officials, managers, and agents denied Ms. Watson promotional opportunities in favor of white females on three distinct occasions and paid her unequally as compared to non-basis employees.

17. On information and belief, Defendant Wheeler by and through its officials, managers, and agents subjected Ms. Watson to discrimination bases on her race and color, a hostile work environment, harassment, and repeated acts of retaliation, where her personal and professional standing were ridiculed, diminished, and demeaned.

18. On information and belief, although Ms. Watson's education, professional certification, licensure, and supervisory experience were more closely aligned with the requirement of the positions at issue. This defendant's officials, managers, and agents (Preble, Baloga, and Arduini) had been and continues to be the main perpetrators of the discriminatory practice complained of herein.

19. In one celebrated incident occurring in November 2018, Defendant Lisa Preble, the immediate supervisor of Ms. Watson published an email to Defendant Baloga which served to damage

Ms. Watson's promotional prospects on the job.

20. **Defendant Lisa Preble** is a white female, and she was Defendant Wheeler's Clinical Supervisor and Program Manager at Defendant Wheeler's New Britain location. **[Emphasis added]**

21. On information and belief, Defendant Preble was an official/manager/agent at Defendant Wheeler's New Britain location, and she reported to Defendant Erica Baloga, under circumstances where they were both responsible for the company's workplace culture in New Britain.

22. This defendant is sued as an official of Defendant Wheeler and she is also sued in her individual capacity by virtue of her tortious conduct against Ms. Watson.

23. This defendant was also Ms. Watson's immediate supervisor from December 2018 through July 2018 and from December 2018 through June.

24. Defendant Heather Arduini succeeded this defendant as Ms. Watson's immediate supervisor until October 2019, when she resigned from Defendant Wheeler.

25. This defendant hired all three comparators or participated in the hire of Christine Grant, Jade Bray, and Satina Salce, an outsider who like Ms. Grant was a mere licensed Professional Counselor-LPC.

26. All three candidates possessed far less experience than Ms. Watson, and Ms. Bray's scant experience did not involve her supervising clinicians as Ms. Watson, while Ms. Grant's supervisory experience concerned part-time interns for eight (8) months only.

27. On information and belief, this defendant hired Ms. Grant and Ms. Bray despite the fact she knew them from a previous employment.

28. At all times relevant herein, this defendant was an official of Defendant Wheeler and she actively and unrelentingly engaged in the discriminatory conduct complained of by Ms. Watson.

29. On information and belief, this defendant also published a libelous email to Defendant Erica

Baloga on or about November 19, 2018, which served to assail Ms. Watson personally and professionally.

30. **Defendant Erica Baloga** is a white female, this defendant was the Associate Director of Adult Outpatient Services, and she was the highest-ranking official/person at Defendant Wheeler's New Britain location. **[Emphasis added]**

31. This defendant is sued as an official of Defendant Wheeler and she is also sued in her individual capacity by virtue of her tortious conduct against Ms. Watson.

32. On information and belief, this defendant was the Associate Director of Adult Outpatient Services, and so, her responsibilities extended to the company's workplace culture in New Britain.

33. This defendant was the immediate supervisor of Defendant Preble and she was one of the two persons who conducted the rounds of interviews, including that of Ms. Watson's in or around November 2018.

34. On information and belief, this defendant accepted an email from Defendant Preble on or around November 19, 2018, which formed the discriminatory basis for Defendant Wheeler's initial denial of Ms. Watson's first promotion application.


35. **Defendant Heather Arduini** is a white female, and she became the Clinical Supervisor in 2018, then to Project Director of the MAT Program around November 2018 at Defendant Wheeler's New Britain location. **[Emphasis added]**

36. This defendant became Ms. Watson's immediate supervisor in or around October 2019, immediately after Defendant Preble resigned, and assumed the title of Associate Director of Defendant Wheeler's New Britain location. She remains Ms. Watson's immediate supervisor to present.

37. This defendant is sued as an official of Defendant Wheeler and she is also sued in her

individual capacity by virtue of her tortious conduct against Ms. Watson.

38. At all times relevant to this complaint's responsibilities extended to the company's workplace culture in New Britain.

39. On information and belief, this defendant has engaged in the same discriminatory conduct previously engaged in by Defendant Preble prior to her resignation.

40. This defendant has also engaged in numerous and various instances of retaliatory conduct, harassment, and she has created a continuously hostile work environment for Ms. Watson, necessitating her seeking mental health treatment.

41. **Defendant Patricia Speicher-Werbner** is a white female and at all relevant times, she was Defendant Wheeler's Chief Human Resources Officer.  **[Emphasis added]**

42. This individual is sued in her individual capacity because she was the "Chief Human Resources official at Defendant Wheeler, and her responsibilities extended to the company's workplace culture in New Britain and beyond.

43. By virtue of her position and her interactions with the individual defendants, she knew or should have known about the unlawful conduct they engaged in against Ms. Watson, and she failed to supervise, or recommend closer supervisor of these defendants to their superiors.

44. By virtue of her position, this defendant could have, should have, and failed to terminate the unlawful conduct the individual defendants engaged in against Ms. Watson.


### III.   STATEMENT OF THE FACTS

45. At all times relevant to this complaint, Ms. Watson was an African American female, and she was employed at Defendant Wheeler's New Britain, Connecticut office as a Senior Intake Clinician from December 18, 2017 until October 7, 2019, when she was "finally" promoted to a supervisory

position-Director of the Prescription Drug Opioid and Addiction and [Medicated Assisted Treatment] (hereinafter PDOA/MAT) grant program.

46. While in New Britain, Ms. Watson was under the immediate supervision of six different supervisors, in one instance two of her supervisors overlapped-Defendant Preble and Christine Grant:

   (a) Jeffery Velleca from December 2017 through February 2018.

   (b) Defendant Lisa Preble from February 2018 through July 2018.

   (c) Defendant Jennifer Lanza from July 2018 through December 2018.

   (d) Defendant Lisa Preble and Christine Grant from January 2018 through October 2019.

   (e) Defendant Heather Arduini from October 2019 to present.

47. On information and belief, all Ms. Watson's immediate supervisors except for Defendant Heather Arduini (became Ms. Watson's immediate supervisor in October 2019) reported to Defendant Erica Baloga, who was the Director of Adult Outpatient Care at Defendant Wheeler Clinic's, New Britain location, from Ms. Watson's hire on December 18, 2017 to summer 2019.

48. On information and belief Defendant Baloga resigned her position on or around summer 2019.

49. On or about March 18, 2018, Ms. Watson's supervisor, Jeff Velleca (White), gave her a 90-day evaluation which provided she was meeting performance expectations.

50. On information and belief, Mr. Velleca did not identify any specific issues with Ms. Watson's performance at that time.

