Case 3:21-cv-00503-RNC  Document 62  Filed 07/21/21

# UNITED STATES DISTRICT COURT

## For the

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AVERY WATSON | Case 3:21-cv-503 (RNC) |
| PLAINTIFF, | |
| V | |
| Wheeler Clinic, Inc., Lisa Preble is sued in her : | |
| Individual capacity, Heater Arduini is sued in   : | |
| Her Individual capacity, Patricia Speicher-      : | SECOND AMENDED COMPLAINT |
| Werbner, Chief Of Human Resources, is            : | |
| in her individual Capacity, Lisa Roth, is sued   : | |
| in her individual capacity, Theodore Anderson | |
| Diaz, Vice President, Adult Outpatient Services   : | |
| DEFENDANTS | July 21, 2021 |

## SECOND AMENDED COMPLAINT

### I.    JURISDICTION AND VENUE

1.      This is an action for damages and other equitable relief arising under 42

U.S.C. subsection 1981, Title VII of the Civil Rights Act of 1964 as Amended-42 U.S.C.

subsection 2000e-2, et seq. 42 United States Code subsection 1988 for attorney's fees.

Conn. Gen. Stat. ss46a-60(b)(1)et seq, and the common law of the State of

Connecticut.

2.      This Court has jurisdiction of this controversy by virtue of 42 United lStates

Code SS 1981, Title VII, 42 U.S.C. ss2000e-2, and 42 United States Code SS 1988 and

by virtue of this Court's powers and authority to hear pending state law claims.  Venue

in this district is appropriate pursuant to 28 U.S.C. SS 1391 and 28 U.S.C. ss1391 and

28 U.S.C. ss1392..

### II.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.      The Plaintiff has exhausted her administrative remedies before the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunities Commission (EEOC) on March 10, 2021 and on April 23, 2021, respectively. Exhibits 1 and 2.

## III.    PARTIES

4.      The Plaintiff, Avery Watson (hereinafter Miss Watson) is a Black female, and for all relevant times, she was a Licensed Clinical Social Worker (hereinafter (LCSW), [Emphasis Added] and was also licensed as an (LADC) Licensed Alcohol and Drug Counselor and (CDP) Certified Dementia Practitioner.

5.      At all times relevant herein, Miss Watson has been a resident of Middletown, Connecticut.

6.      Miss Watson was hired by Wheeler Clinic (hereinafter-Defendant Wheeler) on or around December 18, 2017, and she worked as a Senior Intake Clinician at Defendant Wheeler's Division of Adult Outpatient in New Britain, Connecticut.

7.      Miss Watson holds a bachelor's degree in Social Work (BSW) from Johnson C. Smith University, Charlotte, North Carolina, and she also holds a master's degree in social work (MSW) from Barry University, Miami Shores,  Florida.  Miss Watson holds Licensed Clinical Social Worker (LCSW), Licensed Alcohol and Drug Counselor (LADC) and is a (CDP) Certified Dementia Practitioner.

8.      For all times relevant Miss Watson possessed approximately four and one half year's (4-1/2) supervisory experience, with two (2) years of clinical supervisory experience prior to her tenure at Defendant Wheeler. Her employment was extremely persuasive and highly recommended to Wheeler.

2

Case 3:21-cv-00503-RNC Document 62 Filed 7/21/21

9.      Miss Watson was denied promotion, retaliated against, subjected to unequal pay and unequal duties, subjected to defamation of her character, hostile work environment even physically assaulted, Intentional discriminatorily denied promotional opportunities, denied vacation time and pay, infliction of emotional distress, discriminated against based on her race and color (black), and the terms and conditions of her employment.  On or around May 20, 2021, under duress, Miss Watson resigned her position at Defendant Wheeler, based on the intolerable and discriminatory conduct she was subjected to by the defendants over a period of 2-½ years.

10.     Defendant Wheeler is a Connecticut Corporation whose business location is 91 Northwest Drive, Plainville, CT 06062. [Emphasis added]

11.     This defendant provides behavioral health and addiction services to adults and children and provides training to others in the industry.

12.     Defendant Wheeler derives much of its revenue income from Federal, State and private Grants such as Federal Grant Program (MAT) Medication Assisted Treatment.[Emphasis Added]

13.     The Plaintiff, Miss Watson's, divisions are Adult Outpatient Services and MAT PDOA Addiction Services, which is located in New Britain, Connecticut.

14.     On information and belief, although Miss Watson's education, professional certification, licensure, and supervisory experience aligned with the requirement of the positions at issue and the white women did not, they were chosen three times in her stead.  At times herein, the named natural person defendants acted in their official capacities in concert with each other and as agents of Defendant Wheeler.

15.     For the purpose of this action, conduct complained of herein began in or around the beginning of 2018.  Conduct became increasingly more hostile and continued until Miss Watson resigned May 20, 2021.

16.     On information and belief, Defendant Wheeler by and through its officials, managers, and agents subjected Miss Watson to disparate treatment as to the terms and conditions of her employment and paid her unequally compared to non-basis employees.

17.     On information and belief, Defendant Wheeler by and through its officials, managers, and agents subjected Miss Watson to discriminatioin based on her race and color, a hostile work environment, harassment, and repeated acts of retaliation, where her personal and professional standing were ridiculed, diminished and demeaned.

18.     On information and belief, Defendant Wheeler by and through its officials, managers and agents denied Miss Watson promotional opportunities in favor of white females on three distinct occasions and paid her unequally as compared to non-basis employees.

19.     This Defendant's officials, managers and agents, Preble and Arduini and Speicher had been the primary perpetrators of the discriminatory practice complained of herein.  Defendants Baloga, Diaz and Roth, had been indoctrinated into this mutiny at the behest of Heather Arduini (Baloga and Preble have since resigned).

20.     This Defendant Wheeler refuses to pay vacation benefits after Miss Watson resigned under duress per the Work Contract of "at will" between Miss Watson and Defendant Wheeler.

21.     **Defendant Lisa Preble** is a white female who was hired as a Clinical Supervisor on or about February 2018 and shortly thereafter, approximately three (3) months, was Promoted to Program Manager.  She was hired at Wheeler two months after Miss Watson was hired.

22.     Defendant Preble was an official manager/agent at Defendant Wheeler's New Britain location, and is an LCSW and LADC same as Miss Watson.

23.     This Defendant is sued as an official of Defendant Wheeler and is also sued in her individual capacity by virtue of her tortious conduct against Miss Watson and reported to Defendant Erica Baloga under circumstances where they were both responsible for the Company's workplace culture in New Britain.

24.     Defendant Preble became Miss Watson's immediate clinical supervisor after Miss Watson's previous hiring supervisor, Jeff Velleca, left Defendant Wheeler mid March 2018.  This Defendant received a promotion to Department's Manager approximately three months later and was no longer  Clinical Supervisor.

25.     Defendant Preble was Miss Watson's official immediate supervisor for three and one half (3-1/2) months only, i.e. mid-March 2018 through June 2018 after which time she was promoted to the Department Program Manager.  Miss Watson was shifted to another clinical supervisor, Jennifer Lanza from July 2018 to January 2019.

26.     It is on information and belief that Defendant Preble hired all three comparators or participated in the hire of Christine Grant, Jade Bray, and Satina Salce with the knowledge that they lacked the preferred/required experience, qualifications and/or preferred licensure for the position at issue.

27.     At all times relevant herein, this defendant was an official of Defendant Wheeler and she actively and unrelentingly engaged in the discriminatory conduct complained of by Miss Watson

28.     This defendant published a libelous email to Defendant Erica Baloga November 19, 2018, which served to assail Miss Watson personally and professionally.

29.     This Defendant conspired with Heather Arduini to fabricate a story to Miss Watson about the promotion for which she was seeking.  This Defendant sarcastically asked Baloga and Arduini if this was a joke when she received Miss Watson's formal application note from HR.  She subsequently told them she was going to delete the note.  They began to joke that Miss Watson was still trying to get the job for yet a third time.

30.     This Defendant went on to explain the Denial for the position because of Miss Watson's communication style.  Miss Watson responded
 interview was re Defendant Preble called Miss Watson and her immediate supervisor, Jennifer Lanza's routine supervision.  mmediately after the interview the interviewers, Sue Mason, Program Manager and Erica Baloga, Associate Director reported that Miss Watson's interview performance was stellar, with statements like "she knocked it out of the park" further noting her work ethic, her insight and proficiency.

31.     Miss Watson responded to the news of the first promotion denial with dismay and sadly responded I now kind of wish you had just told me I didn't get it without the explanations.

32.     On information and belief Miss Watson performed better than Ms. Grant on the interview evidenced by a subsequent email dated November 19, 2018.  In this

email Defendant Preble sent to Defendant Baloga, excluding the other person who interviewed Ms. Grant and Miss Watson, Sue Mason, this defendant explained that even though Miss Watson had done well in the interview, she consistently demonstrates poor interpersonal, written and communication skills.

33.     This Defendant sent racial baiting remarks falsely accusing Miss Watson of bringing black people to her office stating that the person had distinctive hair namely blonde dreadlocks that she said didn't match any co-worker in the Company.

34.     On information and belief, this Defendant resented black and marginalized people even to the point of reprimanding Miss Watson for showing what Defendant Preble felt was overly concern for clients.  Remarking to Miss Watson that she wasn't going to get a gold star for volunteering to intake a client who had been waiting for hours as an Outpatient walk-in.

35.     This Defendant resented Miss Watson's respect and concern for often marginalized clients, and Miss Watson's expressing Defendant Wheeler allowing a culture of criminalizing black clients displaying symptoms of their mental health disorder in fear; while treating white clients and addressing their disorders appropriately.

36.     This Defendant dismissed the concerns tearfully expressed to her by Miss Watson about Defendant Preble's demonstrated discontentment continually shown towards black clients, as a result of Miss Watson just being upset due to "her upbringing and the neighborhood she grew up in".

37.      When Whitney Williams, (black) and a white coworker were leaving Defendant Wheeler, this Defendant announced to the staff to bring vegetarian and soul food.  Upon learning of Defendant Prebles' announcement to the staff, Whitney Williams

7

emailed that soul food was not her preference.  Defendant Preble challenged Ms.

Williams accused her that when she had first begun in the department she recalled her

eating soul food.

38.     This Defendant treated black staff members with disrespect failing to

provide adequate training and response to their learning.  Upon forcing a black man out,

Christian Brooks, this defendant was heard saying it's good that he's gone so now we

can get someone new.  She hired a white staffer, Amanda Brail. Each time black staffers

became frustrated and left she replaced them with a white staffer.

39.     On information and belief on or about March 4, 2018, This Defendant was

knowingly or should have known, heard by staffers talking on her phone to HR accusing

Miss Watson of being combative and disorderly along with Defendant Heather Arduini

during a time when Miss Watson had been out of the office recommended for Rest and

Recovery by the Wheeler Employee Assistance Program.

40.     On information and belief, on or about March 4, 2018, Kiersten Aston

(white coworker) said she went to Defendant Preble and told her she should close her

door and she didn't appreciate her talking about Miss Watson.  Sarah Aikley (white

coworker) called Miss Watson over to her desk to also tell her that Defendant Preble

was on the phone talking to someone as though she was trying to get a story together.

Sarah Aikley had jotted two words to remember--combative, disorderly on a yellow

sticky note.

41.     This Defendant claims that the negative communication style reported on

Performance Review, ironically during the actual period she was Miss Watson's

immediate supervisor, (mid-March through June 2018) was a result of other managers'

complaints to her about Miss Watson's abrasive communication and bad interpersonal skills.

42.     This Defendant ostracized Miss Watson and encouraged others to sit in her "office foot spa" and talk about Miss Watson along with herself, Heather Arduini and Christine Grant under the guise of a department relaxation station and snack station.

43.     On information and belief this Defendant fabricated an intake story shared by a black worker Whitney Williams as an opportunity to support her falsehood that coworkers did not want to work with Miss Watson.  text from Ms. Williams to Miss Watson two weeks after Whitney began at Wheeler: 11/7/2018-*"Avery, can you apply for Heather's supervisor position so you can supervise me until I leave?*" When Whitney saw the posting to be sure Miss Watson noticed it she texted: 11/12/2018-*"The job posting is up! Apply!"*

44.     On information and belief, on or around March 2019 this Defendant fabricated hiring documentation providing a fake note addressed to HR representative which they never received on behalf of a competing white comparator and went against Company Hiring Policy to keep Miss Watson from receiving the promotion.

45.     On information and belief this Defendant conspired in coercing her own supervisor, Defendant Baloga, to sign off on an email note to falsely represent the timeline of events of hiring Miss Watson's competing comparator and denied her promotion.

46.     On information and belief in or around March 4, 2019, this Defendant sought to cause stress to Miss Watson by summoning her to an impromptu meeting

after she returned to work from the Defendant Wheeler Employee Assistant Program (EAP) recommended time off on work-related job stress relief.

47.    On information and belief in or around January 2019, This Defendant sought to fabricate a timeline of a marked deterioration of Miss Watson's usual work ethics, job dependability, and attentiveness to detail via emails of fabricated mistakes that she claimed to have fixed on Miss Watson's behalf before errors were verified.

48.    On information and belief This Defendant intentionally caused infliction of emotional distress by inundating Miss Watson with emails, sabotaging her work, undue scrutiny, claiming unwarranted performance issues, and denying her policy-related downtime afforded to other staff to maintain workload.

49.    Although this Defendant was no longer Miss Watson's immediate supervisor she insisted on doubling up supervisory duties to continue her unrelenting onslaught against Miss Watson in conjunction with Miss Watson's new official immediate supervisor, Christine Grant, after her promotion on or around November 2018.

50.    This Defendant gave Miss Watson assignments out of her scope of duties, but denied her appropriate procedural training to handle.  She also made changes to workload to benefit other white staff members at their request while adding extra assignments to Miss Watson often causing Miss Watson to work after hours with no regard for her familial responsibilities.