51. Around this same time, Defendant Lisa Preble began supervising Ms. Watson.

52. As Ms. Watson's supervisor, Defendant Preble counseled her on March 14, 2018, claiming in her notes that Ms. Watson should "**use appropriate language in the office.**" More particularly, Defendant Preble noted Ms. Watson's inclination to use "abrasive comments" such as "passing the

buck."  **[Emphasis added]**

53. On information and belief, Ms. Watson's use of this phrase arose under circumstances where she approached a group of supervisors for guidance on handling an intake.

54. On information and belief, one of the supervisors suggested she refer the client to someone else, to which Ms. Watson responded that she did not want to "pass the buck" and was willing to handle the matter herself.

55. Defendant Preble is alleged that Ms. Watson's comment angered the supervisors, and that was why she counseled Ms. Watson about the matter.

56. On information and belief, Defendant Preble's supervision notes/email also included references that Ms. Watson's was **"combative, disorderly, consistently demonstrated poor interpersonal skills, poor written and verbal communications skills, and at her tone at times borders on insubordinate[ion] . . ., she [also] has the reputation to be horribly apathetic and short with clients."  [Emphasis added]**

57. On information and belief, the theme and methodology of Defendant Preble assault upon Ms. Watson's reputation was unrelenting and continued unabated from March 2018 until she left Defendant Wheeler's employment in June 2019.

58. On information and belief, Defendant Preble's supervisors Defendant Baloga, knew of or she should have known of Defendant Preble's illegal conduct.

59. On information and belief, Ms. Watson repeatedly objected to Defendant Preble targeting her communication style because of her race, and that others who made alleged abrasive comments were not counseled or disciplined for it.

60. On information and belief, Defendant Preble advised her supervisor, Erica Baloga (White), about Ms. Watson's response.

61.  At some point thereafter, both Defendants Preble and Baloga reported the matter to Human Resources but no action was taken.  It is believed that Defendant Wheeler's Human Resources manager did not want to do anything about Ms. Watson, on the basis "she was just speaking her mind."

62.  According to Defendant Preble, most of the complaints she received about Ms. Watson's communication were from other managers.  Heather Arduini (White) regularly complained that Ms. Watson did not say "Hi," to her, while Defendant Baloga complained that Ms. Watson "exhibited an abrasive tone in staff meetings."

63. In one instance, a peer complained that Ms. Watson left a door open when the facility was in lockdown and felt that Ms. Watson was dismissive with regard to the safety of the facility.

64. On information and belief, on two occasions, Ms. Watson and Defendant Preble disagreed over the treatment of Black clients; Ms. Watson objected because she felt they were criminalizing people with mental health issues by calling the police to handle them, while they did not accord the same treatment to White clients.

65.  In one instance, Defendant Preble and Defendant Baloga had a long conversation about the situation with Ms. Watson. Ms. Watson subsequently became upset that the police had been called and the client put in handcuffs.

66. Thereafter, Defendant Preble testified that she and Defendant Baloga considered disciplining Ms. Watson over the incident, but they decided against it, because they had "compassion for her position."

67. One other incident involved a client who would not consent to be transported to an emergency room for medical treatment. Defendant Preble called the police, but the responding officer said, "he did not have justification for detaining the client against her will."

68. In or around May 2018, Defendant Preble decided to make changes to staff workloads,

which she attributed to a need to distribute caseloads more evenly and to use Ms. Watson more effectively.

69. Ms. Watson was the sole intake person at Defendant Wheeler's New Britain location at the time, because Defendant Preble assigned the other intake personnel to provided outpatient services.

70. In the end, Ms. Watson was made responsible to run some groups in addition to performing her task in intake. Because of this shift change, Ms. Watson's schedule was to

changed, which made her very unhappy.

71. On or about May 30, 2018, Defendant Preble learned of Ms. Watson's response, she counseled Ms. Watson for objecting to the changes she had made to Ms. Watson's schedule, despite her failing to inform Ms. Watson beforehand.  In the end, Defendant Preble agreed to allow Ms. Watson to leave at her normal time if the group meetings could permit.

72. On information and belief, Defendant Preble did not subject Ms. Watson's co-workers (Vina Petrano or Claire Travis who are both White) in the intake unit to the same changed terms and conditions of the job.

73. On information and belief, Defendant Preble acknowledged that the other staff members were quite happy with the changes she had instituted because they benefitted from them, while Ms. Watson was left displeased, especially given she had to work extra hours.

74.  Ms. Watson's objection was further met with Defendant Preble's retort that "she knew she was getting the short end of the stick."

75. As a consequence, in 2018 and 2019, when Ms. Watson applied to take her vacation, her application was denied on the basis she "did not locate a co-worker to stand in while she would have been on vacation," for the same time Defendant Preble and the Human Resources Department had denied.

76. On or about August 1, 2018, Defendant Preble authored a "Supervision Note" marked "Avery Only" and passed it to Ms. Jennifer Lanza, who had become Ms. Watson's supervisor. During the same time period, although Ms. Watson's performance met standards, Defendant Preble counseled her for being argumentative, due to her objections to the particulars of her annual evaluation.

**The Defendants Discriminatorily Denied Ms. Watson Promotions on Three Occasions:**

**(a) Clinical Supervisor position-application November 8, 2018**

77. On or about November 8, 2018, Defendant Wheeler posted a Clinical Supervisor position at its New Britain location.

78.  On information and belief, the hiring procedure at Defendant Wheeler provided that its Human Resources department would screen applicants to verify that they met the minimum qualifications for the job, and the hiring manager would conduct the interviews along with Ms. Baloga in this instance and select from the pool of identified candidates.

79. Thereafter, Ms. Watson applied for the Clinical Supervisor position on or about November 12, 2018, and her application was forwarded for consideration.

80.  Ms. Watson is a Licensed Clinical Social Worker with approximately two and a half (2 ½) years of supervising a team of staffers, including nurses, Substance Abuse Counselor, Peer Support Specialists, Qualified Professionals and other Clinicians.

81. Ms. Preble who was Ms. Watson's immediate supervisor was the hiring manager for this position; however, Ms. Baloga took over this responsibility for the hiring decision, because Ms. Preble worked with one of the candidates, Christine Grant (White), at a previous job. Ms. Preble claimed, "she was stepping aside to avoid an appearance of favoritism in the selection process."