51.    Upon information and belief This defendant sought to hire all white workers in the department once she became Program Manager.

Case 3:21-cv-00503-RNC Document 62 Filed 7/21/21

52.     Upon information and belief This Defendant is known to view black people as criminals and ignorant and less than others in society.  Noted on her facebook page. On the job this defendant has evidenced this by the way she treats black clients by criminalizing their mental health behaviors and to the contrary for whites similarly situated she empathizes and seeks appropriate healthcare.

53.     When This Defendant was asked by front desk client intake staff Whitney Boone, if she should reach out to Avery as the only Sr.Clinical Staff member in the building, this defendant responded; no call Jill--*"anybody can pass a test";* indicating the credentialing behind Miss Watson's name does not carry the same value as her own.

54.     **Defendant Healther Arduini** is a white female who was hired as a clinician.  She became a Licensed Marriage and Family Therapist (LMFT) in October 2017.  This Defendant was promoted to Clinical Supervisor after five months, in March 2018.  She received her second promotion within six months leaving clinical services. September 2018 she was promoted to exclusively maintain the Federal grant SAMHSA MAT PDOA as Project Director in Defendant Wheeler's New Britain location.

55.     This Defendant was promoted to Associate Director of Adult Outpatient services when Defendant Preble went on leave in June 2019.

56.     This Defendant became Miss Watson's immediate supervisor in or around October 2019, immediately after Defendant Preble officially resigned after her being out on leave of absence.

57.     This Defendant was given the title of Associate Director of Defendant Wheeler's New Britain location and thereby became Miss Watson's Supervisor after Miss Watson was promoted to Clinical Supervisor in October 2019.

58.     This Defendant Arduini remained Ms. Watson's immediate supervisor until April 29, 2021 when HR finally took action to eradicate the continual relentless assault Miss Watson suffered at her hands for more than two years.

59.     This defendant is sued as an official of Defendant Wheeler and she is also sued in her individual capacity by virtue of her tortious conduct against Miss Watson.

60.     At all times relevant to this complaint, this Defendant's responsibilities extended to the company's workplace culture in New Britain.

61.     On information and belief this Defendant has engaged in the same discriminatory conduct previously engaged in by Defendant Preble prior to Defendant Preble's resignation.

62.     This defendant has also engaged in numerous and vairon instances of retaliatory conduct, harassment, and she has created a continuously hostile work environment for Miss Watson, necessitating her beginning to seek mental health treatment.

63.     On information and belief and to fabricate Miss Watson breaking a Wheeler policy, this defendant spread a false allegation to Defendant Preble the Program Manager that Miss Watson did not say hi to her in the hallways on a daily basis.  During this time this defendant was no longer a member of Miss Watson's department and Miss Preble's department.

64.     This defendant would get other coworkers to go against Miss Watson forming the likes of a mutiny against her.  This defendant would call Miss Watson into her office and pick her brain and present it as her own thoughts.

65.     This Defendant falsely reported to Defendant Preble, who in turn forwarded this defendants comments in an email to the Vice President, Teo Diaz, that Miss Watson had pushed away his survey and refused to complete it during a staff meeting.

66.     This Defendant along with Defendant Preble accused Miss Watson of making them feel uncomfortable and feeling tension; in dialogue they would accuse Miss Watson of seeming frustrated; she often reported that Miss Watson made her feel uncomfortable in meetings.

67.     This Defendant would demean Miss Watson's non white staff (hispanic) and caused them to feel as though their harassing treatment was because they worked under Miss Watson.

68.     On information and belief this Defendant allowed white staff to demean clients which aligned with This Defendants previous Performance Review Goals in 2017 set by her then immediate clinical supervisor Shane.  She needed to become more empathetic with clients.  To try to be more understanding to them.

69.     This Defendant continually undermined Miss Watson's Supervisory authority admonishing her staff that they did not have to listen to her when she would give suggestions or directives.

70.     After Miss Watson asked This Defendant to let her know the directives and permissions she was giving to her subordinates to help keep Miss Watson informed,

This Defendant doubled-down on directing Miss Watson's direct reports and took over any project Miss Watson tried to handle.

71.     When Miss Watson told this defendant she felt belittled, devalued and it was hard to cope having a supervisory title and not being able to supervise, This defendant reported Miss Watson to HR V.P. Joe Tedone who told Miss Watson that no one has to inform her of anything before giving directives and that her subordinates have a right to go to Miss Watson's supervisor.

72.     Subsequently Defendant Arduini also advised Miss Watson that she did not have to let her know anything that she was telling Miss Watson's staff/team to do. This defendant reminded Miss Watson that she has an open-door policy for them.

73.     On information and belief Defendant Arduini is a Licensed Marriage and Family Therapist (LMFT), yet hired to confront an Addiction population which does not afford her the clinical knowledge for the Outpatient Addiction Services; and therefore, this Defendant is known to stir up petty situations within the department with non white staff.

74.     On or about February 23, 2021, This Defendant made up false reports about Miss Watson and her staff and garnered support from Teo Diaz V.P. of their department.  Together they put together a supervision agenda telling Miss Watson how to communicate in a meeting Miss Watson had independently initiated and implemented for her own purposes with her direct report staff.

75.     This Agenda from this Defendant included-- **_always use "I" statements when making suggestions/recommendations; Suggestions and recommendations are not directives; Use the following prompts when seeking clarification or_**

*confirmation of what was said: "I don't understand", "can you please clarify or restate what you said?"; Virtual Meeting Etiquette: Assure that meeting participants can see your face during meetings; Asks are prefaced with "please, could you, or can someone volunteer to"?*

76.     The first month of this Defendant's virtual return to office, she summoned Miss Watson and undermined all Miss Watson had accomplished in her absence.

77.     The MAT PDOA grant program was on a continual upward climb maintaining high standards for the Federal Government.  The other two supervisors, Christine Grant and Jade Bray, were not harassed nor were their staff members as Miss Watson's non white ones were.

78.     This Defendant began attacking Miss Watson just as she had done prior to her maternity leave, but this defendant was now using her influence to summon Teo Diaz, Vice President Adult Outpatient Services (hispanic) and  Lisa Roth, (white) New Britain Site Director.

79.     This Defendant Arduini joined Defendant Roth in infiltrating Miss Watson's staff meeting. This Defendant made an agenda for the meeting and named herself as the facilitator.

80.     On February 2, 2021, This Defendant exclusively chose the invitees to Miss Watson's MAT staff meeting, namely her two co conspirators against Miss Watson: New Britain Site Director, Lisa Roth, (white) Vice President Adult Outpatient, Teo Anderson Diaz, (Hispanic) and also the Adult Outpatient Medical Director, Tina Loarte-Rodriguez, (Hispanic); the Medical Director of Adult Outpatient, Dr. Eleck, (white); and also Miss Watson and her MAT team staff: Avery Watson, Project Director,

(black) Carrie Perez (Hispanic), Andrea Jimenez (Hispanic), Kate Denette, APRN
(white) and Subrina Manabat (white).

80.     This Defendant created the Agenda for this meeting on or around
February 2, 2021 including: "***be kind to one another.  Be respectful to each other,
active listening."***  also on the Agenda: Job Descriptions and Chain of Supervision.

81.     This Defendant did not have any meeting requirements for the other two
Adult Outpatient Clinical Supervisors, Christine Grant (white) nor Jade Bray "biracial"
(white/West African) who had been hired denying MIss Watson promotional
opportunities.

82.     On information and belief this defendant would humiliate Miss Watson by
gaining her knowledge in private supervision and present what Miss Watson shares
during their staff meetings as though it was her own idea and in turn smirk at Miss
Watson.

83.     On or about November 30, 2020, This Defendant caused Miss Watson's
Hispanic staff members to threaten to quit their jobs.  The Peer support staff, Carrie
Perez (hispanic) called Miss Watson crying profusely saying she just doesn't get why
they are treating Miss Watson as they do.  Andrea Jiminez (hispanic) also became ill
and threatened that they were going to have to quit the company because of this
harassment that was now, according to them, all because of Miss Watson taking over as
Project Director.

84.     On information and belief Carrie reported to Mr. Tedone, HR Vice
President, This Defendant's harassment going on in the department towards the MAT
Team Staff and Avery Watson.

85.     This Defendant Arduini, Program Director, shortly after would succeed in her effort to get Carrie Perez to no longer regard Miss Watson as her clinical supervisor and she began to pull Carrie away from Miss Watson disrespecting her authority and clinging to this Defendant.  This Defendant undermined Miss Watson's authority over the MAT program and in effort to divide and conquer asked Miss Watson's, member, to represent the MAT Team workings to a group of people off site instead of Miss Watson.

86.     This Defendant Arduini forbade Miss Watson to give directives and caused her to muzzle herself at work for fear of this defendant accusing her of talking to the wrong person or speaking in an alleged wrong tone, or a frustrated look accusation.

87.     This Defendant set up meetings soliciting upper management to attack Miss Watson's professional abilities through unwarranted meeting agendas designed to attack her MAT Project Directorial competence.

88.     This Defendant set up meetings to destroy the positive outcomes and trends Miss Watson had consistently and independently maintained while managing both her teams i.e. the Adult Outpatient Clinical Supervisor and MAT PDOA Project Director, respectively for the one and one half (1-½) years through the COVID experience challenges and as noted by SAMSHA Government Program Officers.

89,     This Defendant Arduini, after she recruited Defendants Teo Diaz, Vice President of Adult Outpatient  and Lisa Roth, Site Director, totally undermined Miss Watson's authority in her team members' presence.

90.     This Defendant conspired with Defendant Preble to lie to Miss Watson concerning her third available promotional opportunity Miss Watson was seeking after

two previous fraudulent denials by telling Miss Watson someone else had taken the job already.

91.     **Defendant Erica Baloga, (white)**  this defendant was the Associate Director of Adult Outpatient Services, and she was the highest-ranking official person at Defendant Wheeler's New Britain location. [Emphasis added]

92.     This Defendant is sued as an official of Defendant Wheeler and she is also sued in her individual capacity by virtue of her tortious conduct against Ms. Watson.

93.     On information and belief, Defendant Baloga was the Associate Director of Adult Outpatient Services, and so, her responsibilities extended to the Company's workplace culture in New Britain.

94.     This defendant was the immediate supervisor of Defendant Preble who was responsible for the culture of the department.

95.     This Defendant along with Sue Mason, Program Manager in the Bristol location were the two people who conducted the rounds of interviews for the Clinical Supervisor position including that of Miss Watson's  and Christine Grant in or around November 2018.

96.     On information and belief This Defendant and the other interviewer, Sue Mason, initially reported that Miss Watson had a stellar interview adding she hit it out of the park.

97.     On information and belief this defendant, Erica Baloga made the ultimate decision to omit Sue Mason's input, to hire Miss Watson and discriminately hired Christine Grant (white).

98.    This Defendant Baloga dishonestly sides with three white women coworkers who were hiding under a desk in Miss Watson's office, when she returned from lunch shouting shut the door because they feared the black client outside. Miss Watson told them the client was put in the police car.  Miss Watson then put away her belongings and went out the automatic close door to return to her job space for intakes.

99.    Defendant Baloga intentionally held back her personally  known information that the lockdown had been lifted.  That could have stopped the false accusations later levied against Miss Watson.  Defendant Baloga was present when the officer opened the exterior entry door into the building as Miss Watson returned from lunch and Defendant Baloga herself held the door (Miss Watson's arms were full) for her to enter into the office space.

100.    After the Client was taken away, This Defendant Baloga together with Defendant Preble called Miss Watson in.  Defendant Preble told her a few coworkers had come to her and told them Miss Watson hadn't taken the lockdown seriously.  When Miss Watson said that the lockdown was lifted, and asked if the client (black client) was arrested?

101.    This Defendant Baloga said nothing and Defendant Preble said that she had called the police; her choice.  Defendant Preble said she and This Defendant Baloga, did not discipline Miss Watson because she was crying and they **felt compassion"** that Miss Watson was so *upset about the black client they felt "**due to her own upbringing and the neighborhood she grew up in".**

102.    On information and belief Defendant Baloga hid the qualities she knew about Miss Watson from the team:  On January 7, 2019 This Defendant   thanked Miss

Watson for helping out by taking on extra work and staying late on short notice.  On private notes This Defendant told her about her great work ethic.  When this Defendant was moving on, she gave Miss Watson praise telling told her to keep it up nher that her work ethic was what they needed noting Miss Watson as an inspiration.

103.    On information and belief, this defendant accepted as fact an email from Defendant Preble on or around November 19, 2018 which formed the discriminatory basis for Defendant Wheeler's initial denial of Ms. Wason's first promotion application. She also conspired with Defendant Preble to help her fabricate an email with a false timeline of events relating to the hiring of Jade Bray.

104.    **Defendant Lisa Roth** is a white female and at all relevant times, she was New Britain Site director.. [Emphasis added]

105.    On or around May 13, 2021, This Defendant Roth came into a provider office where Miss Watson was standing in communication with a coworker.  This Defendant stood listening to her then gestured and intentionally bumped into Miss Watson as she went by her.  She offered no apology to Miss Watson and began talking to someone else.

106.    This Defendant had been a perpetrator of discrimination against Miss Watson since she became Site Director at the New Britain office mid 2020. She was not a member of Miss Watson's department.

107.    On information and belief this defendant caused four (4) other non whites (Dee, Yanick, Nicole, Pam) to leave the job because of her discriminatory actions toward them.  Two were fired and two left on constructive discharge and Miss Watson

believes she was her next intended target.  This Defendant was site director and in or around April 2021 moved her seat directly outside Miss Watson's office.

108.    This Defendant continued to harass Miss Watson and seek to undermine her authority as MAT Project Director.  She had no academic reason to involve herself with Miss Watson professionally.

109.    This Defendant insisted that Miss Watson invite her to MAT staff meetings which Miss Watson implemented to speak with her Team Members.