82. However, on or about November 19, 2018, Ms. Preble emailed Ms. Baloga to say:

> "In case anything comes up about the supervisor position before we get to meet, I want to let you know that I literally lost sleep this weekend thinking about the Avery situation. [Ms. Preble further stated that] she did not want Watson to get the promotion to Clinical Supervisor because of **her poor interpersonal skills, poor written and verbal communication skills, and her tone at times has bordered on insubordinate** . . . I would rather hire nobody than hire Avery. [Ms. Preble concluded her email by stating that she was] sorry to bother [Ms. Baloga] with this [again]. Like I said, I actually lost sleep over this over the weekend and just really needed to get it out." **[Emphasis added]**

83. After the interviews, Ms. Baloga stated that Ms. Watson and Christine Grant both had excellent interviews and were qualified for the job.

84. On information and belief, Ms. Grant was not qualified for the job, because she was a mere Licensed Professional Counselor (hereinafter LPC), where the position required a LCSW, which Ms. Watson had. Ms. Grant also had eight months (8) supervising part-time interns, to Ms. Watson's two - and one-half years (2 ½) supervising Nurses, Substance Abuse Counselor, Peer Support Specialists, Qualified Professionals and other Clinicians. For her part, Ms. Grant had only been at the Wheeler Clinic for six months when she applied for the position-contrary to policy providing for one year, and she only had approximately eight (8) months supervising part-time interns.

85. On information and belief, pursuant to the state of Connecticut Department of Public Health's Regulations, Ms. Watson as a LCSW could sign off on work or hours performed

(three thousand 3,000 hours were required) by Ms. Grant to gain licensure as a LCSW, while Ms. Grant (she had an LPC) by DPH regulations could not reciprocate on behalf of Ms. Watson.

86.  Ultimately, Ms. Baloga deferred to Ms. Preble's preference and selected Ms. Grant for the supervisory position, despite Ms. Preble's email published on November 19, 2018, concerning the "appearance of favoritism."

87. On information and belief, at the time Ms. Grant was hired as Ms. Watson's supervisor, she had only worked at Wheeler Clinic for about six months at that time in contravention to Defendant Wheeler's policy and practice that candidates for promotion had to be employed by the company for one year to be eligible for promotions.

### (b) Clinical Supervisor position-application January 3, 2019

88. On or about January 3, 2019, Defendant Wheeler posted another Clinical Supervisor position at its New Britain location, and Ms. Watson applied for this on or about January 6, 2019, pursuant to Defendant Wheeler's application procedures.

89. On information and belief, Ms. Preble denied receiving an application from Ms. Watson for this position.

90. Ms. Preble also did not interview Ms. Watson for the position, and she hired candidate Satina Salce (White), an external candidate for the position instead.

91. On information and belief, Ms. Salce like Ms. Grant before her was a mere Licensed Professional Counselor (LPC), with absolutely no supervisory experience.

92. There was a long delay in Ms. Salce's start with the Wheeler Clinic, New Britain location, and she resigned within a few days of the beginning of her employment there, complaining that she did not like the color of the walls and the tiles.

93. On information and belief, Ms. Salce may have misrepresented her credentials.

### (c) Clinical Supervisor position-application March 12, 2019

94.  On March 12, 2019, Defendant Wheeler through its agents/representatives posted the Supervisor position once more, and Ms. Watson, Ms. Watson applied on or about March 13, 2019.

95.  On the same day that Ms. Preble submitted the position for posting, she contacted Jade Bray (White/African American) about applying for the position. Like Ms. Christine Grant in the case of Job (a) above, Ms. Preble had worked with Ms. Bray previously at another company.

96.  On information and belief, Ms. Bray had applied for jobs with Wheeler at other locations, and Ms. Baloga had participated in interviewing her for a clinician position.

97.  On information and belief, Ms. Baloga liked her as a candidate, so Ms. Preble contacted her to see if she was interested in the Supervisory position at Defendant Wheeler's New Britain location.

98. On information and belief, Ms. Bray was surprised that Ms. Preble contacted her about the position, as they had not been close when they worked together before.

99.  On information and belief, Ms. Bray was a Licensed Clinical Social Worker (LCSW) like Ms. Watson, but she had experience working a Disability Claims Examiner.

100.  On information and belief, Ms. Bray she had no supervisory experience, but she was interested in the job and completed an online application on the same day as Ms. Watson.

101.  On or about March 18, 2019, Ms. Preble called and offered Ms. Bray the position.

102.  On information and belief, on the same day, Ms. Preble received Ms. Watson's application (Despite the fact Ms. Watson applied on March 13, 2019), and she contacted Human Resources to ask if she was required to interview Ms. Watson.

103.  On information and belief, Human Resources informed Ms. Preble that she did not

have to interview Ms. Watson, so she did not.

104.   On information and belief, Ms. Bray came onto the job site on the afternoon of March 18, 2019, and when offered the job then, she said she wanted to think about it before giving an answer.

105.   On information and belief, Ms. Bray did not accept the position until March 21, 2019, and on that date, Ms. Preble emailed Ms. Watson and stated that they had offered the position to someone else (Ms. Bray) before she received Ms. Watson's application.

106.   Around this time, Ms. Preble had been promoted and was no longer Ms. Watson's direct supervisor. Despite this, Preble emailed Ms. Watson's regularly about issues and required her to have weekly supervision with her again.

107.   On information and belief, Ms. Preble would email Ms. Watson separately about corrections, so there were a lot of emails detailing specific items. Routinely, Ms. Watson's direct supervisors gave her evaluations covering this time period which indicate that her performance was meeting expectations overall and exceeding in some categories.

108.   After being passed over for the third promotion, Ms. Watson contacted Defendants Preble, Bagola, and Ms. Grant by email complaining that she was discriminated against with respect to the three position.  Defendant Bagola subsequently sent Ms. Watson's email to Chief of Human Resources, Patricia Speicher Werbner, who noted that the third hiree, Ms. Bray had been licensed a year less than Ms. Watson and was not working in a clinical position when she was hired to supervise a clinical staff at Defendant Wheeler's New Britain location.

109.   Ms. Watson then filed a complaint with the Connecticut Commission on Human Rights and Opportunities (hereinafter CHRO) on April 12, 2019-Commission Complaint #

1910436 and EEOC # 16A201901132.

110.  On information and belief, all named representatives, officials and agents including, Ms. Preble, Ms. Baloga, Ms. Grant, Ms. Lanza, Ms. Patricia Speicher Werbner, Ms. Arduini, and Mr. Diaz of Defendant Wheeler were aware of Ms. Watson's complaint before the CHRO.

111.  Between March 13, 2019 and April 4, 2019, Ms. Preble resorted to emailing Ms. Watson on a continuous basis on "purported" performance issues, which did not relate to Defendant Wheeler's denial of the three prior promotions, curiously, they coincided with Ms. Preble recruiting and hiring Ms. Bray, and some were postdated to coincide with time prior to Ms. Watson's CHRO complaint.

112.  Ms. Baloga and Ms. Preble resigned their positions at Defendant Wheeler during the summer and October 2019, respectively.