110.    This Defendant was disruptive when she came to Miss Watson's team meetings late and just as disruptive when she left many times early.

111.    On information and belief, this Defendant Roth in collaboration with Heather Arduini changed the meeting agenda and sought to sabotage its good reputation.

112.    This Defendant went to Miss Watson's hispanic staff member, Andrea Jiminez, and had her provide a written timeline of everything Miss Watson signed off on for her to do and told her she would no longer continue as she had under Miss Watson's direction.

113.    This Defendant caused Andrea Jiminez to express that these changes were due to Miss Watson having become the Project Director.  This made it awkward to communicate effectively with her team any longer..

114.    This Defendant along with Defendant Arduini insisted the MAT Team nurse, Kate (white), no longer had to follow Miss Watson's direction and admonished her to ignore Miss Watson's directives per the MATPDOA Federal grant job description Miss Watson had given her.

.     115.    This Defendant Roth conspired with Heather Arduini in stripping all authority and ability to lead the highly producing MAT Team from Miss Watson in front of her staff and other departments even soliciting their input.

116.    On information and belief this Defendant engaged in acts to provoke Miss Watson into getting fired and further humiliate Miss Watson by blocking her parked car in on the driver side door so that Miss Watson couldn't get into her car after coming out of work.

117.    On information and belief This Defendant began to do things to humiliate Miss Watson by excessively saying hi each time they passed in the hallway in order to get Miss Watson to not say hi and violate Company Policy which states one must say hi the same as Defendant Heather Arduini tried to falsely accuse Miss Watson of.

118.    This Defendant intentionally neglected to advise Miss Watson  that she had potentially been exposed to COVID-19 by way of her interactions with a Mental Health client during the CDC danger season of COVID-19 on or about October 2020, Defendant Roth told everyone else who was listed to have had contact with this client and insisted they be tested, but neglected to inform Miss Watson of her potential death risk to her and her family.

119.    This Defendant along with Heather Arduini and Teo Diaz humiliated Miss Watson inviting V.P.'s, Directors, Managers outside of Miss Watson's immediate staff to meetings where they presented their fictitious and unprovoked Agenda language for the MAT grant Miss Watson Managed.--*"be respectful to one another", "be kind to one another", "professional and objective language", "only speak to direct reports".*

120.   **Defendant Teo Diaz** is a Hispanic Vice President of Adult Outpatient

Operations.  He was hired in May of 2019.  This Defendant is the highest ranking

person reporting to the CEO of the Adult Outpatient Addiction Services operations.

121.   This defendant Teo Diaz on 2/23/21 supported a Supervision agenda to

review along with Miss Watson where he made a surprise appearance to her weekly

routine supervision with her supervisor, Heather Arduini only.  The Agenda was entitled

Communication.

122.   On information and belief Defendant Diaz conjured up this Communication

Agenda to support Heather's continued unwarranted harassment of Miss Watson's

communication style.

123.   On information and belief This Defendant called Miss Watson into what

seemed like an ambush.  On or about September 2020, This defendant  presented as

though this was a meeting he was not persuaded to call but it soon became apparent he

brought Miss Watson into an ambush prompted by at least one of the two other Clinical

Supervisors who had been promoted and hired, respectively, in her stead.

124.   This Defendant told the three supervisors, Miss Watson, (Black) Jade Bray

("bi-racial"-white/West African) and Christine Grant (white) how important it is to be

cohesive with others.  He prompted Christine Grant to follow, she reported that she did

not feel close to Miss Watson and she felt it was because of what happened in the past.

(Defendant Preble days).

125.   This Defendant told Miss Watson she could not use him for support when

she was mistreated but gave support to the white staffers against her.  Defendant Diaz

became Miss Watson immediate supervisor before she resigned in May.  He suddenly

started appearing in Miss Watson's area to the wonderment of the coworkers.  He humiliated Miss Watson and she lasted only a few days as the only coworker under his direct supervision.

126.   **Defendant Patricia Speicher-Werbner** is a white female and at all times relevant she was Defendant Wheeler's Chief Human Resources Officer. [Emphasis Added]

127.   This individual is sued in her individual capacity because she was te "Chief Human Resources official at Defendant Wheeler, and her responsibilities extended to the company's workplace culture in New Britain and beyond.

128.   This Defendant by virtue of her position and her interactions with the individual defendants she knew or should have known about the unlawful conduct that engaged in against Miss Watson and she failed to supervise, or recommend a closer supervisor of these defendants to their superiors.  In effect this defendant had an obligation to eradicate the offense.

129.   This Defendant did not properly investigate CVS white manager who accused Miss Watson even though CVS said that he was wrong for the steps he took with Miss Watson in the store; however, Defendant Speicher-Werbner chose to give Miss Watson a Written Warning.

130.   When Miss Watson complained to Defendant Baloga about Defendant Preble's harassment, Defendant Baloga forwarded the complaint to Defendant Speicher-Werbner.

131.    Speicher spoke to Miss Watson and told her she would set up a meeting for her and Defendant Preble and Defendant Baloga to discuss the matter.  Instead, Defendant Speicher actually set up a meeting to advise Miss Waton of training that she could take to make her a better communicator to become more suitable for an opening should one come up.

132.    Defendant Speicher called to talk with her to investigate the email Miss Watson sent about how she was feeling in the hostile work environment.  Miss Watson tells her about the bullying and how after she had returned from EAP recommended Rest and Recovery, Defendant Preble called her to a meeting to challenge her on supposed errors.  How she was dying inside

133.    Instead Defendant Speicher began by introducing her HR Benefits person, Ashley on a speaker phone warning Miss Watson that if she plans to continue to be out as she had for two occasions now in the past 30 days she runs the risk of this poorly affecting her Performance Reviews.

134.     Defendant Speicher instead of offering support against the continued extreme bullying and harassment, this Defendant advised Miss Watson of training she felt could really **help her improve her communication in case a supervisory position became available for yet a fourth time.**

135,    This Defendant threatened that just because Miss Watson has earned time off available, Defendant Wheeler still has the right to say if her days off are considered excessive. This Defendant and her Benefits person, Ashley, assured her that this meeting talking about her absences was not to make her more anxious.

Defendant Speicher-Werbner assured her they were not trying to pry into her personal situation.

136.    This Defendant sent another email noting the would include ways Miss Watson should improve her communication style and interpersonal skills. This Defendant made Miss Watson the focus of the problems in the department and sought to be rid of her instead of disciplining the bullies and harassers.

137.    This Defendant suggested Miss Watson take offers in different cities if she wanted to be Clinical supervisor, i.e. Waterbury and Bristol locations.

138.    On information and belief in or around December 2018, and according to this defendant, Christine Grant, Miss Watson's supervisor, called this defendant in tears and upset that Miss Watson was in tears as well and "pushing back" wanting to take her vacation before the year ended. This Defendant advised Christine Grant, that she should hold Miss Watson to the same rules she does to everyone else.

139.    This Defendant told Christine Grant to use the non-company vacation policy Defendant Preble had now implemented for her department. On information and belief this Defendant knew this vacation policy was desperate toward Miss Watson as the only Sr Intake Clinician.

140.    This Defendant knew or should have known this vacation rule to find your own coverage was desperate towards Miss Watson but still sided with Defendant Preble's rule and to make her do what you do for everyone else.

141.    This Defendant subsequently began to make offers at other locations to Miss Watson where she could relocate and Defendant Speicher would promote her to

Clinical Supervisor if she did consent to relocating out of the New Britain location to Waterbury or Bristol sites.

**FACTS**

142.   Defendant Preble, just coming on as Plaintiff's immediate supervisor at March end (approx.) 16 days after her 90-day review, reflects Plaintiff's Communication Style as an area of Needs Improvement.

143.   During a routine Supervision designed for dialogue between staff and supervisor, Miss Watson asks for feedback as to the remarkable Communication Style change that Defendant Preble added to her Performance Review via Miss Watson's new supervisor.

144.   On information and belief Defendant Preble's supervision notes/email also included references that Miss Watson was  "combative, disorderly, consistently demonstrated poor interpersonal skills, poor written and verbal communication skills, and her tone at times borders on insubordinate...she also has the reputation to be horribly apathetic and short with clients"

145    On information and belief, the theme and methodology of Defendant Preble assaults upon Miss Watson's reputation was unrelenting and continued unabated from March 2018 until this defendant left Defendant Wheeler's employment in June 2019.

146.   On information and belief Miss Watson continually questioned why Defendant Preble and Arduini targeted her communication style because of her race.

147.    Miss Watson reminded them on occasion that the other white coworkers who really were using sarcastic language and profanity were not disciplined for doing so.

148.    On information and belief, Defendant Preble's supervisor Defendant Baloga knew of or should have known of Defendant Preble's illegal conduct.

149.    While working with a client Miss Watson ran over to where managers were sitting and asked a quick question.  They told her to give it to someone else.

150.    Miss Watson let them know that she wasn't trying to hand off this duty just to understand the procedure in order that she could take care of the waiting Client.

151.    Defendant Preble gave this reason for the Communication Style in Performance Review because:

152.    Joanne Ruggerio felt that she was calling them lazy and she was offended.

153.    Defendant explained that the only reason she is talking about it is because the other Managers in the room were offended and they felt the Plaintiff was calling them lazy.

154.    It is with information and belief that Defendant Preble reported this exchange with Miss Watson to HR and though HR advised of no wrongdoing on Miss Watson's part or that she could speak her mind, Preble chose to still consider this a Performance Appraisal communication Needs Improvement.

155.    Defendant Preble claimed much of her disciplining actions against Miss Watson were based  upon reporting from Heather Arduini and other managers. Defendant Preble sent an email to the Vice President of Adult Outpatient reporting that

Miss Watson threw his requested paperwork during a meeting, and was the only clinician refusing to participate

## IV STATEMENT OF THE FACTS

156.    At all times relevant to this complaint, Miss Watson was an African American female and she was employed at Defendant Wheeler's New Britain, Connecticut office as a Senior Intake Clinician from December 18, 2017, until October 7, 2019, when she was "Finally" promoted  to the position--Clinical Supervisor of the Outpatient Addiction Services and also Project Director of SAMSHA Medication Assisted Treatment hereinafter MAT PDOA Federal Grant Program.

157.    While in New Britain, because of the staff turnaround Defendant Preble headed, Miss Watson was under the immediate supervision of six different supervisors and many times forced to provide coverage for up to four hired positions as well as fill-ins.

158.    On information and belief Defendant Preble chose to leave the Clinical Supervisor position vacant for more than three months due to her refusal to promote Miss Watson while awaiting white women to fill the position as unqualified as they were.

159.    Defendant Preble chose to stay-on as some sort of secondary supervisor to Miss Watson even though Miss Watson had an immediate supervisor to add pressure to her work life until Defendant Preble resigned June or October 2019: Miss Watson's immediate supervisor listing:

A.    Jeffery Velleca 12/2017 to mid March 2018

B.    Defendant Lisa  Preble mid-March 2018 through June 2018

C.      Jennifer Lanza July 2018 through January 2019

D.      Christine Grant November 2018 to October 2019

E.      Defendant Heather Arduini, AOP Dir. October 2019 thru April 29,

2020

F.      Teo Diaz, V.P. Adult Addiction Services May 15 through May 21,

2021 constructive discharge/resigned.

160.    On information and belief, all Miss Watson's immediate supervisors except Defendant Heather Arduini at one time were under the direction of Erica Baloga until she resigned from Defendant Wheeler Clinic July 2019.

161.    On information and belief Defendant Baloga provided great feedback on Miss Watson's performance complimenting her work ethic and the value she is to the team.

164.    On information and belief, though Defendant Baloga praised Miss Watson in private she stood by and allowed the hostile environment and intentional infliction of emotional distress perpetrated by Defendants Preble and Arduini; and of which she would later become a part, to exist causing Miss Watson to suffer greatly.

165.    On information and belief **Mr.Vellecca** hired Miss Watson and identified no issues with Miss Watson's performance and on 90-day Performance Review praised her ability to take managers' constructive feedback and provide great documentation as a result of its application.

166.    **Mr. Velleca** notes Miss Watson's ability to refer within Wheeler Clinic for primary care consults to efficiently and effectively meet the needs of the client.

167.   **Mr. Velleca** notes Miss Watson's ability to conduct screening and evaluation to formulate diagnoses that are in accordance with DSM and notes she develops and documents clear clinical formulations.

168.   **Mr. Velleca** notes her shown ability to implement safety protocols including assessing risk, referring to crisis support services or referring to Hospitals as necessary.

169.   **Mr. Velleca** notes her ability to adhere to program standards on appropriate levels of care at initial assessment and that she has shown ability to document clinical symptoms in the initial intake assessment formulations.

170.   **Mr. Velleca** further notes that Miss Watson regularly seeks supervision, consultation as needed and reviews all intake check outs with a supervisor.

171.   On information and belief **Jennifer Lanza,** Miss Watson's clinical supervisor, had no issues with Miss Watson's performance.

172.   **Jennifer Lanza** praised her highly for being efficient and helpful, going beyond the call in support of clients' level of care for their mental health and/or substance use needs..

173.   **Ms. Jennifer Lanza,** Her immediate supervisor notes how impressive Miss Watson quickly would work to get someone to inpatient and/or detox or connected to a specific program for their treatment needs,

174.   **Jennifer Lanza** highly praises Miss Watson's willingness to seek out consultation from her supervisor when necessary in order to meet client's care needs.

175.   **Jennifer Lanza** further notes that Miss Watson was always receptive to feedback in a group setting with all clinicians.

176.   **Ms. Lanza** notes when Miss Watson was asked to float to another Adult Outpatient site to assist she would follow through.

177.   When Ms. **Christine Grant** comments while doing some type of "hybrid" model with Defendant Preble of supervising Miss Watson comments vary from other supervisors over Miss Watson's first year with the Defendant Wheeler.