113.  Defendant Wheeler Clinic subsequently promoted Ms. Watson on October 7, 2019, with Ms. Heather Arduini as her immediate supervisor.

114.  Ms. Watson was Defendant Wheeler's Medicated Assisted Treatment (hereinafter MAT) Program Director, as well a Clinical Supervisor.

115.  As the MAT Program Director, provisions of the grant (MAT) specifically provided that Defendant's nurse, Community Health Worker and Peer Support Specialist to report directly to Ms. Watson, however, Ms. Arduini inform them in a staff meeting that they did not have to take directions or report to Ms. Watson.

116. In or around March 2021, Ms. Watson amended her complaint before the CHRO to include the fact the defendants continue to retaliate against her, despite the fact the agency found cause to believe that the defendants had engaged in a discriminatory practice against Ms. Watson.

117.    More specifically, since lodging her CHRO complaint, the defendants have continued to subject her to ongoing unequal treatment, retaliation, and harassment due to her race/color and in retaliation for having engaged in prior protected activity.

118. Since early October 2019 to present, after Defendant Heather Arduini (White) became Ms. Watson's Supervisor, and after Ms. Watson was finally promoted from Senior Intake Clinician to Integrated Care to Supervisor/Project Director for MAT, Defendant Arduini has continued to harass Ms. Watson, subject her to different treatment, and engage in retaliatory conduct due to her race/color and because of her prior Commission Complaint.

119. On information and belief, from October 2019 to the present, Defendant Arduini has undermined and demeaned Ms. Watson's authority as a Supervisor by instructing subordinate staff to go directly to her, not Ms. Watson for supervisory direction.

120. On or about November 30, 2020. Defendant Arduini and Lisa Roth, a White, Manager, subjected Ms. Watson to an unwarranted meeting called **"GROWTH"** and the development of MAT/PDOA. **[Emphasis added]**

121.    On information and belief, Defendant Diaz, Vice-President, and upper management was also present at the meeting.

122. More specifically, on or about March 9, 2020, Defendant Arduini sent an email to Ms. Watson, which provided that she did not like Ms. Watson's tone and that she appeared frustrated.

123. There was no basis for this email, and upon information and belief, Defendant Arduini made these accusations about Ms. Watson in an effort to further undermine her on the basis of her race/color and in retaliation to her filing a previous complaint against the defendants.

124. Defendant Arduini has resorted to spreading innuendo about Ms. Watson to her

fellow staff members that she does not know how to **effectively communicate or how to run her program. [Emphasis added]**

125.  On or around January 15, 2021, Defendant Arduini specifically invited Defendant Tao Diaz, Vice President Director of Behavioral Health, to a weekly supervision virtual meeting (something she has never done prior).  Ms. Watson was very surprised by the attendees at this meeting.

126.  During the meeting the agenda item was **MAT PDOA, and how supervisors collaborate and communicate**. **[Emphasis added]**

127.  On information and belief, Defendant Arduini brought Defendant Diaz to this meeting **to facilitate collaboration and communication amongst supervisors,** which is an area that she has accused Ms. Watson of in the past.  On information and belief, Defendant Diaz was invited to the meeting to specifically speak to Ms. Watson.  **[Emphasis added]**

128.  During the meeting, Defendant Diaz presented stories of how he handles conflict, and he emphasized the importance of cohesiveness and collaboration of the MAT Team, while Defendant Arduini chimed in with examples of her own experiences as well.

129.  During the meeting, Ms. Watson questioned why Defendant Diaz was invited to the meeting, and then cited her duties with the MAT Team in addition to her supervisory responsibilities at Wheeler Clinic.

130.  At some point prior to conclusion of the meeting, Defendant Diaz excused himself, to which Defendant Arduini stated that "she did not understand what Tao was talking about and that she was going to speak to his supervisor about it."

131.  Ms. Watson became ill and had to leave work upon hearing Defendant Arduini state that she did not know why Mr. Diaz had attended the meeting.  As a result, Ms. Watson was kept out of work by her health care provider for a week.

132.  On or about February 2, 2021, during a virtual meeting, Defendant Arduini (who conducted the meeting and invited eight other staffers) ridiculed, humiliated, and derided Ms. Watson in front of the staffers, including the three (3) members of her MAT Team she supervised-Ms. Carrie Perez, Peer Support, Ms. Andrea Jiminez, Community Health Worker, and Kate Denette, Nurse MAT Care Manager.

133.  During the virtual meeting held on February 2, 2021, Defendant Arduini put on the agenda the topic of **effective collaboration and communication style** which Ms. Watson interpreted as a personal attack.  As an agenda item, Defendant Arduini also dealt with "**the importance of being kind and respectful,"**  which took on the character of the same attacks Ms. Watson had endured under Defendants Preble and Baloga prior to their respective resignations in 2019. **[Emphasis added]**

134.  Like Defendants Preble, Baloga, and Lanza before her, Defendant Arduini has subjected Ms. Watson to dissimilar treatment compared to her similarly situated non-bases coworkers who also supervise and manage Defendant Wheeler's Grants Program.

135.  Upon information and belief, since Ms. Watson's promotion with greater job responsibilities, from 2019 and continuing to present, she learned that she has been paid unequally compared to her similarly situated non-bases coworkers who also supervise and manage Defendant Wheeler's Grants Program.

136.  Based on the foregoing, the defendants have subjected Ms. Watson to discriminatory conduct, retaliation, a hostile work environment, harassment, unequal

terms and conditions and unequal pay based upon her race/color and in retaliation for her previous protected activity.

## COUNT ONE:  VIOLATION OF 42 U.S.C. §1981 AS AGAINST DEFENDANTS WHEELER CLINIC, PREBLE, BAGOLA AND ARDUINI.

137.    Ms. Watson repeats, realleges and incorporate by reference the allegations set forth in paragraph 1 through 136, inclusive, as though fully set forth herein.

138.    Defendants intentionally discriminated against Ms. Watson on the basis of her race-black and color, and because of her membership in the aforementioned protected class in violation of 42 U.S.C. §1981.

139.    From 2017 to present, the defendants intentionally subjected Ms. Watson to unrelenting workplace harassment and a hostile work environment in violation of 42 U.S.C. §1981, by demeaning her work, characterizing her of having poor verbal and written communications skills, define her presentations skills and style as ineffectual and "abrasive," and bordered on insubordinate.

140.    The defendants' acted intentionally or recklessly to violate Ms. Watson's right to equal treatment under Federal law as it pertained to her right to make and enforce her employment contract, perform, modify, and terminate contracts, and to enjoy all benefits, privileges, terms, and conditions of the contractual relationship.