178.   **Christine Grant** notes that she, as Miss Watson's Supervisor, will continue to work and support Miss Watson to strengthen skills in the area to increase accuracy of diagnosis to reflect appropriate DSM V Diagnostic criteria, in the area of screening and evaluation and formulating diagnosis in accordance with the DSM manual.

179.   **Christine Grant** notes Miss Watson could work towards improving responses to feedback from management.  Ms. Grant notes Miss Watson has oftentimes demonstrated difficulty in receiving constructive feedback.

180.   **Ms. Grant** notes that Management will continue to support Miss Watson in developing diagnostic skills.

181.   **Christine Grant** notes, however, that Miss Watson has demonstrated a willingness to help at other sites and demonstrates mindfulness and attention to detail with policies and procedures.

182.   **Defendant Lisa Preble** notes they look forward to helping Miss Watson's productivity improve by increasing her lenient contact hours through intakes and weekly group.

183.   **Defendant Preble** makes this note for pretext to support her unfair treatment to inundate her with extra work.  Note:Miss Watson is already at a 93%

quartile YTD at the end of June; she is well over her mark.  Defendant Preble to the

contrary adds that Miss Watson will continue to work towards meeting productivity

expectations over the next year.

184.   **Defendant Preble** has no basis for this comment;  you will Note:Miss

Watson is currently at 93% of 100% at mid year.

185.   **Defendant Preble:** Management has addressed Avery's communication

style, which has been perceived as argumentative at times over the last year

Defendant Preble says they look forward to continuing to work on improving her

communication style for optimal effective and professional communication..

186.   **Defendant Preble** comments on Miss Watson as an asset to the North

Mountain Rd. team and that she has proven herself as an effective clinician with great

diagnostic assessment skills.

187.   **Defendant Preble** further comments that Miss Watson has been an

important and respected member of our clinical team and we look forward to continuing

to work with her over the upcoming year.

188.   **Defendant Preble:** Over the upcoming year Miss Watson will benefit from

being more mindful of her communication style which has been perceived as

unprofessional at times in the last year.

189.   When Defendant Preble took over immediate supervision from Mr. Valecca

in mid March she claimed in her notes that Miss Watson should use appropriate

language in the office"  Defendant Preble noted Miss Watson's inclination to use

"abrasive language".

190.    Defendant Preble claims the first time they met Joanne Ruggiero was under the opinion that Miss Watson was an abrasive communicator.

191.    Ms. Ruggerio had interviewed and hired Miss Watson.  All of what Defendant Preble claimed she brought was from Joanne Ruggerio, the Associate Director who was the head person of AOP at that time.

192.    Defendant Preble claims she took no offense to the way Miss Watson communicated, but that over time complaints began to build up among the managers.

193.    In particular Heather Arduini, Project Director of MAT PDOA reported that close to daily she would say hi to Miss Watson walking by but Defendant Preble herself had no experience.

194.    On information and belief Miss Watson and Defendant Prele disagreed over the treatment of Black clients.  One one occasion Miss Watson objected because she felt they were continually criminalizing people with mental health issues demeaning them and calling the police to handle them while they did not accord the same treatment to white clients.

195.    On one occasion she told her that she did not have to follow up to the extent  she did because she would follow up on the referral connections to be sure the client did not fall through the cracks.  Defendant Preble told her that was not necessary saying on the other hand you don't get a gold star to take a client you don't have to work that hard.

196.    On yet another occasion that stands out, a black woman was having an appointment trying to express the ineffective sleep medication.  Defendant Preble involved herself when the APRN was in discussion with the client as everyone else

heard.  Defendant Preble told the client to go out in the lobby and get the number to the medical director from the front desk which Preble knew the client would not be able to call Dr. Twist on her own.

197.   When the client went to the front desk they called the medical team because they were not willing to hear the client out to give the client her medicine; Defendant Preble should have never sent her to the front desk alone.  After discussing what they were going to do, Defendant Preble asks what we should charge the client with.

198.   Miss Watson was trying to get the officer to transport the client to the hospital instead of being arrested with a disorderly conduct charge.  The Receptionist recognized what was about to happen with Defendant Preble and the police so they called another supervisor and the client went with that supervisor inside the medical area.

199.   In or around may 2018 Defendant Preble decided to make changes to staff workloads which she attributed to a need to distribute caseloads more evenly and claimed to use Ms. Watson more effectively.

200.   Ms. Wason was hired as sole intake person at Defendant Wheeler's New Britain location.

201.   On information and belief Defendant Preble allowed two white workers who preferred to do Miss Watson's job duties in exchange for handing off their duties to Miss Watson to benefit their lack in productivity numbers, to hand off their assignments to Miss Watson.

202.    To accommodate their lack of productivity their desire to switch caused Miss Watson to have to take their task which she was not hired to do.  Miss Preble discussed this and gave the white workers, Dina and their preferred schedule changes and didn't accord Miss Watson any preferred opportunities.

203.    In the end Miss Watson was made responsible to run some groups in addition to performing her task intake.  Because of this shift change, Miss Watson's schedule was to change, which placed an undue and unexpected burden on her familial responsibilities.

204.    These changes meant that Miss Watson was handling tasks outside her job duties and scope for which she had not been provided the procedural training as were the others.

205.    Miss Watson asked Miss Preble if she could have an opportunity to pick a better time.  Miss Preble told her she could leave, however, the necessary step to complete the group assessments /documentation was the reduced time allotted, therefore Miss Watson had to often work from home to complete the groups extra workload.

206.    On information and belief due to these two white workers' requests, Defendant Preble retorted that she knew Miss Watson was "getting the short end of the stick".

207.    On information and belief, to negatively influence Miss Watson's immediate supervisor against her, On or about August 1, 2018, Defendant Preble authored a "Supervision Note" marked "Avery Only" and passed it to Ms. Jennifer Lanza,  Per This note Defendant Preble counseled Miss Watson for being

argumentative due to her objections to the particulars of her annual evaluation where Preble pushed back that Heather Arduini said Miss Watson had made her feel uncomfortable during a conversation.

208.   Heather Arduini left the department some 5 months prior, however she frequented Defendant Preble's "foot spa" and sat at a worktable in Preble's office.

209.   The Defendants Discriminatorily Denied Ms. Watson Promotions on three Occasions

210.   **Clinical Supervisor position-application November 8, 2018**

211.   On or about November 8, 2018. Defendant Wheeler posted a Clinical Supervisor position at its New Britain location.

212.   On information and belief, the hiring procedure at Defendant Wheeler provided that its Human Resources department screens applicants to verify that they met the minimum qualifications for the job, and the hiring manager would conduct the interview along with Miss Baloga, in this instance, and select from the pool of identified candidates.

213.   Thereafter, Miss Watson applied for the Clinical Supervisor position on or about November 12, 2018, and her application was forwarded for consideration.

214.   Ms. Watson is a Licensed Clinical Social Worker with approximately two and a half years (2-½)of supervising a team of staffers, including nurses, Substance abuse counselor, peer support specialists, qualified professionals and other clinicians.

215.   Ms. Preble who was Program Manager of the department was the hiring manager for this position however Miss Baloga Associate Director and Sue Mason, Program Manager in Bristol location took over this responsibility for the hiring decision

because Ms. Preble opted to recuse herself because she had worked with one of the candidates at a previous company.

216.    On information and belief, this candidate, Ms. Grant had been hired by Defendant Preble into Wheeler as a clinician some five months prior.

217.    On information and belief Defendant Preble yet claimed to recuse herself as an appearance of bias within this potential promotional opportunity for her hiree, Ms. Christine Grant.

218.    Subsequently, not only did Defendant Preble see that Ms. Grant received the promotion instead of Miss Watson but as an insult to injury made her Miss Watson's immediate supervisor.

219.    On or about November 9, 2018, Miss Preble invited herself to Miss Watson and her immediate supervisor, Jennifer Lanza's routinely scheduled Supervision.  She insisted, rather than Miss Watson's immediate supervisor, that she would deliver the news to Miss Watson that she was not chosen for the promotion.

220.    Even though Miss Watson's immediate supervisor was there, Defendant Preble began by saying she wanted to tell her that she didn't get the promotion but wanted to let her know that management regarded her interview as stellar, mentioning her noteworthy insight, work ethic and proficiency.

221.    This Defendant added that Miss Watson was a lot like herself and would be more suitable for a Program Manager position such as she was but conversely noted you'd first have to become a clinical supervisor (for which she was being denied) to become that Program Manager.

222.    This Defendant went on to opine to Miss Watson that she was not fit for the clinical supervisor due to the fact that she wasn't friendly enough and if she were a clinical supervisor her staff would not feel they could come to her with their personal problems.  Her communication style was a problem.

223.    Miss Watson then told her she did not understand or agree and that she now wishes that This Defendant didn't tell her why she didn't get it because it makes her feel worse.  Miss Watson also said that profanity is used by the other clinicians and not herself and sarcasm is prevalent.

224.    Until this point Ms. Lanza had said nothing. When Miss Watson said this in Ms. Lanza's hearing Ms. Lanza chimed in and said "I know I am the queen of sarcasm". She never once said Miss Watson was at all.

225.    On information and belief Ms. Grant was not qualified for the job.  Ms. Grant did not have the 2-year clinical supervising experience.  Ms. Grant was not a Licensed Clinical lSocial Worker (LCSW) Ms. Grant did not have the job tenure of one year.  Ms. Grant had no Clinical Supervisory Experience; not the required two years post licensure (LCSW preferred) supervisory experience.  Ms. Grant had been with Wheeler five months, not the required one year.

226.    Miss Watson is a Licensed Clinical Social Worker.  Miss Watson had over two years clinical supervisory experience including, Substance Abuse Counselor, Peer Support Staff, Qualified Professionals and Clinicians.

227.    On information and belief, pursuant to the state of Connecticut Department of public Health's Regulations, Ms. Watson as an LCSW could sign-off on work or hours performed (three 3,000 for Ms. Grant, to gain licensure as a LCSW while

Ms. Grants as an LPC by DPH regulations could not reciprocate on behalf of Ms. Watson.

228.   Defendant Preble uses the latter as pretext as she claims that she continued to do a "hybrid" supervisory over Miss Watson along with Christine Grant over Ms. Watson after Ms. Grant was promoted to Miss Watson's  supervisor.

229.   On information and belief this Defendant provides this reason as pretex as neither of these two comparators were seeking to gain any form of licensure.  As Miss Watson is both a LCSW and LADC Licensed Alcohol and Drug Counselor as well as certified as (LDP) LIcensed Dementia Professional

230.   **Clinical Supervisor position application Number 2 January 3, 2019**

231.   On or about January 3, 2019, Defendant Wheeler posted another Clinical Supervisor position at its New Britain location and Miss Watson applied for this on or about January 6, 2019, pursuant to Defendant Wheeler's application procedures.

232.   On information and belief Ms. Preble denied receiving an application from Ms. Watson for this position.

233.   Ms. Preble also did not interview Ms. Watson for the position and she hired a candidate.(white)

234.   Ms. Satina Salce (white) , an external candidate, was not qualified for this position.

235.   On information and belief Defendant Preble hired this comparator (white) with full knowledge that she did not have preferred LCSW licensure nor was she qualified for this Clinical Supervisory Position.

236.    Miss Watson was covering for up to 5 open positions while Defendant Preble chose to hire no one than to hire Miss Watson. On information and belief the long delay in Ms. Salce's start date i.e. hired in January started on or around March 5, 2019 was fitting with Defendant Preble refusal to "hire no one than to hire" Miss Watson.

237.    Defendant Preble claims this comparator called her over the weekend and resigned to which Defendant Preble was not surprised.

238.    Defendant Preble claims it was just a bad week.  The desk was broken where Ms. Salce was to sit and she quit after a mere 5 days.

239.    On information and belief because Miss Watson was out and her presence was missed, Miss Preble is said to have called it hell week without her.

240.    In view of the email of November 19, 2021 where Defendant Preble in her determination to not have Miss Watson (black) gain a supervisory promotion was willing to hire a non-qualified  person as she says in the **email of November 29, 2021, "I'd rather hire no one than to hire Avery".**

**241.    Supervisor Position-Application 3 March 12, 2019**

242.    On or about March 12, 2019, Defendant Wheeler through its agents/representatives posted the Supervisor position the afternoon of March 12, 2019; Miss Watson Applied on March 13, 2019 submitting her application to HR.

243.    On information and belief Miss Watson's application was ended up with a delayed date to Defendant Preble, Hiring attendant.

244.    There was a series of conversations regarding Miss Watson's application between Defendants Baloga, Arduini and Preble.

245.    Defendant Preble sent a note to Arduini, no longer a part of the department, but continued to stay around with Defendant Preble to intentionally inflict emotional distress on Miss Watson.

246.    Upon receiving Miss Watson's application from HR, Defendant Preble sent an email to Baloga and Arduini saying that it must be a joke that Miss Watson still had the nerve to apply after all she had been through.

247.    On information and belief Defendant Arduini conspired to get rid of Miss Watson telling Defendant Preble that she was not joking about Miss Watson and for Defendant Preble to falsely tell her she already offered the job to someone.

248.    On information and belief Heather Arduini was no longer a member of Miss Watson's and Ms Preble's department but continued as an ally in this conspiracy to harm Miss Watson.

249.    They would later tell Miss Watson that Ms. Bray was hired on Monday morning before they received Miss Watson's application at 12:30p.m.

250.    Defendant Arduini suggests a way to get out of it by just telling Miss Watson she already hired someone.

251.    On information and belief Ms. Preble reported that she had not interviewed Miss Watson based on her calling HR and learning that she was not obligated to interview a non-qualified person (being Miss Watson) if she already knew they were unqualified.

252.    On information and belief Ms. Bray had applied for clinician jobs with Wheeler at other locations that were non supervisory clinical positions.

253.    On information and belief Ms. Beloga said Hartford wasn't going to hire her but she was obtaining references for the Clinical position perhaps in another area.

254.    On information and belief Ms. Preble hired Jade Bray (white) from outside in violation of Defendant Wheeler Company hiring practice.