141.    All-natural person defendants were acting in their capacities as officials, managers, and agents of Defendant Wheeler Clinic.

142.    The defendants by their conduct failed to provide adequately training to their subordinate employee regarding the right to equal employment opportunities and treatment in accordance with law.

143.    On information and belief, at least two or more of the defendants asserted that "they would rather hire no one than hire Ms. Watson," despite the fact she was easily the most qualified candidate for all three positions at issue.

144.    On information and belief, at least two or more of the defendants asserted that "they would rather "hire no one than hire Ms. Watson

145.    On information and belief, the defendants' policy position in denying Ms. Watson promotional opportunities extended from 2017 through the present, although the defendants reluctantly promoted Ms. Watson in or around November 2019.

146.    At all times relevant herein, Ms. Watson was the most qualified candidate with respect to all three position she applied for and was discriminatorily denied promotion.

147.    On information and belief, two or more of the defendants maintained a file termed "Supervision Note" marked "Avery Only" and passed it to Ms. Jennifer Lanza, who was Ms. Watson's immediate supervisor at the time.

148.    On information and belief, the defendants did not subject other similarly situated non basis employees to the same conduct complained of in the above items.

149.    These defendants After Ms. Watson's rights against retaliation were violated by the defendants pursuant to 42 U.S.C. §1981, after she engaged in previously protected activity, by filing a complaint against the defendants on April 12, 2019 with the Connecticut Commission on Human Rights and Opportunities.

150.    As a direct and proximate result of the defendants' discrimination conduct, Ms. Watson has suffered compensatory damages, benefits-vacation pay, mental anguish, humiliation, distress, inconvenience, damages to her personal and professional reputation.

151.    Plaintiff, thereby entitling her to an award of punitive damages.

152.     The Plaintiff alleges that the workplace harassment she was subjected to by the defendants was pervasive, severe, and involved a physical threat to her safety and well-being.

153.     As a direct and proximate result of the unlawful conduct complained of, the defendants selectively enforced rules, custom, practices, procedures, and requirements for employee conduct against Plaintiff and terminated her employment in retaliation for filing a complaint.

154.     That the defendants by their unlawful conduct maintained a severe and pervasively hostile work environment and denied Ms. Watson the right to be free from discrimination, harassment, and retaliation.

155.     Ms. Watson was subjected defamation and false light occasioned by the conduct of Defendant Preble.

156.      The defendants' conduct was motivated by the Plaintiff's race and color, as were.

157.     The Plaintiff believed her work environment to be hostile and abusive as a result of the conduct complained of herein.

158.     That the Defendant Wheeler failed to provide adequately training to its employee, such as Defendant Preble, Baloga and Arduini regarding the right to equal employment opportunities and treatment in accordance with law.

159.     That the Defendant Wheeler failed to promulgate, maintain and enforce adequate, meaningful and effective policies and procedures for employees to complain of violations of their right, and for investigation, and discipline in the event of such complaints.

160.     As a direct and proximate result of said unlawful conduct, Ms. Watson suffered and continues to suffer the loss of pay, benefits and retirement credits, and her career has been impeded and impaired.

161.    As a direct and proximate result of said unlawful discrimination, harassment on the job, and retaliation, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

162.    As a direct and proximate result of the unlawful conduct complained of, Ms. Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

163.    As a direct and proximate result of the aforementioned unlawful conduct complained of, Ms. Watson has incurred medical expenses, other economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of the injuries visited upon her by the defendants.

164.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson continues to suffer stress and mental/emotional distress.

165.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson is entitled to back pay, front pay, compensatory damages, and punitive damages.

166.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

## COUNT TWO, <u>Conn. Gen. Stat. §46a-60(b)(1)</u>, *at seq.*, AS AGAINST DEFENDANTS <u>WHEELER CLINIC, PREBLE, BAGOLA AND ARDUINI</u>.

167.    Ms. Watson repeats, realleges and incorporate by reference the allegations set forth in paragraph 1 through 166, inclusive, as though fully set forth herein.

168.    Defendants intentionally discriminated against Ms. Watson on the basis of her race-black and color, and because of her membership in the aforementioned protected class in violation of and pursuant to provisions of CFEPA.

169.    From 2017 to present, the defendants intentionally subjected Ms. Watson to unrelenting workplace harassment and a hostile work environment in of and pursuant to provisions of CFEPA, by demeaning her work, characterizing her of having poor verbal and written communications skills, define her presentations skills and style as ineffectual and "abrasive," and bordered on insubordinate.

170.    The defendants' acted intentionally or recklessly to violate Ms. Watson's right to equal protection pursuant to the Constitution of the United States.

171.    All-natural person defendants were acting in their capacities as officials, managers, and agents of Defendant Wheeler Clinic.

172.    On information and belief, at least two or more of the defendants asserted that "they would rather hire no one than hire Ms. Watson," despite the fact she was easily the most qualified candidate for all three positions at issue.

173.    On information and belief, at least two or more of the defendants asserted that "they would rather "hire no one than hire Ms. Watson

174.    On information and belief, the defendants' policy position in denying Ms. Watson promotional opportunities extended from 2017 through the present, although the defendants reluctantly promoted Ms. Watson in or around November 2019.

175.    At all times relevant herein, Ms. Watson was the most qualified candidate with respect to all three position she applied for and was discriminatorily denied promotion.

176.    On information and belief, two or more of the defendants maintained a file termed

"Supervision Note" marked "Avery Only" and passed it to Ms. Jennifer Lanza, who was Ms. Watson's immediate supervisor at the time.

177.    On information and belief, the defendants did not subject other similarly situated non basis employees to the same conduct complained of in the above items.

178.    These defendants After Ms. Watson's rights against retaliation were violated by the defendants of and pursuant to provisions of CFEPA, after she engaged in previously protected activity, by filing a complaint against the defendants on April 12, 2019 with the Connecticut Commission on Human Rights and Opportunities.

179.    As a direct and proximate result of the defendants' discrimination conduct, Ms. Watson has suffered compensatory damages, benefits-vacation pay, mental anguish, humiliation, distress, inconvenience, damages to her personal and professional reputation.

180.    Ms. Watson is entitled to an award of punitive damages.

181.    As a direct and proximate result of the unlawful conduct complained of, the defendants selectively enforced rules, custom, practices, procedures, and requirements for employee conduct against Ms. Watson equal protection rights as they pertain to promotional opportunities, and her right to be free from workplace retaliation for filing a complaint to the CHRO.

182.    That the defendants' unlawful conduct served to maintain a severe and pervasively hostile work environment and denied Ms. Watson's right to be free from discrimination, harassment on the job.

183.    Ms. Watson was subjected to unwelcomed touching of her person, and verbally offensive comments by the, such that a reasonable person would find intolerable, hostile and abusive.