255.    Ms. Bray claimed she was surprised at being contacted on March 11, 2021 from Defendant Preble telling her about a Clinical Supervisory position in New Britain. Neither of them could recall how the contact was made but Ms. Bray does remember applying and then letting Ms. Preble know.

256.    There is no official record of Ms. Bray's application to Defendant Wheeler.

257.    Defendant Preble claims to have contacted Ms. Bray on March 11, 2021 to tell her to apply only after she had posted the position per Wheeler policy.  On information and belief, the position was posted on the 12th.

258.    Preble implies she knew Ms. Bray's potential because she had worked with her previously at another company, but to the contrary Ms. Bray says she was surprised to hear from Ms. Preble because she doesn't give her contact information out like that and she didn't really know her.

259.    Ms. Bray had been an LCSW for just over one year and no supervisory experience to supervise clinical staff.

260.    Ms. Preble claims that on the same day that Ms. Preble submitted the position for posting, she contacted Jade Bray (White/"West African") about applying for the position.

261.    Ms. Preble colluded with Ms. Beloga and Ms. Arduini to hire Ms. Bray in violation of Company Policy circumventing Human Resources.  They falsified a letter to Human Resources to include with the hiring file.

262.    There is no formal Human Resource documentation that indicates Ms. Bray did not violate Wheeler Policy when she was hired for the Clinical Supervisor Position instead of Miss Watson

263.    Around this time Ms. Preble had been promoted and was not Miss Watson's direct supervisor.  Despite this, Preble emailed Ms Watson regularly about issues and required Miss Watson to have weekly supervision withat times instead of Christine.

264.    On information and belief Ms. Preble claimed she would email Ms. Watson separately about corrections so there were a lot of emails detailing specific items, but most times Miss Watson was not at fault in the end.  Routinely Ms. Watson' direct supervisors gave her evaluations covering this time period which indicate that her performance was meeting expectations overall and exceeding in some categories.

265.    Ms. Watson then filed a complaint with the Connecticut Commission on Human Rights and Opportunities (hereinafter CHRO) on April 12, 2019 Commission Complaint #1910436 and EEOC #16A201901132.

266.    On information and belief, all named representatives, officials and agents including Ms. Preble, Ms. Baloga, Ms. Grant, Ms. Patricia Speicher Werbner, Ms. Arduini, and Mr. Diaz of Defendant Wheeler were aware of Ms. Watson's complaint before the CHRO.

267.    Between March 13, 2019, and April 4, 2019 Ms. Preble restored to emailing Ms. Watson on a continuous basis, particularly returning from rest and recovery, on "purported" performance issues which did not relate to Defendant Wheeler's denial of the three prior promotions, curiously, they coincided with Ms. Preble's recruiting and hiring.

268.    summer of 2019; Defendant Preble resigned her position October 2019 following a leave of absence beginning that June 2019. Ms. Beloga resigned her positions at Defendant Wheeler during

269.    After being passed over for the third promotion, Miss Watson contacted Defendant Preble, Defendant Baloga and Ms. Grant by email complaining that she was discriminated against with respect to the three positions.

270.    Defendant Baloga subsequently sent Ms. Watson's complaint to HR.

271.    Defendant Wheeler Clinic subsequently posted a fourth clinical supervisor position in September of 2019.   Miss Watson would apply yet again.

272.    This time unlike any other hirees, Miss Watson was made to interview with the Vice President, Teo Anderson Diaz along with her immediate supervisor, Heather Arduini and a Clinical Supervisor from the Hartford location.

273.    Miss Watson was put under undue scrutiny unlike any other hire, and made to prove herself worthy of the clinical supervisor position according to the vice president.

274.    On information and belief Ms. Arduini offered the position to Miss Watson in an email with sarcasm promoting her yet undermining her authority the entire way. Miss Watson would have to work two full time positions.

275.   She would now be hired  as the Federal Grant full time position as

SAMSHA MAT Project Director for the grant PDOA program  and also work as a full time

Clinical Supervisor for Wheeler Clinic Adult Outpatient Services.

276.   As the MAT Project Director, provisions of the grant (MAT PDOA

specifically provided support of a nurse, Community Health  Worker and Peer Support

Specialists dedicated to the grant program and thereby reporting directly to a Project

Director, Miss Watson, also dedicated 100% to the grant.

277.   Ms Arduini would ultimately inform them in a staff meeting that they did not

have to take direction from or report to Miss Watson.

278.   Under the direction of Teo Diaz and Heather Arduini, this staff meeting

included Teo Vice President, and other upper management unrelated personnel.

279.   In or around March 2021 Miss Watson amended her complaint before the

CHRO to include the fact the defendants continue to retaliate against her, despite the

fact the agency found cause to believe that the defendants had engaged in a

discriminatory practice against Miss Watson.

280.   More specifically, since lodging her CHRO complaint, the defendants have

continued to subject her to annoying unequal treatment, retaliation and harassment due

to her race/color and in retaliation for having prior protected activity.

281.   Since early October 2019 to present after Defendant Heather Arduini

(white) became Miss Watson's supervisor, and after Miss Watson was finally promoted

from Sr. Intake Clinician to Integrated Care Supervisor and Project Director for MAT,

Defendant Arduini has continued to harass Miss Watson, subjected to different

treatment and engage in retaliatory conduct due to her race/color and because of her prior Commission Complaint.

And complaints of Ms. Arduini's continued defamation October 2019 to the present.

282.   Defendant Arduini has undermined and demeaned Miss Watson's authority as a supervisor by instructing subordinate staff to go directly to her, not Miss Watson for supervisory direction.

283.   On or about November 30, 2020, Defendant Arduini, having just returned from maternity leave, only on a halftime remote virtual schedule at this time due to COVID protocols, and Defendant Roth subjected Miss Watson to an unwarranted virtual meeting; subject called "GROWTH" and the development of MAT PDOA. [Emphasis added]

284.   This program was notable for continually producing positive outcomes with no complaints from clients served nor the grant producers.  To the contrary the National Federal SAMSHA grant providers GOP commended Wheeler in general and Miss Watson in particular for this millions of dollar grant.

285.   Defendant Roth told her they were going to make changes to the staff. That she was going to handle coordinating with team staffer Andrea now including her MAT Team Duties.  That she was going to no longer allow Andrea (hispanic) to do Outreach because she needed to be available to Kate (white) in case she needed her support, and therefore, she would also move her physical seat.

286.   Defendant Roth, followed up with a reprimand that they were not there to talk about outcomes but cited no examples of rude behavior, misconduct, nor team rivalry except the one white team member Kate (white RN) who they had informed both

she and Miss Watson that she did not have to follow the duty Miss Watson related to her directly from the Grant Award specifications.

287.    More specifically, on or about March 9, 2020, Defendant Arduini sent an email to Miss Watson, which provided that she did not like Ms. Watson's tone and that she appeared frustrated when they spoke about moving an intern Miss Watson was supervising down to the basement and that she would be glad this intern's term was up and she would be leaving.

288.    In this meeting it was apparent to Miss Watson once again that Ms. Arduini had previously had an issue with the other two supervisors Jade and Christine prior to their scheduled staff meeting omitting Miss Watson.

289.    During the meeting Ms. Arduini would bring the subject up knowing her goal to offend Miss Watson.  Ms. Arduini castigated the black intern to which Miss Watson became visibly upset and excused herself to the ladies room.  Ms. Arduini called this frustration but it was anxiety of trying to sit and cope with the discriminatory comments of yet another.

290.    When Miss Watson was ready to speak she explained that she really wanted the intern to have an opportunity and moving her to the basement would not serve this goal well as she would essentially be away from the dynamics of the office.

291,    There was no basis for this email and upon information and belief, Defendant made these accusations about Ms. Watson to further undermine her on the basis of her race/color and in retaliation to her filing a previous complaint against the defendants. Ms. Arduini forwarded this email to HR Joe Tedone once again.

292.    Defendant Arduini has resorted to spreading innuendo about Ms. Watson to her fellow staff members that she does not know how to effectively communicate or how to run her program [emphasis added].

293.    On or around January 15, 2021, Defendant Arduini specifically invited Defendant Teo Diaz, Vice President Director of Behavioral Health to a weekly supervision virtual meeting (she had never done).  Miss Watson was incredibly surprised by the attendees at this meeting.

294.    During the meeting the Agenda item was MAT PDOA, and how supervisors collaborate and communicate. [Emphasis added].

295.    On information and belief, Defendant Arduini brought Defendant Diaz to this meeting to facilitate collaboration and communication amongst supervisors, which is an area that she has accused Miss Watson of in the past.  On information and belief, Defendant Diaz was invited to the meeting to specifically speak to Ms. Watson [emphasis added]

296. During the meeting Defendant Diaz presented stories of how he handles conflict and he emphasized the importance of cohesiveness and collaboration of the MAT Team, while Defendant Arduini chimed in with examples of her own experiences as well.

297.    During the meeting, Ms. Watson questioned why Defendant Diaz was invited to the meeting and then cited her duties with the MAT Team in addition to her supervisory responsibilities at Wheeler Clinic.

298.    At some point prior to the conclusion of the meeting, Defendant Diaz excused himself, to which Defendant Arduini stated that "she did not understand what Mr. Diaz was talking about, and that she was going to speak to his supervisor about it.

299.    Miss Watson became ill and had to leave work upon hearing Defendant Arduini state that she did not know why Mr. Diaz had attended the meeting.  As a result, Miss Watson was kept out of work by her health care provider for a week of rest and recovery.

300.    On or about February 2, 2021, during a virtual meeting, Defendant Arduini (who conducted the meeting and invited eight other staffers) ridiculed humiliated and derided Miss Watson in front of the staffers including the three members of her MAT Team she supervised Carrie Perez, Andrea Jiminez, Kate Denette.

301.    During the virtual meeting held on February 2, 2021, Defendant Arduini put on the agenda the topic of effective collaboration and communications style which Miss Watson interpreted as a personal attack.  As an agenda item, Defendant Arduini also dealt with "the importance of being kind and respectful", which took on the character of the same attacks Miss Watson had endured under Defendant preble and Baloga prior to their respective resignations in 2019 [emphasis added].

302.    Like Defendants Preble, and Baloga, Arduini has subjected Ms. Watson to dissimilar treatment compared to her similarly situated non-bases coworkers who also manage Defendant Wheeler's Grants Program.  But are not made to do any of the things Miss Watson has to do.

303.    Upon information and belief, since Ms. Watson's promotion with greater job responsibilities from 2019 and continuing to present she learned that she has not been paid as Wheeler reports in the Federal Grant.

304.    Based on the foregoing the defendants have subjected Ms. Watson to discriminatory conduct, retaliation, a hostile work environment, harassment, unequal terms and conditions and unequal pay based upon her race/color and in retaliation for her previous protected activity.

**COUNT ONE: VIOLATION OF 42 U.S.C. subsection 1981 AS AGAINST DEFENDANTS WHEELER CLINIC, SPEICHNER-WERBNER, PREBLE, BALOGA, DIAZ, ROTH and ARDUINI**

305.    Miss Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 304 inclusive, as fully set forth herein., and because of her membership in the aforementioned protected class in violation of 42 U.S.C. subsection 1981, despite the fact her employment evaluations were satisfactory.

306.    The Defendants subjected the Plaintiff to adverse employment action with respect to her right to make and enforce her employment contract in violation of 42 U.S.C. subsection 1981, by demeaning her work, characterizing her of having poor verbal and written communications skills, define her presentations skills and style as ineffectual and "abrasive." and bordered on insubordination.

307.    From 2018, to present the defendants intentionally subjected Miss Watson to discrimination under subsection1981, by demeaning her work, characterizing her of having poor verbal and written communications skills, define her presentations skills and style as ineffectual and "abrasive" and bordering on "insubordination:.unrelenting workplace harassment and a hostile work environment in violation of 42 U.S.C.145.

308.   That to make and enforce her employment contract, perform, modify, and terminate contracts and to enjoy all benefits privileges terms and conditions of the contractual relationship.

309.   All natural person defendants were acting in their capacities as officials, managers and agents of Defendant Wheeler Clinic.

310.   The defendants by their conduct failed to provide adequate training to their subordinate employee regarding the right to equal employment opportunities and treatment in accordance with law.

311.   On information and belief at least two or more of the defendants asserted that they would rather hire no one than hire Miss Watson, "despite the fact she was easily the most qualified candidate for all three positions at issue.

312.   On information and belief the defendants policy position in denying Ms. Wason promotional opportunities extended from 2018 through the present although the defendants reluctantly promoted Miss Watson in the New Britain office in or around October 2019.

313.   At all times relevant herein, Ms. Watson was the most qualified candidate with respect to all three positions she applied for and was discriminatorily denied promotion.

314.   On information and belief one or more of the defendants maintain a file termed "Supervision Note" marked "Avery Only" and passed it to Ms. Jennifer Lanza who was Miss Watson's immediate supervisor at the time.

315.   On information and belief, the defendants did not subject other similarly situated non basis employees to the same conduct for the above items.

316.    These defendants, after Miss Watson's rights against retaliation were violated by the defendants pursuant to 42 U.S.C. subsection 1981, after she engaged in previously protected activity, by filing a complaint against the defendants on April 12, 2019, with the Connecticut Commission on Human Rights and Opportunities.

317.    As direct and proximate result of the defendants' discrimination conduct, Miss Waston has suffered compensatory damages benefits--vacation pay, mental anguish, humiliation, distress inconvenience damages to her personal and professional reputation, loss of enjoyment of life and indirect harm to her young son in his developmentally important grade school years.

318.    Miss Watson thereby entitling her to an award of punitive damages alleges that the workplace harassment she was subjected to by the defendants was pervasive, severe, and involved a physical threat to her safety and well-being.

319.    Miss Watson, thereby entitling her to an award of punitive damages, alleges that the workplace harassment Wheeler clients were subjected to by the defendants was pervasive, demeaning, debilitative,  severe, and involved a physical threat to their safety and well-being.