184.    The defendants' conduct was motivated by Ms. Watson's race and color.

185.    Ms. Watson believed her work environment to be hostile and abusive as a result of the conduct complained of herein.

186.    The defendants by their conduct failed to provide adequately training to their subordinate employee regarding the right to equal employment opportunities and treatment in accordance with law.

187.    The defendants by their conduct failed to promulgate, maintain and enforce adequate, meaningful and effective policies and procedures for employees to complain of violations of their right, and for investigation, and discipline in the event of such complaints.

188.    As a direct and proximate result of said unlawful conduct, Ms. Watson suffered and continues to suffer the loss of pay, benefits and retirement credits, and her career has been impeded and impaired.

189.    As a direct and proximate result of said unlawful discrimination, and harassment on the job, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

190.    As a direct and proximate result of the unlawful conduct complained of, Ms. Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

191.    As a direct and proximate result of the aforementioned unlawful conduct complained of, Ms. Watson has incurred medical expenses, other economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of the injuries visited

upon her by the defendants.

192.   As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson continues to suffer stress and mental/emotional distress.

193.   As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson is entitled to back pay, front pay, compensatory damages, and punitive damages.

194.   As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

## COUNT THREE, <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS AGAINST DEFENDANTS WHEELER CLINIC, PREBLE, BAGOLA AND ARDUINI</u>.

195.   Ms. Watson repeats, realleges and incorporate by reference the allegations set forth in paragraph 1 through 194, inclusive, as though fully set forth herein.

196.   The defendant intentionally inflicted emotional distress to Ms. Watson from the discriminatory conduct complained of, as well as the incessant turmoil, public shaming, demeaning, and embarrassment the defendants subjected to Ms. Watson.

197.   More specifically, the defendants intentionally subjected Ms. Watson to emotional distress by subjecting her to unrelenting workplace harassment and a hostile work environment by demeaning and minimizing her work, characterizing her of having poor verbal and written communications skills, define her presentations skills and style as ineffectual and "abrasive," and her work conduct as bordering on insubordinate

198.   These defendants constantly resorted to "nitpicking" Ms. Watson's work in an effort to and caused emotional distress.

199.   On or about November 2020, Defendant Arduini acting in concert with Lisa Roth,

who is White subjected Ms. Watson to an unwarranted meeting called GROWTH and the development of MAT PBOA.

200.     In another instance on January 15, 2021, Defendant Arduini invited Mr. Tao Diaz, Vice-President who was an upper manager to their weekly supervisory virtual meeting (something she has never done before) to undermine Ms. Watson.

201.     On information and belief, during the round table-meeting, the topic was MAT PBOA-how supervisors collaborate and communicate, how to facilitate collaboration and communication amongst supervisors, which is an area Defendant Arduini has previously accused Ms. Watson of being deficient in.

202.     During the meeting, Mr. Diaz presented stories of how he handled conflict and stressed the importance of cohesiveness and collaboration of the MAT Team, while Defendant Arduini chided in with examples as well.

203.     During the meeting, Ms. Watson questioned why Mr. Diaz was invited to the meeting.  At some point after Ms. Watson stressed her supervisory responsibilities at Wheeler Clinic, Mr. Diaz excused himself from the meeting.

204.      After the meeting, Defendant Arduini stated how "she did not understand what Mr. Diaz was talking about and that she was going to speak to his supervisor about it."

205.     On information and belief, at some point after the meeting, Defendant Arduini asked Ms. Watson "if she was frustrated."

206.     The defendants engaged in conduct they knew with substantial certainty involved an unreasonable risk of causing severe emotional distress to the Ms. Watson's, by placing her in distress, and that the distress would have resulted in further illness or bodily injury.

207. The defendants knew with substantial certainty that their conduct would have caused emotional distress.

208. The defendants conduct shocked the conscience and offended Ms. Watson's personal dignity.

209. As a direct and proximate result of said conducts, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

210. As a direct and proximate result of the unlawful conduct complained of, Ms. Watson's has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment, and humiliation.

211. As a direct and proximate result of the unlawful conduct complained of, Ms. Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of her injuries, and to alleviate her pain and suffering.

212. As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

213. As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

**COUNT FOUR, <u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AS AGAINST DEFENDANTS WHEELER CLINIC, PREBLE, BAGOLA AND ARDUINI</u>.**

214. Ms. Watson repeats, realleges and incorporate by reference the allegations set forth in paragraph 1 through 213, inclusive, as though fully set forth herein.

215.    The defendants owned a duty of care to Ms. Watson to be free from emotional distress, or they should have realized the unreasonable risk of emotional distress which would have resulted from their conduct towards Ms. Watson.

216.    The defendants breached the duty of care they owed Ms. Watson to be free from unreasonable risks, which resulted in her injuries by placing her in distress.

217.    The defendants were the proximate cause of the emotional distress suffered by the plaintiff.

218.    Ms. Watson suffered damages resulting from the mental and emotional injuries occasioned by the unreasonable risks the defendants exposed her to from 2017 to present.

219.    The defendants should have known that it was likely that a reasonable person as Ms. Watson, under the circumstances would be distressed by their unlawful conduct and that the distress would have resulted Ms. Watson's subsequent illness and injuries.

220.    As a result of the defendants' conduct, Ms. Watson has been unable to pursue her usual activities due to the psychological, and emotional injuries and damages she has suffered.

221.    As a direct and proximate result of said conducts, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

222.    As a direct and proximate result of the unlawful conduct complained of, Ms. Watson's has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

223.    As a direct and proximate result of the unlawful conduct complained of, Ms. Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies

for medical care and attention in an effort to cure herself of her injuries, and to alleviate her pain and suffering.

224.    As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

225.    As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.


**COUNT FIVE, <u>NEGLIGENT HIRE, SUPERVISION AND RETENTION AS AGAINST DEFENDANTS WHEELER CLINIC, AND IN THEIR INDIVIDUAL CAPACITIES DEFENDANTS LISA PREBLE, ERICA BAGOLA AND HEATHER ARDUINI</u>.**

226.    Ms. Watson incorporates by reference herein the allegations set forth in the preceding paragraphs 1 through 225, as if fully set forth herein.

227.    That for all relevant purposes stated herein, the natural person defendants Lisa Preble, Erica Bagola and Heather Arduini were officials, Managers and supervisors at Defendant Wheeler Clinic.

228.    By virtue of their positions, these defendants were vested with the power and authority to recommend, inform, supervise, and terminate the conduct complained of herein.

229.    That none of the three natural person defendants took the steps necessary to protect Ms. Watson from the conduct complained of at any point, in fact, at times, they were active facilitators of the unlawful conduct complained of by Ms. Watson.