320.    As a direct and proximate result of the unlawful conduct complained of, the defendants selectively enforced rules, custom practices, procedures, and requirements for employee conduct against Plaintiff and forced her constructive discharge.

321.    That the defendants by their unlawful conduct maintained a severe and pervasively hostile work environment for black clients and staff members and denied Miss Watson the right to be free from discrimination, harassment and retaliation.

322.    Miss Watson was subjected to defamation and false light occasioned by the conduct of Defendant Baloga, Defendant Speicher-Werbner, Defendant Arduini, Defendant Roth and Defendant Diaz

323.    Miss Watson's non white staff members, Andrea Jiminez and Carrie Perez, both hispanic, were also subjected to harassment while Miss Watson's similarly situated white member was not.

324.    The defendants' conduct was motivated by the Plaintiff's race and color as were.

325.    The Plaintiff believed her work environment to be hostile and abusive as a result of the conduct complained of herein.

326.    That the Defendant Wheeler failed to provide adequate training to its employees such as Defendant Preble, Baloga and Arduini and Diaz regarding the right to equal employment opportunities and treatment in accordance with law.

327.    That the Defendant Wheeler failed to promulgate, maintain and enforce adequate meaningful and effective policies and procedures for employees to complain of violations of their right and for investigation and discipline in the event of such complaints.

328.    As a direct and proximate result of said unlawful conduct, Miss Watson suffered and continues to suffer the loss of pay, benefits and retirement credits 403(b) plan and her career has been impeded and impared.

329.    As a direct and proximate result of said unlawful discrimination, harrassment on the job and retaliation, Miss Watson's personal relations between friends and family, professional reputations; and relations with coworkers and peers

have been irreparably harmed and she suffered and continues to suffer stress, anxiety and mental emotional distress.

330.    As a direct and proximate result of the unlawful conduct, Ms. Watson has sustained pain and suffering serious psychological injury, emotional distress, mental anguish headaches, embarrassment and humiliation.

331.    As a direct and proximate result of the unlawful conduct complained of, Miss Watson has sustained pain and suffering helplessly watching her grade school child independent of her best self go through the guidance he deserves as a young child seeking to manage life's journey.

332.    As a direct and proximate result of the unlawful conduct complained of herein Miss Watson sustained pain and suffering witnessing her young son's grades drop as he sought to manage his life journey without the benefit of a mother able to work free of stressors preventing her from being her best self.

333.    As a direct and proximate result of the unlawful conduct, Ms. Watson has incurred medical expenses and other economic damages and continues to experience emotional pain and suffering which now obligates her to spend sums of money for medical care and attention in an effort to cure herself.

334.    As a direct and proximate result of said unlawful discrimination, harassment, retaliation on the job, Miss Watson continues to suffer stress and mental emotional distress and anxiety.

335.    As a direct and proximate result of said unlawful discrimination, harassment on the job Miss Watson is entitled to back pay, front pay, compensatory, damages, and punitive damages.

336.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson must incur substantial costs and fees to seek appropriate redress.

337.    As a direct and proximate result of said unlawful discrimination causing Miss Watson to effect a constructive discharge, Miss Watson is entitled to back pay, front pay, compensatory, damages, and punitive damages.

338.    As a direct and proximate result of said unlawful discrimination  resulting in her suffering PTSD though she no longer works for Wheeler Clinic, the affects of this heinous assault is feared that she will be affected for years to come, possibly her life span.

**COUNT TWO: VIOLATION OF TITLE VII AS AGAINST DEFENDANTS WHEELER CLINIC, SPEICHER-WERBNER, PREBLE, ARDUINI,  DIAZ, BALOGA**

339.    Ms. Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 338, inclusive ,as though fully set forth herein.

340.    Defendants subjected Miss Watson to invidious discrimination based on her race and color and because of her membership in the aforementioned protected class in violation of Title VII.

341.    That Miss Watson's work performance was satisfactory, garnering her a promotion in December 2018.

342.    That the defendants subjected Miss Watson to various adverse employment actions based on her race and color including but were not limited to failure to promote her on at least three occasions, paying her less than similarly situated

non-basis employees, doubling her workload denying her vacation, from from 2018 to May 14, 2021, when she constructively quit.

343.   That the defendants' actions occurred under conditions giving rise to an inference of discrimination.

344.   Further, that the defendants subjected Miss Watson to unrelenting workplace harassment and a hostile work environment with intentional infliction of emotional distress and retaliation in violation of Title VII by demeaning her work characterizing her of abrasive, combative, and bordering on insubordination and just overall poor written and verbal skills along with poor interpersonal skills.

345.   All natural person defendants were acting in their capacities as officials, managers and agents of Defendant Wheeler Clinic.

346.   The defendants by their conduct failed to provide adequate training to their subordinate employee regarding the right to equal employment opportunities and treatment in accordance with law.

347.   On information and belief at least two or more of the defendants asserted that they would rather hire no one than hire Miss Watson. Despite the fact she was easily the most qualified candidate for all three positions at issue.

348.   On information and belief. The defendants' took position in denying Ms. Watson promotional opportunities extended from 2018 through May 14, 2021, when she constructively terminated her employment.

349.   At all times relevant herein. Ms. Watson was the most qualified candidate with respect to all three positions she applied for and was discriminatory denied promotion.

350.   On information and belief, two or more of the defendants maintained a file termed "Supervision Note: marked "Avery Only" and passed it to Jennifer Human Rights and Opportunities, that the defendants were made aware of, and as a result, the defendants heightened their unlawful conduct against Miss Watson.

351.   Lanza, who was Ms. Watson's immediate supervisor at the time, had great things to say and not communication or interpersonal problems..

352.   On information and belief the defendants did not subject other similarly situated non basis employees to the same conduct complained of in the above items.

353.   That after Miss Watson's rights were violated the defendants pursuant to Title VII because she engaged in previously protected activity, by filing a complaint against the defendants on April 12, 2019, with the Connecticut Commission on Human Rights and Opportunities, that the defendants were made aware of, and as a result, the defendants heightened their unlawful conduct against Miss Watson.

354.   As a direct and proximate result of t339. Ms. Watson repeats, realleges and inhe defendants' discrimination conduct, Miss Watson has suffered compensatory damages, hereafter vacation pay, mental anguish, humiliation, distress, to her personal and professional reputation.

355.   Wheeler Clinic clients have suffered damages based on the demeaning and discriminatory treatment they suffered due to the misconduct of these defendants allowing a culture that allows this disruptive behavior to their lives mental health.  Miss Watson suffered pain and humiliation witnessing the degrading and humiliating and criminalizing treatment of Wheeler Clients allowed by white staff thereby entitling her to an award of punitive damages.

356.    The plaintiff alleges that the workplace harassment she was subjected to by the defendants was pervasive, severe, and involved a physical threat to her safety and well-being.

357.    As a direct and proximate result of the unlawful conduct,  the defendants selectively enforced rules, custom, practices, procedures. And requirements for employee conduct against the plaintiff and caused her to effect constructive discharge.

358.    That the defendant by their unlawful conductmaintained a severe and pervasively hostile work environment and denied Miss Watson the right to be free from discrimination harassment and retaliation.

359.    The defendants' conduct was motivated by Miss Watson's race/color.

360.    The Plaintiff believed her work environment to be hsotile and abrasive as a result of the conduct complained of herein.

361.    That the Defendant Wheeler failed to provide adequate training to its employees regarding the right to equal employment opportunities and treatment in accordance with law.


362.    That the Defendant Wheeler failed to promulgate, maintain, and enforce adequate meaningful and effective policies and procedures for employees to complain of violations of their right and for investigation and discipline in the event of such complaints.

363.    That the Defendant Wheeler failed to promulgate, maintain, and enforce adequate meaningful and effective policies and procedures for clients to complain of

violations of their right and for investigation and discipline in the event of such complaints.

364.    As a direct and proximate result of said unlawful conduct, Miss Watson suffered and continues to suffer the loss of pay, benefits and retirement credits and her career has been impeded and impaired.

365.    As a direct and proximate result of said unlawful discrimination, harassment on the job and retaliation, Miss Watson's personal and professional reputations and relations with coworkers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental emotional distress, along with Post Traumatic Stress accompanied by debilitating headaches.

366.    As a direct and proximate result of the unlawful conduct, complaints of Miss Watson have sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment, and humiliation.

367.    As a direct and proximate result of the unlawful conduct complaints, Miss Watson has incurred medical expenses, other economic damages, and continues to experience emotional pain and suffering which has now obligated her to expand sums of monies for medical care and attention to cure herself of the injuries visited upon her by the defendants.

368.    As a direct and proximate result of said unlawful discrimination harassment on the job, Miss Watson continues to suffer stress and mental distress.

369.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson is entitled to back pay, front pay, compensatory damages, and punitive damages.

370.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson must incur substantial costs and attorney's fees to seek appropriate redress.

**COUNT THREE: RETALIATION IN VIOLATION OF TITLE VII AS AGAINST DEFENDANTS WHEELER CLINIC,SPEICHER-WERBNER, PREBLE, BALOGA, AND ARDUINI**

371.    Miss Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 370, inclusive as though fully set forth herein.

372.    The defendants retaliated against Miss Watson in violation of Title VII for filing a complaint sounding in discriminaiton to the CHRO, despite the fact her employment evaluations were satisfactory.

373.    That Ms. Watson's complaint to the CHRO was filed on April 12, 2019, Commission Complaint #1910436 and EEOC #16A201901132 and the defendants were notified by CHRO of the Plaintiff's Complaint and retaliation began immediately after they became aware that Miss Watson had filed a complaint with the CHRO.

374.    That thereafter defendants heightened their unlawful conduct against Miss Watson because she filed a complaint against them.

375.    As a direct and proximate result of said unlawful conduct, Miss Watson suffered and continues to suffer the loss of pay, benefits and retirement credits and her career has been impeded and imipaired.'

376.    As a direct and proximate result of said unlawful discrimination, harassment on the job, and retaliation, Miss Watson's personal and professional

reputations and relations with workers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental emotional distress.

377.    As a direct and proximate result of the unlawful conduct, Ms. Watson has sustained pain and suffering serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

378.    As a direct and proximate result of the unlawful conduct complained of Ms. Watson has incurred medical expenses, other economic damages and continues to experience emotional pain and suffering, which has now obligated her to spend sums of money for medical care and attention to cure herself of the injuries visited upon her by the defendants.

379.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson coninues to suffer stress and mental emotional distress.

380.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson is entitled to back pay, front pay compensatory damages and punitive damages.

381.    As a direct and proximate result of said unlawful discriminaiton, harassment on the job, Miss Watson Commission Complaint 1910436 and EEOC #16A201901132, and the defendants were notified by CHRO of the Plaintiff's complaint.

382.    That thereafter the Defendants heightened their unlawful coThat the adverse action involved Defendant's refusal to hire Miss Wtson, promote, and increase her pay with other similarly situated non basis employees.

383.    That the defendants' unlawful conduct against Miss Watson because she filed a complaint for discriminaiton against them with the CHRO

defendants acted intentionally or recklessly to violate Miss Watson's right to equal treatment under Federal laaw as it pertained to her rigDefendants subjected Ms. Watson to invidious discrimination based on her race-black/color

**COUNT FOUR: HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII AS AGAINST DEFENDANTS WHEELER CLINIC, PREBLE, BALOGA, ARDUINI**

384.    Ms. Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 383, Inclusive, as though fully set forth herein.

385.    Those defendants subjected Miss Watson to intentional harassment, objectively severe that a reasonable person would have found hostile or abusive.

386.    That the conduct complained about was sufficiently extensive to render Miss Watson's work environment hostile or abusive, such that she was constantly ridiculed, intimidated and embarrassed, severe, humiliating, and unreasonably interfered with Miss Watson's work performance.

387.    That the defendants' conduct included but were not limited to "calling her out in meetings without basis in the presence of her coworkers and subordinates, and labeling her as combative, disorderly, consistently demonstrating poor interpersonal skills, poor written and verbal communication skills, and that her tone at times bordered

on insubordinate\ion\...she also has the reputation to be horribly apathetic and short with clients.:

388.   As a direct and proximate result of said unlawful conduct. Miss Watson suffered and continues to suffer the loss of pay, benefits and retirement credits, and her career has been impeded and impaired.

389.   As a direct and proximate result of said unlawful discrimination, harassment on the job, and retaliation, Miss Watson's personal and professional reputations and relations with coworkes and peers have been irreparably harmed, and she suffered and continues to suffer stress.

390.   As a direct and proximate result of the unlawful conduct complained of, Miss Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish headaches, embarrassment and humiliation.

391.   As a direct and proximate result of the unlawful conduct, Miss Watson has incurred medical expenses, other economic damages, and continues to experience emotional distress.


392.   As a direct and proximate result of said unlawful discrimination harassment on the job, Miss Watson continues to suffer stress and mental emotional distress.

393.   As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson is entitled to back pay, front pay, compensatory damages, and punitive damages.

394.    As a direct and proximate result of said unlawful discrimination,

harassment on the job, Miss Watson must incur substantial costs and attorney's fees to

seek appropriate redress.

395.    That defendants' conduct was frequent which was in violation of Title VII,

despite the fact her employment evaluations were satisfactory.

**COUNT FIVE, Conn.Gen.Stat. subsection46a-60(b)(1), at seq., AGAINST
DEFENDANTS WHEELER CLINIC, PREBLE, BALOGA, ARDUINI**

396.    Ms. Watson repeats, realleges and incorporates by reference the

allegations set forth in paragraph 1 through 395 inclusive, as though fully set forth

herein.

397.    Defendants intentionally discriminated against Miss Watson on the basis

of her race-black and color, and because of her membership in the aforementioned

protected class in violation of and pursuant to provisions of CFEPA.

398.    That Ms. Watson's job performance was satisfactory.

399.    That Ms. Watson suffered adverse employment action; and

400.    That the action occurred under conditions giving rise to an inference of

discrimination.