230.    That all three natural person defendants engaged in acts, or omissions that served to violate the duty of care owed Ms. Watson free from harassment, defamatory comments and harmful conduct.

231.    That all three natural person defendants engaged in acts, or omissions that served

to breach the duty of care owed Ms. Watson free from harassment, defamatory comments and

harmful conduct, and that said breaches of those duties proximately caused the damages and

injuries to Ms. Watson.

232.    That Defendant Baloga breached her duty to Ms. Watson by negligently

supervising her and retaining her as here where she knew or should have known that the exercise

of reasonable care on her part parts, would have revealed that Defendant Preble was incompetent

and/or unfit, thereby creating an unreasonable risk of harm to others, including the Ms. Watson,

and that she should not have been hired, she should have been terminated, or at the least

subjected to heightened supervision.

233.    Defendant Baloga knew or should have known from her personal encounter with

Defendant Preble on or around November 2018, when she published a defamatory email which

provided in pertinent parts that:

> "In case anything comes up about the supervisor position before
> we get to meet, I want to let you know that I literally lost sleep this
> weekend thinking about the Avery situation.  [Ms. Preble further
> stated that] she did not want Watson to get the promotion to
> Clinical Supervisor because of **her poor interpersonal skills,
> poor written and verbal communication skills, and her tone at
> times has bordered on insubordinate** . . .  I would rather hire
> nobody than hire Avery. [Ms. Preble concluded her email by
> stating that she was] sorry to bother [Ms. Baloga] with this [again].
> Like I said, I actually lost sleep over this over the weekend and just
> really needed to get it out."

234.    Additionally, Defendant Baloga knew or should have known that Defendant

Preble was actively engaging in repeated acts to deny Ms. Watson promotional opportunities.

235.    Defendant Baloga knew or should have known of Defendant Preble's unfitness

and incompetence over a sustained period of time, especially here, the exercise of reasonable

care on her part would have revealed Defendant Preble's was incompetent and/or unfit, thereby creating an unreasonable risk of harm to Ms. Watson, and that Defendant Preble should not have been hired, retained, that she should have been terminated, or at the least subjected to heightened supervision.

236.    That Defendant Baloga owned a duty of care to Ms. Watson to be free from the unreasonable risk of injury that she knew or should have realized would have posed an unreasonable risk of causing injury to the Plaintiff from Defendant Preble.

237.     Defendant Baloga breached the duty of care he owed Ms. Watson to be free from injury.

238.    Defendant Baloga's conduct, or omission was the proximate cause of the injuries suffered by Ms. Watson.

239.    Ms. Watson suffered damages occasioned by the unreasonable risks Defendant Preble exposed her to.

240.    That Defendant Baloga knew or should have known that it was likely that a reasonable person under the circumstances would be injured by Defendant Preble's unlawful conduct.

241.    As a result of Defendant Baloga's' conduct, Ms. Watson has been unable to pursue her usual activities and employment due to the psychological, and emotional injuries and damages she has suffered.

242.    As a direct and proximate result of said conducts, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

243.    As a direct and proximate result of the unlawful conduct by the defendants, Ms.

Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

244.    As a direct and proximate result of the aforementioned unlawful conduct by the defendants, Ms. Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of her injuries, and to alleviate her pain and suffering.

245.    As a direct and proximate result of said unlawful conduct Plaintiff is entitled to compensatory damages for the injuries Defendant Preble caused, as well as punitive damages.

246.    As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

**COUNT SIX, <u>NEGLIGENT HIRE, SUPERVISION AND RETENTION AS AGAINST DEFENDANTS WHEELER CLINIC BY AND THROUGH ITS SUPERVISORY HUMAN RESOURCES AGENTS-DEFENDANT PATRICIA SPEICHER WERBNER</u>.**

247.    Ms. Watson incorporates by reference herein the allegations set forth in the preceding paragraphs 1 through 246, as if fully set forth herein.

248.    That for all relevant purposes stated herein, the Defendant Wheeler Clinic is administered by natural persons herein referred to as Patricia Speicher Werbner, Chief of the Human Resources Department.

249.    That on information and belief, this person analyses and advises officials, managers and supervisors at Defendant Wheeler day-to-day on personnel related issues.

250.    That the acts and or omissions of the Human Resources department serves to legally

bind the Defendant Wheelers Clinic.

251.    That Defendants Lisa Preble, Erica Bagola and Heather Arduini were officials, managers and supervisors at Defendant Wheeler Clinic, and they consulted with and or conferred with Patricia Speicher Werbner, Chief of the Human Resources Department.

252.    By virtue of the authority vested in Patricia Speicher Werbner, Chief of the Human Resources Department, she had the power and authority to recommend, inform, supervise, and terminate the conduct complained of herein, or in the alternative, she could have s=complained to the supervisors of Defendants Lisa Preble, Erica Bagola and Heather Arduini.

253.    That for purposes of this action, the Human Resources Department is Defendant Wheeler, and its agents acts on its behalf.

254.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department failed to take steps necessary to protect Ms. Watson from the conduct complained of at any point, where she knew or should have known of the conduct complained of herein.

255.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew of should have known of the acts and omissions engaged in serving to violate the duty of care owed Ms. Watson to be free from harassment, defamatory comments and other harmful, and discriminatory conduct, and Wheeler knew or should have known of these activities.

256.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department breach the duty of care owed Ms. Watson to be free from harassment, defamatory comments and harmful conduct, and that said breaches of those duties proximately caused the damages and injuries to Ms. Watson.

257.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department failed to take steps necessary to protect Ms. Watson from the conduct complained of at any point, where it knew or should have known of the conduct complained of herein.

258.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department breached her duty to Ms. Watson by negligently supervising Defendants Preble, Baloba and Arduini by retaining them as here where she knew or should have known that the exercise of reasonable care on her part parts, would have revealed that these defendant were incompetent and/or unfit, thereby creating an unreasonable risk of harm to Ms. Watson, and that they should not have been hired, or they should have been terminated, or at the least subjected to heightened supervision.

259.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department failed to take steps necessary to protect Ms. Watson from the conduct complained of at any point, where she knew or should have known of the conduct complained of herein.

260.    Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department its agents knew or should have known from the natural persons' conduct that Ms. Watson was harassed and injured by the defendants as asserted above.

261.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew or should have known from the natural persons' conduct that Ms. Watson was harassed and injured by Defendant Preble, Baloga and Arduini.

262.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew or should have known or should have known that the

defendants were actively engaging in repeated acts to deny Ms. Watson promotional

opportunities, and harassment.