401.    That from 2018 to present, the defendants intentionally subjected Miss

Watson to unrelenting workplace harassment and a hostile work environment pursuant

to provisions of CFEPA by demeaning her work, characterizing her of having poor

verbal and written communications skills, defining her presentation skills and style as

ineffectual and abrasive and bordered on subordinate.

402.    Defendants Hired non basis employees who were less qualified than Miss

Watson.

403.    The defendants' acted intentionally or recklessly to violate Miss Watson's right to equal protection pursuant to the Constitution of the United States.

404.    All-natural person defendants were acting in their capacities as officials, managers and agents of Defendant Wheeler Clinic.

405.    On information and belief, at least two or more of the defendants asserted that "they would rather hire no one than hire Miss Watson." despite the fact she was easily the most qualified candidate for all three positions at issue.

406.    On information and belief at least two or more of the defendants asserted that "they would rather hire no one than hire Miss Watson.

407.    On information and belief, the defendants' policy position in denying Ms. Watson promotional opportunities extended from 2018 through the present, although the defendants reluctantly promoted Miss Watson on or around October 2019.

408.    At all times relevant herein, Ms. Watson was the most qualified candidate with respect to all three positions she applied for and was discriminatorily denied promotion.

409.    On information and belief, two or more of the defendants maintained a file termed "Supervision Note" marked "Avery Only" and passed it to Ms. Jennifer Lanza, who was Miss Watson's immediate supervisor at the time.

410.    On information and belief, the defendants did not subject other similarly situated non basis employees to the same conduct complained of in the above items.

411.    These defendants, after Miss Watson's rights against retaliation were violated by the defendants of and pursuant to provisions of CFEPA, after she engaged

in previously protected activity by filing a complaint against the defendants on April 12, 2019, with the Connecticut Commission on Human Rights and Opportunities.

412.    As a direct and proximate result of the defendants discrimination conduct. Ms. Watson has suffered compensatory damages, benefits-vacation pay, mental anguish, humiliation, distress, inconvenience, damages to her personal and professional reputation.

413.    Ms. Watson is entitled to an award of punitive damages.

414.    As a direct and proximate result of the unlawful conduct complained of, the defendants selectively enforced rules, custom, practices, procedures, and requirements for employee conduct against Miss Watson's equal protection rights as they pertain to promotional opportunities, and her right to be free from workplace retaliation for filing a complaint to the CHRO.

415.    That the defendants' unlawful conduct served to maintain a severe and pervasive hostile work environment and denied Miss Watson's right to be free from discrimination, harassment on the job.

416.    Miss Watson was subjected to unwelcome touching of her person, and verbally offensive comments such that a reasonable person would find intolerable, hostile and abusive.

417.    The defendants' conduct was motivated by Miss Watson's race and color.

418.    Miss Watson believed her work environment to be hostile and abusive because of the conduct complained of herein.

419.    The defendants by their conduct failed to provide adequate training to their subordinate employee regarding the right to equal employment opportunities and treatment in accordance with law.

420.    The defendants by their conduct failed to promulgate, maintain and enforce adequate, meaningful and effective policies and procedures that  harmed and she suffered and continues to suffer stress and mental emotional  distress.

421.    As a direct and proximate result of the unlawful conduct complained of, Miss Watson, has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

422.    Defendants lack areas for employees to complain of violations of their right and for investigation and discipline in the event of such complaints.

423.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson is entitled to back pay, front pay, compensatory damages, and punitive damages.

424.    As a direct and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson is entitled to back pay, front pay due to substantial costs and attorney's fees to seek appropriate redress.

**COUNT SIX, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AS AGAINST DEFENDANTS WHEELER CLINIC, PREBLE BALOGA AND ARDUINI**

425.    Miss Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 424 inclusive as though fully set forth herein.

426.   The defendants intentionally inflicted emotional distress to Miss Watson from the discriminatory conduct complained of, as well as the incessant turmoil, public shaming, demeaning and embarrassment the defendants subjected to Miss Watson.

427.   More specifically the defendants intentionally subjected Miss Watson to emotional distress by subjecting her to unrelenting workplace harassment and a hostile work environment by demeaning and minimizing her work, characterizing her of having poor verbal and written communication skills, define her presentation skills and style as ineffectual and abrasive and her work conduct as bordering on insubordinate.

428.   These defendants constantly resorted to  "nitpicking" Miss Watson's to and caused emotional distress.

429.   As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

430.   As a direct and proximate result of said unlawful discrimination, harassment on the job, Miss Watson must incur substantial costs and attorney's fees to seek appropriate redress.

431.   On or about November 2020, Arduini acting in concert with Lisa Roth who is White subjected Miss Watson to an unwarranted meeting called GROWTH and the development of MAT PDOA.

432.   In another instance on January 15, 2021, Defendant Arduini invited Mr. Teo Diaz, Vice President who was an upper manager to their weekly supervisory virtual meeting (not done) to undermine Miss Watson.

433.   On information and belief, during the round table meeting, the topic was MAT PDOA -how supervisors collaborate and communicate, how to facilitate collaboration and communication amongst supervisors, which is an area Defendant Arduini has previously accused Miss Watson of being deficient in.

434.   During the meeting Mr. Diaz presented stories of how he handled conflict and stressed the importance of cohesiveness and collaboration of the MAT Team, while Defendant Arduini chimed in with examples as well.

435.   During the meeting, Miss Watson questioned why Mr. Diaz was invited to the meeting.  At some point after Miss Watson stressed her supervisory responsibilities at Wheeler Clinic, Mr. Diaz excused himself from the meeting.

436.   After the meeting, Defendant Arduini stated how "she did not understand what Mr. Diaz was talking about and that she was going to speak to his supervisor about it.

437.   On information and belief, at some point after meeting Defendant Arduini asked Miss Watson if she was frustrated.

438.   The defendants engaged in conduct they knew with substantial certainty involved an unreasonable risk of causing severe emotional distress to Miss Watson by placing her in distress and that the distress would have resulted in further illness or bodily injury.

439.   The defendants knew with substantial certainty that their conduct would have caused emotional distress and vomiting.

440.   The defendant's conduct shocked the conscience and offended Miss Watson's personal dignity.

441.    As a direct and proximate result of said conducts, Miss Watson's personal and professional reputations and relations with coworkers and peers have been irreparably harmed. And, she suffered and continues to suffer stress and mental emotional distress and work debilitating breakdowns.

442.    As a direct and proximate result of the unlawful conduct complained of Ms. Watson's has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish and embarrassment, and humiliation.

443.    As a direct and proximate result of the unlawful conduct complained of Miss Watson has incurred medical expenses and she has incurred economic damages and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention to cure herself of her injuries, as well as to alleviate her pain and suffering.

444.    As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

445.    As a direct and proximate result of said unlawful conduct Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

## COUNT SEVEN, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AS AGAINST DEFENDANTS WHEELER CLINIC, PREBLE, BALOGA, ARDUINI, DIAZ, ROTH, SPEICHER WERBNER

446.    Miss Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 445 inclusive, as though fully set forth herein.

447.    The defendants owed a duty of care to Miss Watson to be free from emotional distress, or they should have realized the unreasonable risk of emotional distress which would have resulted from their conduct towards Miss Watson.

448.    The defendants breached the duty of care they owed Miss Watson to be free from unreasonable risks, which resulted in her injuries by placing her in distress.

449.    The defendants were the proximate cause of the emotional distress suffered by Miss Watson and the continued PTSD.

450.    Ms. Watson suffered damages resulting from the mental and emotional injuries occasioned by the unreasonable risks the defendants exposed her to from 2018 to present.

451.    The defendants should have known that it was likely that a reasonable person as Ms. Watson under the circumstances would be distressed by their unlawful conduct and that the distress would have resulted in Miss Watson's subsequent illness and injuries.

452.    As a result of the defendants' conduct, Miss Watson has been unable to pursue her usual activities due to the psychological, and emotional injuries and damages she has suffered.

453.    As a direct and proximate result of said conducts. Miss Watson's personal and professional reputations and relations with coworkers and peers have been irreparably harmed and she suffered and continues to suffer stress and mental/emotional distress and debilitating headaches.

454.     As a direct and proximate result of the unlawful conduct, Miss Watson has sustained pain and suffering serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

455.     As a direct and proximate result of the unlawful conduct complained of Miss Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention to cure herself of her injuries, and to alleviate her pain and suffering.

456.     As a result of said unlawful conduct Miss Watson has incurred medical expenses, other economic damages, and continues to experience emotional pain and suffering which has now obligated her to expend sums of monies for medical care and attention in an effort to cure herself of her injuries and to alleviate her pain and suffering.

457.     As a direct and proximate result of said unlawful conduct Miss Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

458.     As a direct and proximate result of said unlawful conduct, Miss Watson must incur substantial costs and attorney's fees to seek appropriate redress.

**COUNT EIGHT, NEGLIGENT HIRE, SUPERVISION AND RETENTION AS AGAINST DEFENDANTS WHEELER CLINIC, AND IN THEIR INDIVIDUAL CAPACITIES DEFENDANTS LISA PREBLE, ERICA BALOGA , HEATHER ARDUINI,  LISA ROTH, THEODORE DIAZ**

459.     Miss Watson incorporates by reference herein the allegations set forth in the preceding paragraphs 1 through 458, as if fully set forth herein.

460.    That for all relevant purposes stated herein, the natural person defendants Lisa Preble Erica Baloga, Heather Arduini and Lis Preble, were officials, managers, and supervisors at Defendant Wheeler.

461.    By virtue of their positions, these defendants were vested with the power and authority to recommend, inform, supervise and terminate the conduct complained of herein.

462.    That none of the three natural person defendants took the steps necessary to protect Miss Watson from the conduct complained of at any point, in fact, at times they were active facilitators of the unlawful conduct complained of by Miss Watson.

463.    That all three natural person defendants engaged in acts or omissions that served to violate the duty of care owed Miss Watson free from harassment, defamatory comments and harmful conduct.

464.    That all three natural person defendants engaged in acts, or omissions that served to breach the duty of care owed Miss Watson free from harassment, defamatory comments and harmful conduct, and that said breaches of those duties, in proximity, caused the damages and injuries to Miss Watson.

465.    That Defendant Baloga breached her duty to Miss Watson by negligently supervising her and retaining her where she knew or should have known that the exercise of reasonable care on her part would have revealed that Defendant Preble was incompetent and or unfit, thereby creating an unreasonable risk of harm to others, including Miss Watson. And that she should not have been hired, she should have been terminated or at the least subjected to heightened supervision.

466.    Defendant Baloga knew or should have know from her personal encounter with Defendant Preble on or around November 2018 when she published a defamatory email which provided in pertinent arts that:

"In case anything comes up about the supervisor position before we get to meet, I want to let you know that I literally lost sleep this weekend thinking about the Avery situation.  Ms. Preble further stated that she did not want Watson to get the promotion to Clinical Supervisor because of her poor interpersonal skills, poor written and verbal communication skills, and her tone at times has bordered on insubordinate… I would rather hire nobody than hire Avery.  Ms. Preble concluded her email by stating that she was sorry to bother Ms. Beloga with this again.  Like I said I actually lost sleep over this over the weekend and just really needed to get it out".

467.    Additionally, Defendant Baloga knew or should have known that Defendant Preble and Defendant Arduini were actively engaging in repeated acts of fraud to deny Miss Watson promotional opportunities.

468.    Defendant Baloga knew or should have know of Defendant Preble's and Defendant Arduini's unfitness, racist attitudes, and incompetence over a sustained period, especially here, the exercise of reasonable care on her part would have revealed Defendant Preble's incompetent and/or unfit, thereby creating an unreasonable risk of harm to Miss Watson, and that Defendant Preble should not have been hired retained, that she should have been terminated, or at the least subjected to heightened supervision.

469.   That Defendant Baloga and Defendant Speicher early on owed a duty of care to Ms.. Watson to be free from the unreasonable risk of injury that she knew or should have realized would have posed an unreasonable risk of causing injury to Miss Watson from Defendant Preble.

470.   Defendant Baloga and Defendant Speicher breached the duty of care she owed Miss  Watson to be free from injury.

471.   Defendant Baloga and Defendant Speicher's conduct or omission was the primary proximate cause of the injuries suffered by Miss Watson.

472.   Miss Watson suffered damages occasioned by the unreasonable risks Defendant Preble et al exposed her to.

473.   That Defendant Baloga knew or should have known that it was likely that a reasonable person under the circumstances would be injured by Defendant Preble's unlawful conduct.

474.   As a result of Defendant Baloga's conduct, Ms. Beluga's conduct, Ms. Watson has been unable to pursue her usual activities and employment due to the psychological and emotional injuries and damages she has suffered.

475.   As a direct and proximate result of said conducts, ms. Watson's personal and professional reputations and relations with coworkers and peers have been irreparably harmed.  And, she suffered and continues to suffer stress and mental emotional distress.

476.   As a direct and proximate result of the unlawful conduct by the defendants, Miss Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

477.    As a direct and proximate result of the unlawful conduct by the defendants, Miss Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering which has now obliged her to expend sums of monies for medical care attention to cure herself of her injuries and to alleviate her pain and suffering.

478.    As a direct and proximate result of said unlawful conduct, Miss Watson is entitled to compensatory damages for the injuries these Defendants caused as well as punitive damages.

479.    As a direct and proximate result of said unlawful conduct Miss Watson must incur substantial costs and attorney fees to seek appropriate redress.

**COUNT NINE, NEGLIGENT HIRE, SUPERVISION AND RETENTION AS AGAINST DEFENDANTS WHEELER CLINIC BY AND THROUGH ITS SUPERVISORY HUMAN RESOURCES AGENTS-DEFENDANT PATRICIA SPEICHER WEBBNER**

480.    Ms. Watson incorporates by reference herein the allegations set forth in the preceding paragraphs 1 through 479, as if fully set forth herein.