263.    That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of

the Human Resources Department knew or should have known of the natural persons' unfitness

and incompetence over a sustained period of time, especially here, where the exercise of

reasonable care on her part would have revealed that said natural person defendants were

incompetent and/or unfit, thereby creating an unreasonable risk of harm to Ms. Watson, and that

they should not have been hired, retained, that she should have been terminated, or at the least

subjected to heightened supervision.

264.    As a result of That Defendant Wheeler through its agent, Patricia Speicher

Werbner, Chief of the Human Resources Department negligent hire, supervision and retention

Ms. Watson has been unable to pursue her usual activities and employment due to the

psychological, and emotional injuries and damages she has suffered.

265.    As a direct and proximate result of said conducts, Ms. Watson's personal and

professional reputations and relations with co-workers and peers have been irreparably harmed,

and she suffered and continues to suffer stress and mental/emotional distress.

266.    As a direct and proximate result of the unlawful conduct by the defendants, Ms.

Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental

anguish, embarrassment and humiliation.

267.    As a direct and proximate result of the aforementioned unlawful conduct by the

defendants, Ms. Watson has incurred medical expenses and she has incurred economic damages,

and continues to experience emotional pain and suffering, which has now obligated her to

expend sums of monies for medical care and attention in an effort to cure herself of her injuries,

and to alleviate her pain and suffering.

268.    As a direct and proximate result of said unlawful conduct Plaintiff is entitled to compensatory damages for the injuries Defendant Preble caused, as well as punitive damages.

269.    As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

### COUNT SEVEN, <u>DEFAMATION OF CHARACTER AS AGAINST DEFENDANT PREBLE IN HER INDIVIDUAL CAPACITY</u>.

270.    Plaintiffs repeats, realleges and incorporate by reference the allegations set forth in paragraph 1 through 269, inclusive, as though fully set forth herein.

271.    That on or around November 2018, Defendant Preble published an email to Defendant Baloga in which she falsely stated that:

> "In case anything comes up about the supervisor position before we get to meet, I want to let you know that I literally lost sleep this weekend thinking about the Avery situation.  [Ms. Preble further stated that] she did not want Watson to get the promotion to Clinical Supervisor because of **her poor interpersonal skills, poor written and verbal communication skills, and her tone at times has bordered on insubordinate** . . .  I would rather hire nobody than hire Avery. [Ms. Preble concluded her email by stating that she was] sorry to bother [Ms. Baloga] with this [again]. Like I said, I actually lost sleep over this over the weekend and just really needed to get it out."  **[Emphasis added]**

272.    As a result of the false statement published by Defendant Preble to Defendant Baloga, Ms. Watson has suffered damages, upon learning of the email through the CHRO discovery process in or around summer 2019.

273.    As a result of the false statement published by Defendant Preble to Defendant Baloga, Ms. Watson has suffered damages to her reputation and professional standing.

274.    That Defendant Preble made and published this false statement intentionally to thwart the promotional opportunities of Ms. Watson.

275.    As a direct and proximate result of said conducts, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

276.    As a direct and proximate result of the unlawful conduct complained of, Ms. Watson's has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment, and humiliation.

277.    As a direct and proximate result of the unlawful conduct complained of, Ms. Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of her injuries, and to alleviate her pain and suffering.

278.    As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

279.    As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

## COUNT SEVEN, <u>FALSE LIGHT AS AGAINST DEFENDANT PREBLE IN HER INDIVIDUAL CAPACITY</u>.

280.    Plaintiffs repeats, realleges and incorporate by reference the allegations set forth in paragraph 1 through 279, inclusive, as though fully set forth herein.

281.    That on or around November 2018, Defendant Preble published an email to

Defendant Baloga in which she falsely stated that:

> "In case anything comes up about the supervisor position before we get to meet, I want to let you know that I literally lost sleep this weekend thinking about the Avery situation. [Ms. Preble further stated that] she did not want Watson to get the promotion to Clinical Supervisor because of **her poor interpersonal skills, poor written and verbal communication skills, and her tone at times has bordered on insubordinate** . . . I would rather hire nobody than hire Avery. [Ms. Preble concluded her email by stating that she was] sorry to bother [Ms. Baloga] with this [again]. Like I said, I actually lost sleep over this over the weekend and just really needed to get it out." **[Emphasis added]**

282.   That defendant Preble either knew that the publicized material was false and would place Ms. Watson in a false light or acted with reckless disregard as to whether the publicized material was false and would place Ms. Watson in a false light; and

283.   That the material Defendant Preble published was a misrepresentation of Ms. Watson's character, history, activities and/or beliefs that a reasonable person in Ms. Watson's position would find highly offensive.

284.   A reasonable person in Ms. Watson's position would be seriously offended by the false material, such that, in the eyes of the community, Ms. Watson would be justified in feeling offended or in feeling aggrieved.

285.   As a result of the false statement published by Defendant Preble to Defendant Baloga, Ms. Watson has suffered damages, upon learning of the email through the CHRO discovery process in or around summer 2019.

286.   As a result of the false statement published by Defendant Preble to Defendant Baloga, Ms. Watson has suffered damages to her reputation and professional standing.

287.   That Defendant Preble made and published this false statement intentionally to thwart the promotional opportunities of Ms. Watson.

288.   As a direct and proximate result of said conducts, Ms. Watson's personal and professional reputations and relations with co-workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

289.   As a direct and proximate result of the unlawful conduct complained of, Ms. Watson's has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment, and humiliation.

290.   As a direct and proximate result of the unlawful conduct complained of, Ms. Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of her injuries, and to alleviate her pain and suffering.

291.   As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

292.   As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.


**FOR THE PLAINTIFF,**
**AVERY WATSON**


BY_____/S/_____
Richard C. Gordon, Esq.,
Fed Bar No.: ct27288
40 Court Street
Windsor, CT 06095
Tele: (860) 534-0547
Email:  rcgordonlaw@gmail.com

**UNITED STATES DISTRICT COURT**
**For the**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **AVERY WATSON,**     **Plaintiff,** ) | **Case No.:  3:21-cv-503** |
| ) | |
| **v.** ) | |
| ) | **TRIAL BY JURY DEMANDED** |
| **Wheeler Clinic, Inc., Lisa Preble is sued in her individual capacity, Erica Baloga is sued in her individual capacity, Heather Arduini is sued in her individual capacity, Patricia Speicher Werbner Chief of Human Resources, is sued in her individual capacity,**     **Defendants.** ) ) ) ) | **April 9, 2021** |

Plaintiff seeks a jury trial on all counts and all questions of fact and law of her Complaint.

**FOR THE PLAINTIFF,**
**AVERY WATSON**

BY _____ /S/ _____
Richard C. Gordon, Esq.,
Fed Bar No.: ct27288
40 Court Street
Windsor, CT 06095
Tele: (860) 534-0547
Email:  rcgordonlaw@gmail.com