481.    That for all relevant purposes stated herein, the Defendant Wheeler Clinic is administered by natural persons herein referred to as atricia Speicher Werbner, Chief of the Human Resources Department.

482.    That on information and belief, this person analyses and advises officials, managers and supervisors at Defendant Wheeler day-to-day on personnel related issues.

483.    That the acts and or omissions of the Human Resources department serves to legally bind the Defendant Wheelers Clinic.

484.     That Defendants Lisaa Preble, Erica Bagola and Heather Arduini were officials, managers, and supervisors at Defendant Wheeler, and they consulted with and or conferred with Patircia Speicher Werbner Chief of the Human Resources Department.

485.     By virtue of the authority vested in Patricia Speicher Werbner, Chief of the Human Resources Department, she had the power and authority to recommend, inform, supervise, and terminate the conduct complained of herein, or in the alternative, she could have complained to the supervisors of Defendants Lisa Preble, Erica Baloga and Heather Arduini.

486.     That for purposes of this action, the Human Resources Department is Defendant Wheeler, and its agents acts on its behalf.Oughits agent, Patriia Speichere Weerbner, Chief of the Human Resources Departmentfailed to take steps necessary to protect Ms. Watson from the conduct complained of at any point, where she knew or should have known of the conduct complained of herein.

487.     That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew of should have known of the acts and commissions engaged in serving to violate the duty of care owed Ms. IWatson to be free from harassment defamatory comments and other harmful,, and discriminatory conduct, and Wheeler knew or should have known of these activities.

488.     That DefendantWheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department breach the duty of care owed Ms. Watson to be free from harassment, defamatory comments, and harmful conduct, and that said

breaches of those duties approximately caused the damages and injuries to Miss

Watson.

489.    That DefendantWheeler through its agent, Patricia Speicher Werbner,

Chief of the Human Resources Department failed to take steps necessary to protect

Miss Watson from the conduct complained of at any point, where it knew or should have

known of the conduct complained of herein.

490.    That Defendant Wheeler through its agent, Patricia Speicher Werbner,

Chief of the Human Resources Department breached her duty to Miss Watson by

negligently supervising Defendants Preble, Bloga and Arduini by etaining them as here

where she new or should hve know that the exercise of reasonable care on her part,

would have revealed that these defendantswere incompetent and or unfit, thereby

creating an unreasonable risk of harem to Miss Watson and tht they should not have

been hired, or they should have been terminated or at the least subjected to heightened

supervision.

491.    That Defendant Wheeler through its agent, Patricia Speichher Werbner,

Chief othe Human Resources Department failed to take steps necessary to protect Ms.

Watson from the conduct complained of at any point, where she knew or should have

known of the conduct complained of herein.

492.    Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of

the Human Resources Department its agents knew or should have known from the

natural persons' conduct that Miss Watson was harassed and injured by the defendants

as asserted above.

493.   That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew or should have known from the natural persons' conduct that Ms. Watson was harassed and injured by the defendants as asserted above.

494.   That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew or should have known or should have known that the defendants were actively engaging in repeated acts to deny Miss Watson promotional opportunities and harassment.

495.   That Defendant Wheeler through its agent, Patricia Speicher Werbner, Chief of the Human Resources Department knew or should have known of the natural persons' unfitness and incompetence over a sustained period of time, especially here, whee the exercise of reasonable care on her part would have revealed that said natural person defendants were incompetent and or unfit, thereby creating an unreasonable risk of harm to Miss Watson, and that they should not have been hired, retained, that she should have been terminated, or at the least subjected to heightened supervision.

496.   As a result of That Defendant Wheeler through its agent Patricia Speicher Werbner, Chief of the Human Resources Department negligent hire, supervision retention Miss Watson has been unable to pursue her usual activities and employment due to the psychological, and emotional injuries and damages she has suffered.

497.   As a direct and proximate result of said conducts, Miss Watson's personal and professional reputations and relations with coworkers and peers have been irreparably harmed, and she suffered and continues to suffer stress and mental emotional distress.

498.   As a direct and proximate result of the unlawful conduct by the defendants, Miss Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment, and humiliation.

499.   As a direct and proximate result of the unlawful conduct by the defendants, Ms. Watson has incurred medical expenses and she has incurred economic damages and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention to cure herself of her injuries, and to alleviate her pain and suffering.

500.   As a direct and proximate result of said unlawful conduct Plaintiff is entitled to compensatory damages for the injuries Defendant Preble caused as well as punitive damages.

501.   As a direct and proximate result of said unlawful conduct, Miss Watson must incur substantial costs and attorney's fees to seek appropriate redress.

**COUNT TEN, DEFAMATION OF CHARACTER AS AGAINST DEFENDANT PREBLE IN HER INDIVIDUAL CAPACITY**

502.   Ms. Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 501, inclusive, as though fully set forth herein.

503.   That on or around November 2018, Defendant Preble published an email to Defendant Baloga in which she falsely stated that:

"In case anything comes up about the supervisor position before 2we get to meet, I want to let you know that I literally lost sleep this weekend thinking about the Avery situation.  Ms. Preble further stated that she did not want Watson to get the promotion to Clinical Supervisor because of her poor interpersonal skills,

poor written and verbal communication skills, and her tone at times has bordered

on insubordinate… I would rather hire nobody than hire Avery.  Ms. Preble

concluded her email by stating that she was sorry to bother Ms. Baloga with this

again.  Like I said I actually lost sleep over this over the weekend and just really

needed to get it out".

504.   As a result of the false statement published by Defendant Preble to

Defendant Baloga, Miss Watson has suffered damages, upon learning of the email

through the CHRO discovery process in or around summer 2019.

505.   As a result of the false statement published by Defendant Preble to

Defendant Baloga and Defendant Arduini, Ms. Watson has suffered damages to her

reputation and professional standing.

506.   That Defendant Preble made and published this false statement

intentionally to thwart the promotional opportunities of Miss Watson.

507.   As a direct and proximate result of said conducts, Miss Watson's personal

and professional reputations and relations with coworkers and peers have been

irreparably harmed, and she suffered and continues to suffer stress and

mental/emotional distress.

508.   As a direct and proximate result of the unlawful conduct complained of,

Miss Watson has sustained pain and suffering, serious psychological injury, emotional

distress, mental anguish, embarrassment and humiliation.

509.   As a direct and proximate result of the unlawful conduct complained of Ms.

Watson has incurred medical expenses and she has incurred economic damages and

continues to experience emotional pain and suffering, which has now obligated her to

expend sums of monies for medical care and attention to cure herself of her injuries, and to alleviate her pain and suffering.

510.   As a direc and proximate result of said unlawful discrimination, harassment on the job, Ms. Watson is entitled to back pay, frrtont pay, compensatory damages, and punitive damages.

511.   As a direct and proximate result of said unlawful discrimination, harassment onthe job miss Watson must incur substantial costs and fees to seek appropriate redress.

## COUNT ELEVEN, FALSE LIGHT AS AGAINST DEFENDANT PREBLE IN HER INDIVIDUAL CAPACITY

512.   Miss Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 511, inclusive, as though fully set forth herein.

513.   That on or around November 2018, Defendant Preble published an email to Defendant Baloga in which she falsely stated that:

"In case anything comes up about the supervisor position before 2we get to meet, I want to let you know that I literally lost sleep this weekend thinking about the Avery situation.  Ms. Preble further stated that she did not want Watson to get the promotion to Clinical Supervisor because of her poor interpersonal skills, poor written and verbal communication skills, and her tone at time has bordered on insubordinate… I would rather hire nobody than hire Avery.  Ms. Preble concluded her email by stating that she was sorry to bother Ms. Beloga with this

again.  Like I said I actually lost sleep over this over the weekend and just really needed to get it out".

514.    That defendant Preble either knew that the publicized material was false and would place Miss Watson in a false light or acted with reckless disregard as to whether the published material was false and would place Miss Watson in a false light: and

515.    That the material Defendant Preble published was a misrepresentation and it was widely published about Miss Watson's character, history, activities and or beliefs that a reasonable person in Miss Watson's position would find highly offensive.

516.    A reasonable person in Miss Watson's position would be seriously offended by the false material, such that, in the eyes of the community, Ms. Watson would be justified in feeling offended or in feeling aggrieved.

517.    As a result of the false statement published by Defendant Preble to Defendant Baloga, Ms. Watson has suffered damages, upon learning of the email through the CHRO discovery process in or around summer 2019.

518.    As a result of the false statement published by Defendant Preble to Defendant Baloga, Ms. Watson has suffered damages to her reputation and professional standing.

519.    Tht Defendant Preble made and published this false statement intentionally to thwart the promotional opportunities of Ms. Watson.

520.    As a direct and proximate result of said conducts, Ms. Watson's personal and professional reputations and relations with co-worker and peers have been

irreparably harmed, and she suffered and continues to suffer stress and mental/emotional distress.

521.    As a direct and proximate result of the unlawful conduct complained of, Miss Watson has sustained pain and suffering, serious psychological injury, emotional distress, mental anguish, embarrassment and humiliation.

522.    As a direct and proximate result of the unlawful conduct complained of ms. Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of money for medical care and attention to cure herself of her injuries, and to alleviate her pain and suffering.

523.    As a direct and proximate result of said unlawful conduct Miss Watson is entitled to compensatory damages for the injuries the defendants caused, as well as punitive damages.

524.    As a direct and proximate result of said unlawful conduct ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

## COUNT TWELVE, BATTERY AS AGAINST DEFENDANT LISA ROTH IN HER INDIVIDUAL CAPACITY

525.    Miss Watson repeats, realleges and incorporates by reference the allegations set forth in paragraph 1 through 524, inclusive, as though fully set forth herein.

526.    On or around May 14, 2021, Miss Watson went to Defendant Wheeler's to complain about the deteriorating conditions of her employment.

527.   That Defendant Roth intentionally made a physical contact with Miss Watson's person by forcefully and intentionally bumping into her, and the defendant had the intention to do so.

528.   The Defendant Lisa Roth works in Adult Outpatient location as Site Director as a whole and is not an immediate officer in Miss Watson's department.

529.   That this contact was harmful or offensive to Miss Watson.

530.   That Defendant Roth did not have consent or have legal justification to contact Miss Watson's person.

531.   That Miss Watson's acknowledgment of the assault caused Defendant to look and then turn away and begin talking to Miss Watson suffered and continues to suffer the loss of pay, benefits and retirement credits,and her career has been impeded and impaired.

532    As a direct and proximate result of the unlawful conduct complained of, Miss Watson has incurred medical expenses and she has incurred economic damages, and continues to experience emotional pain and suffering, which has now obligated her to expend sums of monies for medical care and attention to cure herself of her injuries, and to alleviate her pain and suffering.

533.   As a direct and proximate result of said unlawful conduct Ms. Watson is entitled to compensatory damages for the injuries Defendant Roth caused, as well as punitive damages.

534.   As a direct and proximate result of said unlawful conduct, Ms. Watson must incur substantial costs and attorney's fees to seek appropriate redress.

**V.    PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests:

A.      Compensatory damages, front pay and back pay

B.      Damages for pain and suffering, emotional distress injury to reputation, loss of

self esteem, enjoyment of life and consequential damages

C.      Punitive Damages

D.      Costs

E.      Attorney's fees

F.      Interest and such other and further relief as the Court deems just and equitable.

Plaintiff demands a trial by jury on all issues so triable.




BY_____/S/_____      Dated:  July 21, 2021
Respectfully Submitted,

Avery Watson, Pro Se' Plaintiff
92 Cynthia Lane #A2
Middletown, CT  06457
awatson428@gmail.com
(860)888-6058

Case 3:21-cv-00503-RNC Document 62 Filed 7/21/21

UNITED STATES DISTRICT DISTRICT COURT

For the

DISTRICT OF CONNECTICUT

AVERY WATSON                                          Case 3:21-cv-503 (RNC)
PLAINTIFF,
V
Wheeler Clinic, Inc., Lisa Preble is sued in her :
Individual capacity, Heater Arduini is sued in   :
Her Individual capacity, Patricia Speicher-      :      SECOND AMENDED COMPLAINT
Werbner, Chief Of Human Resources, is            :
in her individual Capacity, Lisa Roth, is sued   :
in her individual capacity, Theodore Anderson
Diaz, Vice President, Adult Outpatient Services              :
DEFENDANTS                                           July 21, 2021


Plaintiff seeks a jury trial on all counts and all questions of fact and law of her
Complaint.




BY_____/S/_____   Dated:  July 21, 2021
Respectfully Submitted,

Avery Watson, Pro Se' Plaintiff
92 Cynthia Lane #A2
Middletown, CT  06457
awatson428@gmail.com
(860)888-6058

UNITED STATES DISTRICT DISTRICT COURT
For the

DISTRICT OF CONNECTICUT

AVERY WATSON                                          Case 3:21-cv-503 (RNC)
PLAINTIFF,
V
Wheeler Clinic, Inc., Lisa Preble is sued in her :
Individual capacity, Heater Arduini is sued in   :
Her Individual capacity, Patricia Speicher-     :       SECOND AMENDED COMPLAINT
Werbner, Chief Of Human Resources, is           :
in her individual Capacity, Lisa Roth, is sued  :
in her individual capacity, Theodore Anderson
Diaz, Vice President, Adult Outpatient Services                        :
DEFENDANTS                                          July 21, 2021


## **CERTIFICATION**


The undersigned Pro Se' Plaintiff certifies that a copy of the foregoing Second Amended

Complaint will be upon the Defendants on or about July 21, 2021, through the Court's

electronic filing system withinthe time prescribed by teh Federal Rules of Civil

Procedure and Local Rules to all counsel of record.


BY_____/S/_____       Dated:  July 21, 2021
Respectfully Submitted,

Avery Watson, Pro Se' Plaintiff
92 Cynthia Lane #A2
Middletown, CT  06457
awatson428@gmail.com
(860)888-6058