## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| AVERY WATSON,<br><br>     *Plaintiff*,<br><br>v.<br><br>WHEELER CLINIC, INC., LISA<br>PREBLE, ERICA BALOGA,<br>HEATHER ARDUINI, LISA ROTH,<br>PATRICIA SPEICHER-WERBNER,<br>and THEODORE ANDERSON DIAZ<br><br>     *Defendants*. | No. 3:21-cv-0503 (MPS) |

## RULING ON MOTION TO DISMISS

### I.    INTRODUCTION

Plaintiff Avery Watson, who is a former employee of Wheeler Clinic, Inc. ("Wheeler"), filed suit against Wheeler and several Wheeler employees (collectively referred to as "Defendants"), including Lisa Preble, Erica Baloga, Heather Arduini, Lisa Roth, Patricia Speicher-Werbner, and Theodore Anderson Diaz.  Watson, who is representing herself, alleges that the Defendants discriminated against her based on her race, in violation of 42 U.S.C. § 1981, Title VII, 42 U.S.C. § 2000e, *et seq*., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60, *et seq*.  Watson further alleges that the Defendants' conduct gives rise to state law claims of intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), negligent supervision, hiring, and retention, defamation, and false light.  Defendants filed a partial motion to dismiss.  ECF No. 72.  For the reasons set forth below, the Defendants' motion is granted in part and denied in part.

1

## II.     FACTUAL BACKGROUND

The following facts are taken from Watson's Third Amended Complaint ("TAC"), ECF

No. 105, and are accepted as true for the purposes of this ruling.[1]

### A.  The Parties

Wheeler provides behavioral health and addiction services to adults and children.  *Id.* ¶

11.  Wheeler "derives much of its revenue" from grants, such as the federal grant program for

Medication Assisted Treatment ("MAT").  *Id.* at 3 ¶ 12.  On December 18, 2017, Wheeler hired

Watson as a Senior Intake Clinician at its New Britain, Connecticut location.  *Id.* at 2 ¶ 6.

Watson is a black woman and is a Licensed Clinical Social Worker ("LCSW"), Licensed

Alcohol and Drug Counselor ("LADC"), and Certified Dementia Practitioner ("CDP").  *Id*. at 2

¶¶ 4, 6.

Lisa Preble is a white woman and is a LCSW and LADC.  *Id.* at 5 ¶¶ 21–22.  In February

2018, Wheeler hired Preble as a Clinical Supervisor.  *Id.* at 5 ¶ 21.  Heather Arduini is a white

---

[1] Watson filed this case against the Defendants on April 11, 2021.  ECF No. 1.  On July 23, 2021, Watson filed a Second Amended Complaint.  ECF No. 63.  On September 10, 2021, Defendants filed a partial motion to dismiss the Second Amended Complaint.  ECF No. 72.  After a telephonic status conference with the parties, the Court entered an order, permitting Watson to file a motion to amend her complaint.  ECF No. 93.  On April 16, 2022, Watson filed a motion for leave to amend the complaint along with a redlined copy of the complaint.  ECF Nos. 95, 95-1.  The Court docketed the redlined copy of the complaint as the "Third Amended Complaint," ECF Nos. 96, 97, and ordered the Defendants to file a notice indicating whether they believed they needed to file a renewed motion to dismiss to address the Third Amended Complaint, ECF No. 96.  Defendants did not file any notice.  The Court afforded the Defendants another opportunity to file a notice indicating whether a renewed motion to dismiss was necessary.  ECF No. 98.  Again, Defendants did not file any notice.  After further review of the Second Amended Complaint and the Third Amended Complaint, the Court was unsure whether it had docketed the right copy of the complaint as the Third Amended Complaint.  ECF No. 102.  Thus, the Court ordered Watson to docket the complaint that she intended to file as her Third Amended Complaint.  *Id.*  In response to the order, Watson docketed a proposed amended complaint, titled "Third Amended Complaint."  ECF No. 103.  The Court docketed that complaint as the "Third Amended Complaint, ECF No. 105, and deemed the previously docketed Third Amended Complaint as stricken, ECF No. 104; *see* ECF No. 97.  Because the Court determined that Watson made only formatting changes between the stricken Third Amended Complaint and the newly docketed Third Amended Complaint, and because the Defendants did not object to the Court's applying the pending motion to dismiss to the stricken Third Amended Complaint, the Court stated that it would apply the pending motion to dismiss to the newly-docketed Third Amended Complaint.  ECF No. 104.

woman and a Licensed Marriage and Family Therapist ("LMFT"). *Id.* at 11 ¶ 54. In October

2017, Wheeler hired Arduini as a clinician. *Id.* Erica Baloga is a white woman and the

"Associate Director of Adult Outpatient Services" at Wheeler's New Britain location. *Id.* at 17 ¶

91. Lisa Roth is a white woman and Wheeler's "New Britain Site director." *Id.* at 20 ¶ 104.

Ted Diaz is "Hispanic" and Wheeler's "Vice President of Adult Outpatient Operations." *Id.* at

22 ¶ 120. Patricia Speicher-Werbner is a white woman and Wheeler's Chief Human Resources

Officer. *Id.* at 23 ¶ 126.

**B. Watson's Performance Review**

From March 2018 to June 2018, Preble supervised Watson until Preble was promoted to

"Department Program Manager." *Id.* at 5 ¶¶ 24, 26. While serving as Watson's supervisor,

Preble identified Watson's "[c]ommunication [s]tyle" on her performance review as an area that

"Needs Improvement." *Id.* at 26 ¶¶ 142–43. Specifically, in Preble's "supervision notes/email,"

she wrote that Watson was "combative, disorderly, consistently demonstrated poor interpersonal

skills, poor written and verbal communication skills, and [that] her tones at times borders on

insubordinate…she also has the reputation to be horribly apathetic and short with clients." *Id.* at

26–27 ¶ 144. Preble stated that her reason for giving this feedback on Watson's communication

style was due to an exchange between Watson and a coworker, during which the coworker "felt

that [Watson] was calling them lazy." *Id.* at 27 ¶¶ 151–53. Preble reported the exchange

between Watson and the coworker to Human Resources ("HR"), and HR determined that Watson

did not do anything wrong. *Id.* at 27 ¶ 154. Preble also claimed that her feedback was based on

"other managers' complaints to her about [] Watson's abrasive communication and bad

interpersonal skills." *Id.* at 9 ¶ 41; *id.* at 27–28 ¶ 155. After Preble's tenure as Watson's

supervisor, she wrote another "Supervision Note" "to negatively influence [] Watson's

immediate supervisor," Jennifer Lanza, stating that Watson was "argumentative." *Id.* at 35 ¶ 207.

### C. Denial of Promotions

Watson claims that the Defendants "[d]iscriminatorily [d]enied" her a promotion on three occasions. *Id.* at 35 ¶ 209.

On November 12, 2018, Watson applied for a promotion to the Clinical Supervisor position. *Id.* at 36 ¶ 213. Initially, Preble was the hiring manager for this position but she "recuse[d] herself because she had worked with one of the candidates at a previous company." *Id.* at 36 ¶ 215. After Preble's recusal, Baloga and Sue Mason, another Wheeler employee, assumed the responsibility for hiring for this position. *Id.* On November 19, 2018,[2] Preble sent an email to Baloga, *id.* at 6 ¶ 28, stating that she "lost sleep this weekend thinking about the Avery situation" and that "she did not want Watson to get the promotion to Clinical Supervisor because of her poor interpersonal skills, poor written and verbal communication skills, and her tone[, which] at times bordered on insubordinate," *id.* at 72 ¶ 466. Further, Preble wrote that "I would rather hire nobody than hire Avery." *Id.* Baloga and Mason ultimately promoted Christine Grant, who is white and was hired initially as a clinician by Preble during the summer of 2018. *Id.* at 18 ¶ 97; *id.* at 36–38 ¶¶ 216, 218. Watson alleges that Grant was not qualified for the job because she was not a LCSW, did not have the requisite experience with clinical supervision, and had not been at Wheeler for at least one year. *Id.* at 38 ¶ 225. In comparison, Watson is a LCSW and had over two years of experience with clinical supervision. *Id.* at 38 ¶ 226. Watson alleges that even though Preble recused herself from the hiring process, Preble ensured that Grant received the promotion over Watson. *Id.* at 36 ¶¶ 217–18.

---

[2] Watson appears to reference Preble's email in another paragraph in the TAC but in that allegation, Watson states that Preble sent the email on November 29, 2021. ECF No. 105 at 40 ¶ 240.

Preble informed Watson that she did not receive the promotion during Watson's "routinely scheduled [s]upervision" with her immediate supervisor, Lanza.[3]  *Id.* at 37 ¶ 219. Preble told Watson that "management" thought that Watson's interview was "stellar," citing "her noteworthy insight, work ethic[,] and proficiency."  *Id.*  Despite the positive feedback, Preble stated that Watson "was not fit for the clinical supervisor" position because "she [was not] friendly enough" and "[h]er communication style was a problem."  *Id.* at 37 ¶ 222.  After her promotion, Grant became Watson's "immediate supervisor," but Preble "insisted" on assuming more supervisory duties to continue "her unrelenting onslaught against [] Watson."  *Id.* at 10 ¶ 49.

On January 6, 2019, Watson applied for a second Clinical Supervisor position.  *Id.* at 39 ¶ 231.  Preble denied receiving an application from Watson and did not interview her for this position.  *Id.* at 39 ¶¶ 232–33.  Preble hired Satina Salce, an external candidate who is white.  *Id.* at 39 ¶¶ 233–34.  Watson claims that Salce was not qualified for the position and did not have the "preferred LCSW licensure."  *Id.* at 39 ¶¶ 234–35.  Salce started her position at Wheeler on March 5, 2019, which was three months after she was hired.  *Id.* at 39 ¶ 236.  While waiting for Salce to start, Watson covered up to "5 open positions."  *Id.*

On March 13, 2019, Watson applied for a third Clinical Supervisor position.  *Id.* at 40 ¶ 242.  When Preble received Watson's application, she emailed Baloga and Arduini, writing that "it must be a joke that Miss Watson still had the nerve to apply after all she had been through." *Id.* at 40 ¶ 246.  Arduini suggested that Preble tell Watson that she had already offered the job to someone else.  *Id.* at 40 ¶ 247.  Preble, Baloga, and Arduini told Watson that they hired Jade

---

[3] It is not clear when this meeting took place.  Watson alleges the meeting took place on November 9, 2018, which is before she applied for the Clinical Supervisor position.  *Compare* ECF No. 105 at 36 ¶ 213 *with* ECF No. at 37 ¶ 219.

Bray before they received Watson's application. *Id.* at 41 ¶ 249. Preble reported that she did not interview Watson for the position because "she was not obligated to interview a non-qualified person." *Id.* at 41 ¶ 251.

Bray, who is "White" and "West African," *id.* at 42 ¶ 260, had applied for "non[-]supervisory clinical positions," *id.* at 41 ¶ 252, and was surprised when Preble contacted her to tell her about the Clinical Supervisor position, *id.* at 41 ¶¶ 255. Watson alleges that Preble told Bray about the Clinical Supervisor position the day before the position was posted and that there is "no official record" of Bray's application. *Id.* at 41–42 ¶ 256–57. At the time of hiring, Bray "had been [a] LCSW for just over one year" and had "no supervisory experience." *Id.* at 42 ¶ 259. Watson alleges that Preble, Baloga, and Arduini "colluded" to hire Bray and "falsified a letter to Human Resources to include with the hiring file." *Id.* at 42 ¶ 261.

After the third denial of a promotion, Watson contacted Preble, Baloga, and Grant, complaining that they had discriminated against her during the hiring process for the three Clinical Supervisor positions. *Id.* at 43 ¶ 270. Baloga sent Watson's complaint to HR. *Id.* at 43 ¶ 271. At an unspecified time, Speicher-Werbner of HR "suggested [] Watson take offers in different cities if she wanted to be [a] Clinical [S]upervisor." *Id.* at 25–26 ¶¶ 137, 141. Further, in response to Watson's complaint[4] about "Preble's harassment," Speicher-Werbner met with Watson to discuss trainings about communication that Watson could complete "to become more suitable" for future job openings. *Id.* at 24 ¶¶ 130–31. In addition, on April 12, 2019, Watson filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). *Id.* at 59 ¶ 373. All of the Defendants knew about Watson's CHRO complaint. *Id.* at 43 ¶ 267.

---

[4] It is not clear that this complaint is the same complaint referenced earlier in the paragraph.

In September 2019, Watson applied for a fourth Clinical Supervisor position.  *Id.* at 43 ¶ 272.  Unlike the other prospective candidates, Watson had to interview with Diaz along with Arduini and an unnamed Clinical Supervisor.  *Id.* at 43–44 ¶ 273.  Watson alleges that she was subjected to "undue scrutiny unlike any other hire" and that Diaz required her "to prove herself worthy of the clinical supervisor position."  *Id.* at 44 ¶ 274.  Arduini offered the position to Watson in an email, using a "sarcastic" tone meant to undermine Watson's authority.  *Id.* at 44 ¶ 275.  As a result of this promotion, Watson worked two full-time positions as a "SAMSHA" MAT Project Director and a Clinical Supervisor for Wheeler Clinic Adult Outpatient Services. *Id.* at 44 ¶¶ 275–76.

In March 2021, Watson amended her CHRO complaint to include a claim of retaliation against the Defendants, alleging that the Defendants retaliated against her for filing a CHRO complaint.  *Id.* at 44–45 ¶¶ 280–81.

### D.  Watson's Other Allegations Relating to the Work Environment

Watson alleges that her coworkers discriminated against her in several other ways.

#### i.    *Allegations About Meetings*

Watson alleges that her coworkers subjected her to unwarranted meetings and undermined her during meetings.  On March 4, 2019, Preble summoned Watson to "an impromptu meeting" after Watson returned from her leave for "work-related job stress relief" under the Employee Assistance Program ("EAP").  *Id.* at 10 ¶ 46.  On November 30, 2020, Arduini and Roth subjected Watson to an unwarranted meeting about "the development of MAT PDOA," *id.* at 45 ¶ 284, during which Roth informed a team member that she did not have to "follow" Watson's instructions related to the MAT grant award specifications.  *Id.* at 45–46 ¶¶

286–87; *see also id.* at 17 ¶ 88 (Arduini met with Watson to "destroy the positive outcomes and trends" from Watson's programs).

Watson also alleges that her coworkers humiliated her on multiple occasions by discussing communication skills during meetings. She claims that the discussions of communication skills were a "personal attack." *Id.* at 47–48 ¶¶ 295, 301. Watson alleges the following additional examples of such meetings. In September 2020, Diaz "ambush[ed]" Watson with a meeting about "how important it is to be cohesive with others." *Id.* at 23 ¶ 123. On January 15, 2021, Arduini invited Diaz to attend a weekly supervision meeting with Watson during which they discussed how supervisors collaborate and communicate. *id.* ¶ 293–98. During a meeting on February 2, 2021, Arduini "ridiculed[,] humilitated[,] and derided" Watson in front of other staff members by discussing "effective collaboration and communication[] style[s]" and "the importance of being kind and respectful." *Id.* at 48 ¶¶ 300–01. On February 23, 2021, Arduini made "false reports about [] Watson and her staff," and as a result, Arduini and Diaz met with Watson to discuss how to communicate during meetings. *Id.* at 14–15 ¶¶ 74–75; *see also id.* at 22 ¶¶ 121–22.

### ii.    *Allegations Regarding Race*

Watson claims that the Defendants made comments about race or treated black people differently.

Watson alleges that Preble was "known to view black people as criminals and ignorant." *Id.* at 11 ¶ 52; *see also id.* at 7 ¶ 34 (Preble "resented black and marginalized people" and reprimanded Watson for showing too much concern for clients); *id.* at 7–8 ¶ 35 (Preble also "resented [] Watson's respect and concern for often marginalized clients" and did not like that Watson expressed that Wheeler had "a culture of criminalizing black clients[, who] display[ed]

symptoms of their mental disorder," while it appropriately treated white clients' mental health

disorders). She further alleges that Preble "sent [race] baiting remarks[,] falsely accusing []

Watson of bringing black people to her office," and "stating that the person had distinctive hair[,]

namely blonde dreadlocks[,] [and] that she didn't match any co-worker in the Company." *Id.* at

7 ¶ 33. In addition, when a black staff member was leaving Wheeler, Preble asked staff

members "to bring vegetarian and soul food," believing that the departing black staff member

preferred soul food. *Id.* at 8 ¶ 37.

Watson also alleges that during a meeting, "Arduini castigated the black intern,"

upsetting Watson, who then excused herself from the meeting because she was anxious from

having to "cope" with another discriminatory comment. *Id.* at 46 ¶ 290. After the meeting, on

March 9, 2020, Arduini sent an email to Watson stating that "she did not like [] Watson's tone"

during the meeting and that she was glad that the black intern's term at Wheeler was almost

done. *Id.* at 46 ¶ 288. Arduini forwarded this email to an employee in HR. *Id.* at 46–47 ¶ 291.

Watson alleges that "[t]here is no basis for this email" and that Arduini "made these accusations

about [] Watson" in retaliation for Watson's CHRO complaint. *Id.*

In another incident, Watson alleges that when she returned from lunch, she found three

white coworkers hiding underneath a desk in her office, shouting at Watson to close the door

because they were afraid of a black client. *Id.* at 18 ¶ 98. Watson told the three coworkers that

the black client was in a police car. *Id.* Afterwards, Baloga and Preble accused Watson of

failing to take the lockdown seriously. *Id.* at 19 ¶ 100. Watson responded that the lockdown was

lifted and asked if the black client was arrested. *Id.* Preble stated that she called the police. *Id.*

at 19 ¶ 101. Preble also stated that Watson would not be disciplined because Preble and Baloga

"felt compassion" and believed that Watson was upset about the black client based on "her own

upbringing and the neighborhood she grew up in." *Id.*; *see also id.* at 33 ¶ 194 (Watson and Preble disagreed over the treatment of black clients, and Watson felt that Wheeler often called the police to handle black clients but did not do so for white clients.).

Watson alleges that several Defendants forced black and Hispanic employees to leave Wheeler and treated non-white staff differently.  For example, Preble "forc[ed] a black man out" of Wheeler.  *Id.* at 8 ¶ 38.  Someone overheard Preble "saying it's good that he's gone so now we can get someone new."  *Id.*  Preble then hired a white woman to replace the black employee.  *Id.* Roth "caused" four non-white employees to leave Wheeler "because of her discriminatory actions towards them."  *Id.* at 20 ¶ 107.  Watson believed that she was Roth's "next intended target."  *Id.*  In addition, Arduini "would demean [] Watson's non[-]white staff ([H]ispanic)" and caused the staff to feel that Arduini treated them that way because they worked for Watson.  *Id.* at 13 ¶ 67; *see also id.* at 16 ¶ 83.  Arduini also "allowed white staff to demean clients."  *Id.* at 13 ¶ 68.

### iii.    *Allegations Concerning Watson's Work*

Watson alleges that the Defendants made negative comments about her work.  Between December 2018 and May 2019, Preble emailed Watson "on a continuous basis" concerning "'purported' performance issues."  *Id.* at 43 ¶ 268.  Around January 2019, Preble "fabricate[d] a timeline" of the "deterioration" of "Watson's usual work ethic[], job dependability, and attentiveness to detail" and claimed to have fixed errors that she noticed in Watson's work.  *Id.* at 10 ¶ 47.  At an unspecified time, Arduini told Wheeler staff members that Watson "does not know how to effectively communicate or how to run her program."  *Id.* at 47 ¶ 292.  Further, a coworker overheard Preble refer to Watson as "combative" and "disorderly."  *Id.* at 8 ¶ 39. Watson questioned "why … Preble and Arduini targeted her communication style because of her

race." *Id.* at 27 ¶ 146.  Watson reminded Preble and Arduini that "other white coworkers," who used "sarcastic language and profanity[,] were not disciplined for doing so." *Id.* at 27 ¶ 147.  At an unspecified time, Speicher-Werbner emailed Watson about the ways that "Watson should improve her communication style and interpersonal skills." *Id.* at 25 ¶ 136.

Watson also alleges that the Defendants gave her extra work.  For example, in May 2018, Preble changed the staff workload to "distribute [the] caseload[] more evenly" and to use "Watson more effectively." *Id.* at 34 ¶ 199.  In doing so, Preble "allowed two white workers," who preferred Watson's job duties, to give their duties to Watson in exchange for Watson's duties. *Id.* at 34 ¶¶ 201–02.  The change in Watson's job duties "placed an undue and unexpected burden on her familial responsibilities" and caused Watson to handle tasks outside of her job duties. *Id.* at 34–35 ¶¶ 203–04; *see also id.* at 10–11 ¶ 50 (Watson "work[ed] after hours" due to the change in workload).  Preble did not provide Watson with the requisite training for the new duties and indicated that "she knew [] Watson was 'getting the short end of the stick.'" *Id.* at 35 ¶¶ 204–05.

Watson further alleges that Arduini undermined her supervisory authority.  "Arduini forbade [] Watson" from giving directives. *Id.* at 17 ¶ 86. Arduini also told employees who Watson supervised that "they did not have to take direction from or report to [] Watson," *id.* at 44 ¶ 278, and that they may report to Arduini, *id.* at 45 ¶ 283; *see also id.* at 21 ¶¶ 112, 114.

### iv.   *Other Allegations Regarding the Work Environment*

Watson makes other allegations regarding the work environment at Wheeler, including the following:

- Preble "ostracized [] Watson" and encouraged coworkers, including Arduini and Grant, to sit in her office and talk about Watson, *id.* at 9 ¶ 42;

- Preble "fabricated an intake story shared by" another coworker "as an opportunity to support her falsehood that coworkers did not want to work with [] Watson," *id.* at 9 ¶ 43;

- When asked about Watson, Preble told another Wheeler employee that "anybody can pass a test," suggesting that Watson's credentials did not carry the same value as Preble's, *id.* at 11 ¶ 53;

- Arduini "spread a false allegation to [] Preble … that [] Watson did not say hi to her in the hallways on a daily basis," *id.* at 12 ¶ 63;

- Arduini presented Watson's ideas as her own and convinced other coworkers "to go against [] Watson," *id.* at 13 ¶¶ 64;

- Arduini "falsely reported" that Watson refused to complete Diaz's survey during a staff meeting, *id.* at 13 ¶ 65;

- Arduini and Preble "accused [] Watson of making them feel uncomfortable," *id.* at 13 ¶ 66;

- Baloga "hid qualities [that] she knew about [] Watson from the team" by, for example, praising Watson's work in private but then conspiring with Preble to deny Watson a promotion, *id.* at 19–20 ¶¶ 102–03;

- On May 31, 2021, Roth "intentionally bumped" Watson as she went by and offered no apology to Watson, *id.* at 20 ¶ 105;

- Roth parked next to Watson's car, blocking the driver's side door to prevent Watson from getting into her car, *id.* at 21 ¶ 116;

- Roth excessively said "hi" to Watson each time they passed in the hallway to provoke Watson to "not say hi," in violation of Wheeler policy, which requires coworkers to "say hi," *id.* at 21–22 ¶ 117;

- Roth "intentionally neglected to advise [] Watson" that Watson may have been exposed to COVID-19, *id.* at 22 ¶ 118;

- Speicher-Werbner failed to properly investigate claims from a white manager at CVS who accused Watson of wrongdoing and, instead, gave Watson a written warning, *id.* at 24 ¶ 129;

- After Watson emailed Speicher-Werbner about the "bullying," Speicher-Werbner failed to address Watson's concerns and, instead, called Watson to discuss how often Watson was out on leave, *id.* at 24–25 ¶¶ 132–33; and

- Speicher-Werbner implemented Preble's vacation policy, which required employees to find their own coverage for days that they were on vacation, even though she "knew or should have known" this policy targeted Watson, *id.* at 25–26 ¶¶ 138–40.

### E. Watson's Resignation

On May 20, 2021, Watson "resigned" from Wheeler "under duress" and "based on the intolerable and discriminatory conduct she was subjected to by the defendants." *Id.* at 3 ¶ 9; *see also id.* at 54 ¶ 342. Specifically, from 2018 to 2021, Watson claims that the Defendants denied her promotions for discriminatory reasons, retaliated against her, subjected her to "unequal pay and unequal duties," defamed her character, subjected her to a "hostile work environment," physically assaulted her, denied her vacation time and pay, and inflicted emotional distress. *Id.* at 3 ¶ 9. Watson alleges that "Wheeler refuse[d] to pay vacation benefits after" her resignation. *Id.* at 5 ¶ 20.

### III.   LEGAL STANDARD

In assessing a Rule 12(b)(6) motion to dismiss, the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004); *Ashcroft*, 556 U.S. at 678 ("The

tenet that a court must accept as true all of the allegations in a complaint is inapplicable to legal conclusions.").

In addition, for a plaintiff proceeding *pro se*, "his or her pleadings must be considered under a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Bellamy v. Mount Vernon Hosp.*, No. 07 CIV. 1801 (SAS), 2009 WL 1835939, at *3 (S.D.N.Y. June 26, 2009), *aff'd*, 387 F. App'x 55 (2d Cir. 2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (per curiam)). "[C]ourts must construe [the *pro se* plaintiff's complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (internal quotation marks omitted). *Pro se* status, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted).

## IV.    DISCUSSION

### A.  *Counts Two, Three, Four: Title VII Claims*

Watson brings three Title VII claims against Wheeler and various Wheeler employees. First, she claims that Wheeler, Preble, Baloga, Arduini, Speicher-Werbner, and Diaz discriminated against her on the basis of her "race and color." ECF No. 105 at 54 ¶ 340. Second, she claims that Wheeler, Speicher-Werbner, Preble, Baloga, and Arduini retaliated against her for filing a CHRO complaint. *Id.* at 59 ¶ 371. Third, she claims that Wheeler, Preble, Baloga, and Arduini subjected her to a "hostile or abusive" work environment. *Id.* at 61 ¶ 384. Defendants seek to dismiss the Title VII claims against the individual defendants, i.e., Preble, Baloga, Arduini, Speicher-Werbner, and Diaz, arguing that Title VII does not provide for individual liability. ECF No. 72-1 at 8.

It is well settled that "Title VII 'does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers.'" *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) (quoting *Raspardo v. Carlone,* 770 F.3d 97, 113 (2d Cir.2014)); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998) ("[W]e find that the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities with fifteen or more employees. A finding of agent liability … would lead to results that Congress could not have contemplated.").  Therefore, because there is no individuality liability under Title VII, the Court grants the motion to dismiss the Title VII claims against the individual defendants named in Counts Two, Three, and Four.

### B.  Count Five: CFEPA Claims

Watson asserts that Wheeler, Preble, Baloga, and Arduini discriminated against her based on her race and color and subjected her to a hostile work environment, in violation of Conn. Gen. Stat. § 46a-60(b)(1).  ECF No. 105 at 63 ¶¶ 397, 401.  Defendants seek to dismiss these claims against the individual defendants, arguing that Conn. Gen. Stat. § 46a-60(b)(1) does not provide for individual liability.  ECF No. 72-1 at 10.  Because "there is no individual liability under CFEPA," *Anderson v. Derby Bd. of Educ.,* 718 F. Supp. 2d 258, 267 (D. Conn. 2010) (citing *Perodeau v. City of Hartford*, 259 Conn. 729, 743–44 (2002)),[5] the Court grants the motion to dismiss the CFEPA claims against the individual defendants named in Count Five.

---

[5] Individual defendants may be held liable under CFEPA, however, for aiding and abetting discriminatory employment practices.  *See Edwards v. New Opportunities Inc.*, No. 3:05-cv-1238 (JCH), 2006 WL 1668020, at *3 (D. Conn. June 16, 2006); Conn. Gen. Stat. § 46a-60(b)(5) ("It shall be a discriminatory practice … [f]or any person, whether an employer or employee or not, to aid, abet, incite, compel or coerce the doing of any act declared to be a discriminatory employment practice or attempt to do so.").  Watson does not assert an aiding and abetting claim and does not invoke § 46a-60(b)(5).  To the extent that Watson's claim may be construed as a § 46a-60(b)(5) claim, Defendants argue that Watson did not assert a § 46a-60(b)(5) claim in her CHRO complaints and, thus, failed to exhaust her administrative remedies for any aiding and abetting claim.  ECF No. 72-1 at 10 n.4.  Neither party has

### C.  Count Six: Intentional Infliction of Emotional Distress

Defendants argue that Watson's IIED claim against Wheeler, Preble, Baloga, and Arduini ("IIED Defendants") should be dismissed because she has not alleged any extreme or outrageous conduct.  ECF No. 72-1 at 10–13.  To state a claim of IIED under Connecticut law,[6] a plaintiff must allege "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000).  "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. ... Only where reasonable minds disagree does it become an issue for the jury."  *Id.* (citations omitted).

"Connecticut courts have narrowly defined the boundaries of extreme and outrageous conduct."  *Sacco v. Paradigm New Haven Health Care, LLC,* No. 3:12CV1207 WWE, 2013 WL 2321709, at *2 (D. Conn. May 28, 2013).  A defendant is liable for IIED "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Appleton*, 254 Conn. at 210–11 (quoting 1 Restatement (Second) Torts § 46, comment (d)).  "Conduct on the part of the defendant that is merely insulting or displays bad

---

provided the Court with a copy of the CHRO complaints and so the Court is unable to determine whether Watson exhausted her remedies.

[6] Because the allegedly tortious conduct in this case occurred in Connecticut, Connecticut law applies.

manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003).

In the employment context, "routine employment action, even if made with improper motivations, does not constitute extreme or outrageous behavior." *Adams v. The Hartford Courant & Trib. Co.*, No. CIV.3-03CV-0477(JCH), 2004 WL 1091728, at *4 (D. Conn. May 14, 2004); *see also Perodeau v. City of Hartford*, 259 Conn. 729, 757 (2002) ("[I]ndividuals [in ongoing employment relationships] reasonably should expect to be subject to routine employment-related conduct, including performance evaluations, both formal and informal; decisions related to such evaluations, such as those involving transfer, demotion, promotion and compensation; similar decisions based on the employer's business needs and desires, independent of the employee's performance; and disciplinary or investigatory action arising from actual or alleged employee misconduct. In addition, such individuals reasonably should expect to be subject to other vicissitudes of employment, such as workplace gossip, rivalry, personality conflicts and the like. Thus, it is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace.").  And when "considering whether a plaintiff's claim for IIED sufficiently alleges extreme and outrageous conduct, the court evaluates the employer's conduct, not the motive behind the conduct." *O'Brien v. Meriden Bd. of Educ.*, No. 3:13-CV-1521-VLB, 2014 WL 4494390, at *3 (D. Conn. Sept. 12, 2014) (internal quotation marks and citation omitted).

Here, Watson alleges several ways that the IIED Defendants intentionally subjected her to emotional distress.  *See* ECF No. 105 at 66–69 ¶¶ 425–445.  Watson claims that the IIED

Defendants subjected her to "discriminatory conduct." *Id.* at 66 ¶ 425. Further, Watson claims that the IIED Defendants "public[ly] sham[ed]," "demean[ed]," "embarrass[ed]" her, and "subject[ed] her to unrelenting workplace harassment and a hostile work environment" by "demeaning and minimizing her work," characterizing her communication skills as "poor," describing "her work conduct as bordering on insubordinate," "nitpicking" her work, and subjecting her to unwarranted meetings to discuss effective communications skills. *Id.* at 66–67 ¶¶ 426–28, 431. Defendants address only Watson's allegations that the IIED Defendants characterized her communication style as "poor" and subjected her to unwarranted meetings. ECF No. 72-1 at 15. Watson incorporates, however, all of the "discriminatory conduct complained of" in the TAC. ECF No. 105 at 66 ¶ 425. Thus, the Court will consider all of the alleged discriminatory conduct attributable to the IIED Defendants to determine whether Watson has stated a claim for IIED. In addition to Watson's allegations described above, the TAC contains other allegations regarding "discriminatory conduct" by the IIED Defendants. Generally, Watson claims that the IIED Defendants, some of all of them, (1) criticized Watson's communication style, (2) conspired to ensure that Watson did not receive promotions on three occasions, (3) increased her workload, (4) failed to provide Watson with appropriate training, (5) denied her vacation time, (6) retaliated against Watson for her CHRO complaint, (7) failed to investigate Watson's claims or complaints, (8) made inappropriate comments about race, (9) forced "non-white" employees to leave Wheeler, (10) undermined Watson's supervisory role, (11) ostracized Watson, and (12) spread rumors about Watson. Watson also claims that Wheeler itself subjected her to "unequal pay" and refused to pay Watson vacation benefits after she resigned.

Even when all reasonable inferences are drawn in favor of Watson, Watson's allegations are insufficient to state a claim for IIED because she has not alleged any conduct that qualifies as "extreme and outrageous" as defined by Connecticut law.  The majority of Watson's allegations concern the IIED Defendants' alleged conspiracy to deny her promotions and their comments on her work and communication style.  But denials of promotions and negative feedback qualify as "routine employment action" and do not constitute "extreme or outrageous behavior."  *See Williams v. Deloitte Servs., LP*, No. CIV.A. 3:09-CV-17JCH, 2009 WL 3571365, at *3 (D. Conn. Oct. 26, 2009) (finding that plaintiff's "claims of unfair discipline, negative performance reviews, and failures of promotion" qualify as "routine employment action" and, therefore, do not state a claim for IIED).  Even if the denials of promotions were motivated by discriminatory intent, and even if the negative feedback was fabricated, made with discriminatory intent, unwarranted, or unnecessarily critical of Watson's work, i.e., "nitpicking," that kind of conduct still does not give rise to an IIED claim.  *See Dollard v. Bd. of Educ. of Town of Orange*, 63 Conn. App. 550, 552–53, 555 (2001) (allegations that defendants engaged in a plan to force plaintiff to resign "or to become so distraught that they would have a colorable basis for terminating her employment" by "hypercritically examining every small detail of her professional and personal conduct," transferring her to another school and then secretly hiring a replacement, and publicly admonishing her were insufficient for an IIED claim); *Gillians v. Vivanco–Small,* 128 Conn. App. 207, 213 (2011) (allegations that co-workers, "motivated by personal vendettas," conspired to create a hostile work environment by falsely accusing plaintiff of racial and sexual bias and giving plaintiff negative performance evaluations were insufficient to state a claim of IIED); *White v. Martin,* 23 F. Supp. 2d 203, 208 (D. Conn. 1998) (employer's alleged gender discrimination, including denial of a promotion, discipline, and harassment, was

not extreme or outrageous conduct); *cf. Pinckney v. Miss Porter's Sch., Inc.*, No. CV085009273S, 2009 WL 1175327, at *3 (Conn. Super. Ct. Mar. 30, 2009) ("Emotional distress from poor performance ratings, even if fabricated or exaggerated, is an unavoidable part of being employed." (internal quotation marks and citation omitted)).  Further, allegations that Watson's supervisors "publicly shamed" her by disparaging her communication skills in front of her other coworkers are insufficient to state a claim for IIED.  *See Appleton,* 254 Conn. at 211 (supervisor's conduct toward plaintiff, including making condescending comments in front of colleagues, questioning her ability to read, telephoning the police who escorted plaintiff out of the building, subjecting plaintiff to two psychological examinations, and forcing plaintiff to take a suspension and a leave of absence, did not constitute extreme and outrageous conduct).

Watson also claims that the IIED Defendants increased her workload, failed to provide Watson with appropriate training, denied her use of her vacation time, retaliated against her for her CHRO complaint, failed to investigate her complaints, undermined her supervisory role, ostracized her, spread rumors about her, subjected her to unequal pay, and refused to pay her vacation benefits when she resigned.  But again, these allegations constitute "routine employment actions" or "workplace gossip" rather than "extreme or outrageous behavior."  *See Watkins v. City of Waterbury Bd. of Educ.*, No. 3:19CV593(KAD), 2020 WL 1184783, at *3 (D. Conn. Mar. 11, 2020) (plaintiff's allegations failed to rise to the level of extreme and outrageous conduct where defendant failed to promote the plaintiff, ignored her, failed to provide her training or leadership opportunities, "effectively demoted" her by taking away some of her leadership and training duties, and acted with either a discriminatory or a retaliatory motive); *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 647 (D. Conn. 2005) (employer's "failure to respond to or to prevent, or choosing to ignore, harassing conduct by another employee does not

rise to the level of extreme and outrageous behavior" (internal quotation marks, brackets, and citations omitted)); *Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 391 (D. Conn. 2008) (allegation that employer failed to pay plaintiff compensation "commensurate with her duties" because of her race did not qualify as extreme or outrageous conduct); *Tracy v. New Milford Public Schools,* 101 Conn. App. 560, 562, 567–70 (2007) (allegations that supervisor conspired with superintendent to harass plaintiff by denying promotions, initiating disciplinary actions without proper investigation, and defaming plaintiff's character were insufficient to state a claim for IIED); *Baricko v. Chesebrough-Pond's USA Co.*, No. CV970395642, 2000 WL 33156508, at *2 (Conn. Super. Ct. Dec. 27, 2000) (allegations fell short of "misconduct that exceeds all bounds usually tolerated by decent society" where defendant created a hostile work environment, used coworkers to report to him on plaintiff's performance, attempted to eliminate plaintiff from employment, knew that his behavior adversely affected plaintiff's mental and physical health, prevented plaintiff from using vacation time, and manipulated employees "to get dirt" on other employees (internal quotation marks and citation omitted)).

Further, Watson claims that Preble, Baloga, and Arduini treated black or Hispanic people poorly or made comments about race.  Watson alleges that Preble, Baloga, and Arduini treated white clients differently from black clients, often called the police on black clients, forced black and Hispanic employees to leave Wheeler by discriminating against them, "castigated the black intern" in front of Watson, allowed white staff to demean clients, and asked coworkers to bring "vegetarian and soul food" in anticipation of a black coworker leaving Wheeler.  Although these allegations describe an unpleasant, racially biased workplace, they do not meet the standard for "conduct exceeding all bounds tolerated by a decent society," even when viewed in a light most favorable to Watson.  *See Rivera v. Men's Wearhouse, Inc.*, No. 3:05-CV-1907 WWE, 2006 WL

1801705, at *4–5 (D. Conn. June 27, 2006) (allegations failed to rise to the level of extreme and outrageous conduct where plaintiff was "passed over for promotion in favor of the supervisor's brother," was "assigned to stores in undesirable locations," heard "rumors of racial slurs," and was aware that another employee complained that she was demoted because of her race and resigned); *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 195 (D. Conn. 2000) ("An employer's adverse yet routine employment action, even if improperly motivated, does not constitute extreme and outrageous behavior when the employer does not conduct that action in an egregious and oppressive manner.").

Watson also claims that Preble and Baloga made comments about her race to her. Watson alleges that Preble "resented" black people and sent Watson "baiting remarks," accusing Watson of "bringing black people to her office" and stating "that she didn't match any co-worker" at Wheeler.  Watson also alleges that Preble and Baloga said that Watson was upset about a black client because of her "own upbringing and the neighborhood she grew up in."  "A supervisor's discriminatory comments directed to an employee based on the employee's race, religion, or ethnicity will provide a cause of action for [IIED] if they exceed all bounds of decency."  *Coleman v. S. Cent. Connecticut Reg'l Water Auth.*, No. 3:06-CV-1515RNC, 2009 WL 350597, at *5 (D. Conn. Feb. 12, 2009) (citing *Savage v. Andoh,* No. CV075015657, 2008 WL 1914630, at *3–5 (Conn. Super. Ct. Apr. 11, 2008) (discussing cases)).  While the comments allegedly made to Watson are insensitive and inappropriate, they do not "exceed all bounds of decency."  *Id.* at *2, *5 (dismissing IIED claim based on a supervisor's comments to plaintiff, who is black, that "[a]ll you brothers like eating all that garbage, ribs, chicken" and to plaintiff and another black employee that "[y]ou can't be pimping around with them hats"); *see also Molina v. Eagle Leasing Co.*, No. 3:13-CV-00413-WWE, 2014 WL 3864879, at *1, 3–4 (D.

Conn. Aug. 6, 2014) (dismissing IIED claim where supervisors routinely harassed plaintiff for his Hispanic heritage by reprimanding plaintiff for failing to speak English and screaming offensive phrases at plaintiff, including "Fucking Cuban" and "Go back to Cuba").

Because Watson has failed to allege any "extreme or outrageous behavior," the Court grants the motion to dismiss Count Six.

### D. Count Seven: Negligent Infliction of Emotional Distress

Watson claims that the Defendants "should have known" that their conduct would cause her emotional distress. ECF No. 105 ¶ 451. Defendants argues that Watson's NIED claim should be dismissed because Watson fails to allege that she experienced emotional distress as a result of any termination of her employment. ECF No. 72-1 at 13–15. To state a claim for NIED under Connecticut law, plaintiff must allege that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88 (1997) (citation omitted). In the employment context, however, a NIED claim "arises only where it is based upon unreasonable conduct of the defendant in the termination process." *Id.* (internal quotation marks and citation omitted); *Perodeau*, 259 Conn. at 762–63 (concluding that an individual "may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment"). Constructive termination "[does] not satisfy the termination requirement for a [NIED] claim in an employment context," and "[c]onduct justifying the termination, or, … compelling the resignation, is not itself the actual termination." *Grasso v. Connecticut Hospice, Inc.*, 138 Conn. App. 759, 772 (2012).

Throughout the TAC, Watson details the alleged discriminatory and hostile actions perpetrated by the Defendants while she was employed by Wheeler.  *See* ECF No. 105.  Watson alleges that she then resigned from Wheeler "under duress" and "based on the intolerable and discriminatory conduct she was subjected to by the defendants."  *Id.* at 3 ¶ 9; *see also id.* at 54 ¶ 342 (Watson claiming that the Defendants' actions—including failing to promote her, paying her less than other similarly situated employees, increasing her workload, and denying her vacation request—led her to "constructively quit").  Watson does not make any other allegations about her resignation.

Watson's allegations fail to satisfy the termination requirement for a NIED claim in the employment context.   In fact, Watson fails to allege that Wheeler terminated her at all, let alone that the Defendants acted unreasonably during her termination process.  Instead, Watson claims that she "resigned" or "constructively quit" as a result of the Defendants' conduct.  But, as stated above, neither resignation nor constructive termination satisfies the termination requirement, and further, conduct "compelling the resignation[] is not itself the actual termination."  Thus, Watson's NIED claim solely arises "out of conduct occurring within a continuing employment context," which cannot provide grounds for liability for a NIED claim.  As a result, because Watson fails to allege that she was terminated and that she suffered emotional distress due to the Defendants' unreasonable conduct during her termination process, Watson has failed to state a claim for NIED and the Court grants the motion to dismiss her NIED claim.  *See Grasso*, 138 Conn. App. at 773 (affirming trials court's conclusion that plaintiff failed to satisfy the termination requirement when "plaintiff allege[d] that her employment was constructively terminated due to a series of events occurring during her employment").

### E.  *Counts Eight and Nine: Negligent Hiring, Supervision, and Retention*

Watson asserts claims of negligent hiring, supervision, and retention against Wheeler, Preble, Baloga, Arduini, Roth, Diaz, and Speicher-Werbner.  ECF No. 105 at 71 ¶ 462; *id.* at 75 ¶ 485.  Watson claims that Baloga, Arduini, and Preble failed to "protect" her from and, at times, actively facilitated the discriminatory conduct alleged.  *Id.* at 71 ¶¶ 460–64.  Specifically, Watson claims that Baloga was negligent in her supervision and retention of Preble given that the "exercise of reasonable care … would have revealed that [] Preble was incompetent and[/]or unfit," *id.* at 72 ¶ 465, and that Baloga "knew or should have know[n]" that Preble and Arduini fraudulently denied Watson promotions and that they were unfit, racist, and incompetent, *id.* at 72–73 ¶¶ 467–68.  Watson also claims that Speicher-Werbner owed a duty of care to ensure Watson was free of "harassment[,] defamatory comments[,] and other harmful[] and discriminatory conduct," that she failed to protect Watson from the alleged discriminatory conduct, and that she breached her duty by "negligently supervising" and retaining Preble, Baloga, and Arduini.  *Id.* at 75–76 ¶¶ 487, 489–90.  Defendants argue that, like Watson's NIED claim, Watson's negligent hiring, supervision, and retention claims fail because she does not allege that she was terminated.  ECF No. 72-1 at 15.  Specifically, Defendants point to *Perodeau*, arguing that the Connecticut Supreme Court in that case barred any negligence-based emotional distress claims premised on conduct occurring during an ongoing employment relationship.  *Id.*

In *Perodeau*, the Connecticut Supreme Court considered "whether an individual municipal employee may be found liable for negligent infliction of emotional distress arising out of conduct occurring in the context of a continuing employment relationship, as distinguished from conduct occurring in the context of the termination of employment."  259 Conn. at 730–31.  The court concluded that such an employee could not be found liable in such circumstances.  *Id.*

at 762–63.  In reaching that conclusion, the court reasoned that "individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace."  *Id.* at 757.  Further, the court stated that "when the employment relationship is ongoing, [] public policies … outweigh the interests of persons subject to such behavior in the workplace in being compensated for their emotional injuries."  *Id.* at 758.  Specifically, the court pointed to the following public policies: (1) in an ongoing employment relationship, employees' fear of lawsuits by fellow employees would lead to a "less vigorous and less productive workplace," and (2) "in light of the inherently competitive and stressful nature of the workplace and the difficulties surrounding proof of emotional distress, extending the tort of negligent infliction of emotional distress to ongoing employment relationships would open the door to spurious claims."  *Id.* at 758.  Thus, the court stated that "the societal costs of allowing claims for negligent infliction of emotional distress in the context of ongoing employment are unacceptably high."  *Id.* at 762.

The Connecticut appellate courts have not yet decided whether the reasoning of *Perodeau* should apply to negligent supervision, hiring, and retention claims for emotional distress arising from conduct occurring during an ongoing employment relationship.  Some other judges on this Court have extended *Perodeau* to apply to all negligence-based emotional distress claims arising from an ongoing employment relationship.  *See Antonopoulos v. Zitnay,* 360 F. Supp. 2d 420, 431 (D. Conn. 2005) (holding that *Perodeau* "clarif[ies] that … Connecticut bars all negligence-based emotional distress claims occurring within a continuing employment context" and applying *Perodeau* to a negligent supervision claim); *Marino v. EGS Elec. Grp., LLC*, No. 3:12CV518 JBA, 2014 WL 1289453, at *12 (D. Conn. Mar. 31, 2014) (same); *Nadesan v. Citizens Fin. Grp.*, No. 3:15CV01214 (AVC), 2015 WL 13358454, at *10 (D. Conn. Dec. 11,

2015) (applying *Perodeau* to a negligent hiring, retention, and supervision claim).  One of them reasoned that *Perodeau* applies to "all negligence-based emotional distress claims" because even though "*Perodeau* itself involved an employee suing another employee for negligent infliction of emotional distress, its holding appears equally applicable to employees suing their employers." *Antonopoulos,* 360 F. Supp. 2d at 431 n.5.

Another judge on this Court, as well as some state court trial judges, have noted that *Perodeau*'s holding is limited NIED claims and refused to extend it to other types of negligence claims brought against an employer.  *See Molina*, 2014 WL 3864879, at *3 ("*Perodeau* dealt not with negligent supervision but with negligent infliction of emotional distress."); *Oliver v. Walmart Stores E., L.P.*, No. KNLCV166027223S, 2017 WL 951200, at *3 n.1 (Conn. Super. Ct. Feb. 13, 2017) (rejecting defendant's argument that *Perodeau* applies to negligent supervision and IIED); *Madey v. Stanley Black & Decker, Inc.*, No. HHBCV206088375S, 2021 WL 3727806, at *4 (Conn. Super. Ct. July 29, 2021) (finding that *Perodeau* does not apply to a negligent supervision and retention claim because (1) "*Perodeau* only unambiguously bars" NIED claims, and (2) *Perodeau*'s public policy concerns "are not present in negligent supervision and negligent retention causes of action where … the action is brought against the employer rather than the individual co-worker").  In *Molina* and *Madey*, the plaintiffs sued only their employers.  *See Molina*, 2014 WL 3864879, at *1; *Madey*, 2021 WL 3727806, at *4.  In *Oliver*, the plaintiff sued both her employer and her supervisor, but the court appears to treat the negligent supervision claim as brought against only the employer.  *See Oliver*, 2017 WL 951200, at *3–4.

Because the Connecticut appellate courts have not yet decided the issue of whether *Perodeau* applies to negligent supervision, hiring, and retention claims for emotional distress

arising from an ongoing employment relationship, the Court's task here "is to predict what the Connecticut Supreme Court would do in [this] case." *Joy v. North*, 692 F.2d 880, 885 (2d Cir. 1982). To do so, the Court will examine the public policy concerns motivating the *Perodeau* court and determine whether those concerns apply with equal force to the negligent supervision, retention, and hiring claims brought by Watson against her employer and fellow employees.

Negligent supervision, hiring, and retention claims against fellow employees for emotional distress arising from conduct occurring during an ongoing employment relationship appear to implicate the same public policy concerns raised in *Perodeau* for NIED claims against employees. Specifically, the claims against fellow employees generate the same concern that "employees who fear lawsuits by fellow employees" may be less competitive with each other, refrain from reporting on improper conduct, provide "less frank" feedback, and feel constrained in their employment decisions, leading to a "less vigorous and less productive workplace." In addition, such claims involve "difficulties surrounding proof of emotional distress" and so likewise could "open the door to spurious claims." Thus, because Watson's negligent supervision, hiring, and retention claims against her fellow employees implicate the very same public policy concerns identified in *Perodeau*, the Court concludes that the Connecticut Supreme Court would apply the reasoning of *Perodeau* to bar those claims.

On the other hand, negligent supervision, hiring and retention claims against *employers* do not implicate all the same policy concerns. While the claims against the employers raise the same "difficulties surrounding proof of emotional distress" and thus the same concern for opening the door to "spurious claims," they do not raise the concern about the employees' fear of lawsuits by fellow employees. Further, claims of negligent supervision against employers are well-established in Connecticut, *see Brooks v. Sweeney*, 299 Conn. 196, 209 n.12 (2010) ("Under

Connecticut law, an employer maybe held liable for the negligent supervision of employees."

(citation omitted)), and many Connecticut trial courts have entertained employees' negligent

supervision claims arising from conduct occurring in the context of an employment relationship,

even when the injuries have been emotional.  *See e.g.*, *Michalsky v. Moffly Publications, Inc.*,

No. FSTCV196042420S, 2020 WL 5537003, at *7 (Conn. Super. Ct. Aug. 13, 2020) (denying

motion to strike plaintiff's negligent and reckless supervision claim for "damages for emotional

injuries arising out of a pattern of aggressiveness exhibited by" a coworker); *Washington v. Path*

*Acad. Windham*, No. WWMCV166010818S, 2017 WL 1843519, at *1–3 (Conn. Super. Ct. Apr.

10, 2017) (denying motion to strike negligent supervision claim where plaintiff alleged that his

coworkers discriminated against and harassed him); *Taylor v. Webster Bank, N.A.*, No.

CV116005350S, 2012 WL 3264083, at *4–5 (Conn. Super. Ct. July 20, 2012) (denying motion

to strike plaintiff's negligent supervision claim where plaintiff alleged "that she was not

sufficiently trained in money counting procedure," that her employer failed to properly supervise

her supervisor regarding the money counting procedure, and "that the lack of training and

supervision permitted [her supervisor] to steal bank funds," having a negative impact on

plaintiff); *Dickerson v. Eagle Landing Residential Care, LLC*, No. CV075002263S, 2010 WL

2573960, at *5 (Conn. Super. Ct. May 25, 2010) (denying defendants' renewed motion for a

directed verdict and motion to set aside verdict for plaintiffs on their negligent supervision

claim—which was based on plaintiffs' coworker's spitting into their drinks—where plaintiffs

submitted evidence about their employer's knowledge about their coworker's propensity for

"food tampering"); *Hearn v. Yale-New Haven Hosp.*, No. CV020466339S, 2007 WL 2938624, at

*4 (Conn. Super. Ct. Apr. 2, 2007) (concluding that plaintiff stated a claim for negligent

supervision against her employer where plaintiff alleged that she complained to her employer

about her coworker sexually harassing her, but her employer failed to follow the appropriate disciplinary procedures); *Meade v. Yale Univ.*, No. CV054016155, 2006 WL 2730320, at *1, *6–7 (Conn. Super. Ct. Sept. 7, 2006) (rejecting defendant's argument that only third parties, not employees, are allowed to bring negligent supervision claims and denying motion to strike plaintiff's negligent supervision claim where plaintiff told co-chair of her department that her supervisor "would attempt to retaliate against her and terminate her employment" and, subsequently, her supervisor took away her job duties and then laid her off). Cases like these make clear that in the two decades since the Connecticut Supreme Court decided *Perodeau*, Connecticut trial courts have not hesitated to recognize negligent supervision claims for emotional distress brought by employees against their employers.[7] So extending *Perodeau* to bar such claims would abrogate a wide swath of Connecticut case law. It is not at all clear, without further guidance from the Connecticut Supreme Court, that it would take such a step. Therefore, because claims against employers do not implicate all the same public policy concerns identified in *Perodeau*, and because negligent supervision claims by employees against their employers are well-established in Connecticut, the Court declines to extend *Perodeau* to apply to Watson's negligent supervision, hiring, and retention claims for emotional distress against Wheeler.

In sum, the Court dismisses Watson's negligent supervision, retention, and hiring claims against the individual employees named in Counts Eight and Nine but denies the Defendants' motion to dismiss the negligent supervision, retention, and hiring claims against Wheeler.[8]

---

[7] Most of the cited cases named only the employer as the defendant for these claims, although some also named supervisory employees. *See e.g.*, *Meade v. Yale Univ.*, 2006 WL 2730320, at *1.

[8] The Court notes that Watson is not prejudiced by this ruling because she may obtain the same relief against Wheeler that she sought against the individual defendants.

### F.  Count Ten: Defamation

Watson claims that Preble defamed her by sending an email to Baloga on November 19, 2018, *see* ECF No. 105 at 78–79 ¶ 503, in which Preble disparaged "Watson personally and professionally," *id.* at 6 ¶ 28.  Defendants argue that Watson's defamation claim is barred by the applicable statute of limitations.[9]  ECF No. 72-1 at 17.

Under Connecticut law, claims for defamation are governed by Conn. Gen. Stat. § 52-597, which provides that "[n]o action for libel or slander shall be brought but within two years from the date of the act complained of."  "The statute of limitations for a defamation claim begins on the date of publication, … [and] a new cause of action arises with each publication." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 224 (2004) (citations omitted).  "[B]ecause each alleged defamatory statement constitutes a separate cause of action, Connecticut courts have declined to apply the continuing course of conduct doctrine to defamation claims."  *Britt v. Unknown Officers*, No. 3:17-CV-2158 (JCH), 2019 WL 2453763, at *4 (D. Conn. June 12, 2019) (collecting cases).

Here, Watson alleges that Preble "published" this email to Baloga on November 19, 2018.  ECF No. 105 at 6 ¶ 28; *id.* at 78 ¶ 503.  Watson does not allege any other instances of publication of this email in the TAC.  Thus, the statute of limitations for Watson's defamation claim based on this email began to run on November 19, 2018—the date of publication—and expired on November 19, 2020.  Watson's defamation claim is therefore untimely because she filed this suit on April 11, 2021, well after the expiration of the statute of limitations for this

---

[9] Because the relevant dates appear either on the face of Watson's Third Amended Complaint or on the docket, the Court will consider the Defendants' statute of limitations argument even though the statute of limitations is an affirmative defense. *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) ("Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.").

claim.  In Watson's opposition brief, however, she claims that Preble forwarded the email to Speicher-Werbner on May 19, 2019, effectively publishing the email again.  ECF No. 80 at 16 ¶ 73.  Because "a new cause of action arises with each publication," and because the second alleged publication falls within the statute of limitations for a defamation claim, the Court denies the motion to dismiss Count Ten.[10]

### G.  Count Eleven: False Light

Watson also claims that Preble's November 19, 2018 email to Baloga contained falsities that placed Watson in a "false light."  ECF No. 105 at 80–81 ¶¶ 512, 514.  Defendants argue that Watson's false light claim fails because she did not allege that Preble communicated the contents of the email "to the public at large or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  ECF No. 72-1 at 16.

Under Connecticut law, "[a] claim for false light requires that the defendant give publicity to a matter concerning plaintiff that places the plaintiff before the public in a false light."  *Cayo v. Stop & Shop Supermarket Co.*, No. 3:12CV638 WWE, 2012 WL 5818862, at *3 (D. Conn. Nov. 15, 2012) (citing *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107 (1982)).  While the Connecticut appellate courts have not decided "what constitutes 'publicity' in the context of an action for invasion of privacy," courts analyzing false light claims

---

[10] Although even a self-represented party may not amend her complaint by making new allegations in an opposition brief, Watson would be entitled to amend her complaint—yet again—under governing Second Circuit case law.  *See Rhodes v. Advance Prop. Mgmt., Inc.*, No. 3:10-CV-826 JCH, 2011 WL 4739750, at *2 (D. Conn. Oct. 7, 2011) (citing *Watts v. Services for the Underserved,* 309 Fed. App'x 533, 535 (2d Cir.2009)) ("Where a pro se complaint must be dismissed due to a pleading deficiency, the court should generally provide leave to amend."); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  Watson has already amended her complaint multiple times and, at times, has had difficulty doing it properly from a technical standpoint, necessitating further Court involvement.  Therefore, rather than allow additional amendments to add the May 19, 2019 republication, the Court will simply treat that allegation as being in the TAC.

under Connecticut law "have almost universally adopted the definition of 'publicity' contained in section 652D, Comment a of the Restatement."  *Cavallaro v. Rosado*, No. CV054009939, 2006 WL 2949143, at *7 (Conn. Super. Ct. Oct. 5, 2006) (citations omitted).  The Restatement (Second) of Torts § 652D, comment a, states that "publicity" "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Holmes v. Town of E. Lyme*, 866 F. Supp. 2d 108, 131 (D. Conn. 2012) (quoting *Orsini v. Zimmer,* No. CV075013711S, 2009 WL 5698148, at *7 (Conn. Super. Ct. Dec. 24, 2009)).

Watson alleges that "Preble published an email to [] Baloga."  ECF No. 105 at 80 ¶ 512. There are no allegations that Preble published this email to anyone else.  Publication to one person is plainly insufficient to satisfy the publicity requirement for a false light claim.  *See Sidiropoulos v. Bridgeport Hosp.*, No. CV030401830S, 2004 WL 202256, at *2 (Conn. Super. Ct. Jan. 9, 2004) ("[I]t is not an invasion of privacy to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons."); *see also Palkimas v. Bella*, No. 3:08CV01836 AWT, 2012 WL 1048868, at *7 (D. Conn. Mar. 28, 2012), *aff'd*, 510 Fed. App'x 64 (2d Cir. 2013) (dismissing plaintiff's false light claim based on a letter distributed to the State's Attorneys Office and the Superior Court—which the court classified as a "small group of persons"—because plaintiff failed to create a genuine issue of material fact as to whether the letter reached the public at large); *Cayo v. Stop & Shop Supermarket Co.*, No. 3:12CV638 WWE, 2012 WL 5818862, at *3 (D. Conn. Nov. 15, 2012) (allegations that materials were distributed to individuals at the unemployment office were insufficient to state a claim for false light because the disclosure was made only "to a small number of people").

Because Watson's allegations fail to satisfy the publicity requirement, the Court grants the motion to dismiss Count Eleven.

### H.  Leave to Amend

Watson's opposition brief contains some factual allegations not found in the TAC. Construing Watson's opposition brief liberally, the Court interprets the introduction of new factual allegations as a request for leave to amend her complaint.  *See Roda v. Comm. of Social Sec.*, 338 F. App'x 39, 41 (2d Cir. 2009) ("[D]istrict courts are obligated to construe pro se submissions liberally.").  In addition, Watson explicitly asks for leave to amend Counts Two, Three, Four, and Five of her complaint to include Section 1981 claims against the individual defendants named in those counts.  ECF No. 80 at 1–2.  In those counts, Watson brings claims under Title VII and CFEPA.  And, as stated above, since those statutes do not provide for individual liability, the Court dismissed the Title VII and CFEPA claims against the individual defendants named in those counts.

The Court will address the impact of Watson's additional allegations on only the counts that were dismissed above.  For the reasons below, the Court concludes that Watson's allegations in her opposition brief are either futile or duplicative.  Specifically, the Court finds that Watson's additional allegations do not change the Court's previous analysis (the lone exception is the republication allegation, *see supra* footnote 10) and fail to state a Title VII claim against the individual defendants, a CFEPA claim against the individual defendants, a IIED claim, a NIED claim, a negligent supervision, hiring, or retention claim against the individual defendants, or a false light claim.  Therefore, the Court denies Watson leave to amend her complaint

### i.    *Additional Allegations in Watson's Opposition Brief*

The Court will set forth only the new allegations in Watson's opposition brief.

Wheeler noted on multiple occasions its commitment to diversity.  After being awarded Hartford Courant's award for "Top Workplace," Susan Walkaman, the President and Board Chair of Wheeler" stated the following: "For the sixth consecutive year, Wheeler was named a Hartford Courant Top Workplace, a testament to our commitment to nurturing a highly-skilled, diverse, and dedicated workforce."  ECF No. 80 at 6 ¶ 20 (emphasis omitted).  After Watson filed her CHRO complaint in April 2019, Wheeler "rushed" to start a diversity program.  *Id.* at 6 ¶ 21.  Walkaman stated that the launch of the diversity program was "part of Wheeler's fight against racial injustice."  *Id.*  Watson alleges that although Wheeler claims to use grants to serve "diverse and underserved population[s]," Wheeler itself suffered from a lack of diversity in its management and executive roles.  *Id.* at 9 ¶¶ 31–33.

Watson states that her salary at Wheeler started at $62,000 when she was hired, increased to $70,000 in 2018 due to Wheeler's initiative to retain LCSWs, and increased to $75,000 in 2019.  *Id.* at 6 ¶ 22.  Further, Watson alleges that the salaries for Wheeler's "All White Management team" were the following:

- Susan Walkaman (Chief Executive Officer) – $499, 457,
- Sabrina Trocchi (Chief Operating Officer) - $217, 671,
- Athena Szczesniak (Chief Financial Officer) – $217,671,
- Patricia Speicher-Werbner, Chief Human Resources Officer – $215,012,
- Richard Miller (Medical Director) – $205,539,
- Kimberly Nelson (Senior Vice President of Services) – $190,889;
- Michael Russo (Vice President of Education) – $180,366,
- Nicolangelo (Chief Information Officer) – $178,710,
- Sandra Cohen (Vice President of Quality) – $167,304;
- Elisabeth Cannata (V.P. CBFS, Dental Director) – $166,831,
- Dorota Gasior – $146,504,
- Heidi Joseh (V.P. HCO) – $135,834, and
- Rebecca Eleck Bruce (Medical Director) – $122,739.

*Id.* at 6 ¶ 22.

Watson alleges that she had to "work extra hours" from 2018 to 2019 to cover the extra work from job vacancies but received no compensation for that extra work. *Id.* at 12 ¶¶ 50–51. Watson adds that she was also "forced to cover" extra work as a result of Preble's unexpected resignation on September 6, 2019. *Id.* at 10 ¶ 37.

On July 31, 2018, Watson was shocked to see "NI"[11] on her evaluation and emailed Preble, stating that had not had a supervision meeting "in some time." *Id.* at 18 ¶ 79. Preble responded that they would meet that week and assured Watson that she was "doing great." *Id.*

Watson recounts the three times that Wheeler denied her a promotion in favor of white women in November 2018, January 2019, and March 2019. *Id.* at 10 ¶ 36. After Wheeler promoted Arduini, leaving the MAT position vacant, Wheeler suddenly was willing to promote Watson to the MAT position. *Id.* at 11 ¶¶ 41–42. Watson alleges that Wheeler's "sudden willingness to promote" her was a façade and that actually, Wheeler was interested in "satisfy[ing]" its budget and its need to "fill in … during a period of transition." *Id.* at 11 ¶¶ 42–43. After her promotion to Project Director, Watson alleges that she did not receive any of the budgeted wages for that position. *Id.* at 12 ¶¶ 47–49.

Watson provides in full Preble's email[12] to Baloga regarding Watson's application for the first Clinical Supervisor position, writing the following:

> In case anything comes up about the supervisor position before we get to meet, I want to let you know I literally lost sleep this weekend thinking about the Avery situation. Ultimately, the more I thought about it, the more uncomfortable I came to feel about promoting her. I'm concerned that even if we promote her to another site we run the risk that she won't actually change and that will make us look very bad. If we promote her here and she doesn't change then we have a big mess on our hands. All my mind keeps coming back to is that despite a wonderful interview, Avery has consistently demonstrated poor interpersonal skills, poor written and

---

[11] Watson does not explain what "NI" means but based on the allegations in the TAC, the Court assumes "NI" stands for "Needs Improvement." *See* ECF No. 105 at 26 ¶ 142.

[12] Watson alleges that this email was sent on November 29, 2018. ECF No. 80 at 16 ¶ 74. In the TAC, however, she alleges that this email was sent on November 19, 2018.

verbal communication skills, and her tone at times has bordered on insubordinate. I would be happy to share this with her and let her know that if she makes the changes needed in the future she has a good shot at a promotion down the road. But right now I have no reason to believe these changes will really happen. Also, I forgot to even consider until this morning that if she gets promoted she will need to see individual clients[.] She has a reputation for being horribly apathetic and short with clients. I wouldn't even want her be an outpatient clinician. I still want Jen to go back to Hartford and if you are against the idea of Christine getting the position we can maybe just wait a little longer for more applicants. I would rather hire nobody than hire Avery. Sorry to bother you with this (again). Like I said, I actually lost sleep over this over the weekend and just really needed to get it out. Thanks[.]

*Id.* at 16–17 ¶ 74 (emphasis and internal quotation marks omitted).  On November 28, 2018, after

Preble provided feedback to Watson regarding why she did not receive the promotion to the first

Clinical Supervisor position, Watson emailed Preble the following:

Lisa, Even though you say you didn't have to, I just quickly want to thank you for taking the time to provide me some feedback as to why I was not chosen for the clinical supervision position. It was reassuring to hear that management regards my interview as stellar; noting my insight, work ethic and proficiency. I was most pleased when you mentioned I would have been more suitable for a Program Management position.
In relation to my disqualifying Communication Style is there any in-house material available to somehow develop the acceptable style you require?

*Id.* at 17 ¶ 76.  On November 29, 2018, Preble "published" an email to "defame" Watson to HR,

writing the following:

Yesterday I met with Avery Watson to give her some feedback about why she was not chosen for the clinician supervisor position I noted her poor interpersonal relations with the other clinicians, as well as her abrasive communication style. Both of these issues have been addressed with her in the past. I shared with her that I wanted to provide her with feedback because I feel that he[r] work ethic is very good and she may have potential for a promotion in the future if she can correct these items. I further shared with her that I see potential in her to be a good Program Manager, but we needed her to demonstrate good communication and interpersonal skills as a clinical supervisor first before becoming a PM would be possible. She took this all terribly and stated she wished I never told her why she didn't get the job. She said she would have rather me just said she didn't get it and left it alone. I explained that another thing I look for in a good clinical supervisor is the ability to take feedback in a constructive way. Based on this conversation, as well as past conversations, this is clearly something she also needs to improve upon.

37

> In any case, I told you all of that to ask you this: Per the below email, she apparently had an enormous change of heart and now wants "in home materials" to help her develop an "acceptable communication style". I'm not aware of any such materials, and I'm also not sure how to explain to her that good communication and interpersonal skills aren't simply black and white- they can't be taught from a text book.
>
> Can you help me figure out how to respond to this? I'm hoping we can find a good way to address this with her so Jen can use this as a teachable moment during their supervisions. Thank you (as always)[.]

*Id.* at 17-18 ¶ 77.  Watson alleges that "Preble deliberately humiliated [her]."  *Id.* at 18 ¶ 78.  On May 19, 2019, Preble "published" an email to Speicher-Werbner, which included a copy of Preble's November 2018 email to Baloga and stated the following:

> This is an email I sent to Erica regarding the conversations in management about choosing to hire Christine Grant or Avery Watson for the supervisor position. I generally excused myself from this hiring process due to my history of working with Christine Grant as a peer at another agency and I did not want to give the impression of favoritism. However, I sent this email following a sleepless night due to my fears that Avery may have been selected for the position.

*Id.* at 16 ¶ 73 (emphasis omitted).

Watson alleges that in late 2020, Arduini "defame[d] [Watson's] character by presenting her as contemptuous to upper management."  *Id.* at 11 ¶ 44.  Arduini invited upper management and others to "pretextual meetings necessary to improve, organize[,] or provide growth to the MAT Program even though no problems existed."  *Id.*  Watson alleges that "[t]hese meetings were set up to humiliate and antagonize [her] after she had successfully run" her program for over a year and a half.  *Id.* at 12 ¶ 45.

Watson also alleges that "Preble's Facebook page was brought to [her] attention," and that Preble "'liked' a Racist Article demeaning black people."  *Id.* at 19 ¶ 81.  Watson states that Preble's liking of these articles "confirmed [her] thoughts as to [Preble's] overbearing and egregious conduct against her."  *Id.*

Watson makes additional allegations regarding the Defendants' feedback on her communication style and her work.  On April 16, 2018, Baloga sent Preble an email "trying to come up with language" about Watson's communication style.  *Id.* at 20 ¶ 83 (advising Preble to "[r]emove the word abrasive and [to] put professionally appropriate").  Watson had "pleaded with [] Preble" to stop attacking her based on her race.  *Id.*  Watson alleges that she or any other black coworkers "would never get away with using the language [that] the white workers do." *Id.* at 20 ¶ 84.  Watson claims that "[t]here is truly bad communication[,] i.e.[,] profanity, sarcasm, rudeness[,] and the belittling of clients."  *Id.* at 20 ¶ 83.  Watson also claims that Preble sent her daily emails "accusing [her] of doing something wrong."  *Id.* ¶ 110.

Speicher-Werbner, as the Chief Human Resources Officer, was responsible for Wheeler's "workplace culture."  *Id.* at 14 ¶ 57.  Thus, it was her responsibility to handle investigations of complaints from employees.  *Id.* at 14 ¶ 58.  After Watson filed her complaint,[13] "Speicher-Werbner never spoke to [Watson] about her [c]omplaint," instead, she "set up mentoring and a plan to work on [Watson's] communication."  *Id.* at 14 ¶ 59.  Speicher-Werbner was aware of the discrimination against Watson in 2018 and 2019 because Watson had "complained about the treatment of black clients as well as herself."  *Id.* at 14 ¶ 61.  Watson also alleges that Speicher-Werbner discussed the sensitive nature of Watson's leave of absence from work with Preble and Arduini in a place where other coworkers could overhear.  *Id.* at 15 ¶ 65.  Watson alleges that another Wheeler employee told Preble that "she didn't like the fact that [Preble] was talking about [Watson] where everyone could hear."  *Id.* at 15 ¶ 66.

Watson "was a highly motivated individual in a system where racism and bigotry were the order of the day."  ECF No. 80 at 2 ¶ 2.  She "was denied promotion, retaliated against,

---

[13] It is not clear from the allegations whether Watson is referring to her CHRO complaint or a previous complaint filed with Wheeler.

subjected to negative evaluations, unfounded reprimands; subjected to unequal pay and unequal duties, denied pay, defamation of character, hostile work environment." *Id.* at 2 ¶ 3. As a result of Defendants' alleged discriminatory conduct against Watson, she alleges that she suffered "physiological and emotional damage." *Id.* at 3 ¶ 4; *see also id.* at 3 ¶ 5 (stating that as a result of the damage, she gained weight, suffered from emotional breakdowns, has an increased risk of heart disease and diabetes, and has an increased risk for premature death).

On May 20, 2021, Watson was "constructively discharged" from her positions at Wheeler as a result of a week "heightened by intolerable, egregious, unlawful conduct including assault and battery." *Id.* at 3 ¶ 6. Specifically, Roth "bumped Plaintiff for no reason except to get a reaction that would have caused [Watson] to be fired." *Id.* at 3 ¶ 8. Watson's "anxiety and … rage were so strong that [she] immediately knew she would quit." *Id.* at 4 ¶ 9. After Watson's "constructive discharge," Wheeler refused to pay Watson her earned vacation benefits because she did not give four weeks' notice in her resignation. *Id.* at 13 ¶ 54.

### ii.    *Legal Standard*

"An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Fed. R. Civ. P.] 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). "If the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2015) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)). If, however, "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### iii.   Analysis

####   a.   Counts Two, Three, Four, and Five: Title VII and CFEPA Claims

Watson seeks to amend Counts Two, Three, Four, and Five to include Section 1981 claims against the named individual defendants in each count.  In Count Two, Watson claims that the individual defendants discriminated against her on the basis of her "race and color." ECF No. 105 at 54 ¶ 340.  In Count Three, Watson claims that the individual defendants retaliated against her for filing a CHRO complaint.  *Id.* at 59 ¶ 371.  In Count Four, Watson claims that the individual defendants subjected her to a "hostile or abusive" work environment." *Id.* at 61 ¶ 384.  In Count Five, Watson claims that the individual defendants discriminated against her on the basis of her race and color and subjected her to a hostile work environment. *Id.* at 63 ¶¶ 397, 401.  The individual defendants named in Counts Two through Five are: Preble, Baloga, Arduini, Speicher-Werbner, and Diaz.

Watson's proposal to include Section 1981 claims in Counts Two through Five against the individual defendants, however, is duplicative of her claims in Count One.  In Count One, Watson claims that Wheeler, Speicher-Werbner, Preble, Baloga, Diaz, Roth, and Arduini retaliated against Watson after she filed a CHRO complaint, ECF No. 105 at 51 ¶ 316, created a "hostile work environment," *id.* at 51–52 ¶ 321, and discriminated against her on the basis of her race and color, *id.* at 52 ¶ 324, all in violation of 42 U.S.C. § 1981.  *See generally*, ECF No. 105 at 49–54.  Thus, Watson's proposed amendments assert the same claims under Section 1981 that she has already brought in Count One.  Because the proposed amendment would be duplicative of the claims asserted in Count One, the Court denies Watson's request to amend Counts Two through Five to include Section 1981 claims. *See Cimino v. Glaze*, 228 F.R.D. 169, 173

(W.D.N.Y. 2005) (denying plaintiff leave to amend his complaint to add a new cause of action that would be duplicative of another claim that plaintiff already asserted).

Further, no amendments to the complaint, including additional factual allegations, can render Watson's Title VII and CFEPA claims against the individual defendants valid. That is because none would change the conclusion that, under federal and Connecticut law, Title VII and CFEPA do not provide for individual liability.

### b. Count Six: Intentional Infliction of Emotional Distress

The majority of Watson's additional allegations concerning the IIED Defendants provide more details about the incidents and workplace environment already described in the TAC.[14]  For example, she alleges that she worked extra hours, her co-workers discussed her communication style in emails, Preble sent her daily emails about issues with her work, and Arduini subjected her to "pretextual meetings."  These additional allegations fail for the same reasons Watson's initial claim for IIED failed: they describe "routine employment action" and do not rise to the level of "extreme and outrageous" behavior.  *See Vodovskaia-Scandura v. Hartford Headache Ctr., LLC*, No. HHDCV136044074S, 2017 WL 5931296, at *5 (Conn. Super. Ct. Oct. 31, 2017), *aff'd*, 192 Conn. App. 559, 218 A.3d 209 (2019) (allegations that supervisors "repeatedly expressed their displeasure directly to the plaintiff" about her work, "discussed with the staff their dissatisfaction with the plaintiff," solicited negative feedback about plaintiff, refused to allow plaintiff to leave work to see a doctor, and threatened to fire plaintiff were insufficient to sustain a claim for IIED).  Even if the conduct was racially motivated, as stated above, "routine employment action, even if made with improper motivations, does not constitute extreme or

---

[14] Because Watson brings the IIED claim against Wheeler, Preble, Baloga, and Arduini, the Court will address only the additional allegations regarding those defendants in this section.

outrageous behavior." *Adams v. The Hartford Courant & Trib. Co.*, No. CIV.3-03CV-0477(JCH), 2004 WL 1091728, at *4 (D. Conn. May 14, 2004).

Watson does allege a new incident involving the IIED Defendants, stating that Speicher-Werbner discussed the nature of Watson's leave of absence from work with Preble and Arduini in a place where other coworkers could, and did, overhear the conversation. But as the Defendants point out, this allegation does not meet the standard for "extreme and outrageous behavior." *See Russo v. City of Hartford*, 158 F. Supp. 2d 214, 226 (D. Conn. 2001) (dismissing an IIED claim based on defendant's allegedly giving information about plaintiff's drug test to his coworkers and a newspaper reporter).

Therefore, even when all reasonable inferences are drawn in favor of Watson, her additional allegations do not state a claim for IIED.

### c. Count Seven: Negligent Infliction of Emotional Distress

Watson's additional allegations claim that she "resigned" or was "constructively discharged" due, in part, to Roth's bumping into Watson. Again, for the same reasons above, Watson's NIED claim fails because she does not allege that she was terminated or that Wheeler behaved unreasonably during her termination. Therefore, Watson's additional allegations do not state a claim for NIED.

### d. Counts Eight and Nine: Negligent Supervision, Hiring, and Retention

Watson's additional allegations do not change the Court's previous analysis regarding the negligent supervision, hiring, and retention claims against the individual defendants. Because these claims are brought against individual employees, they implicate the very same public policy concerns identified in *Perodeau* and therefore are barred by the reasoning of *Perodeau*.

### e. Count Eleven: False Light

Watson alleges that Preble sent a copy of her November 19, 2018 email to Speicher-Werbner and that Preble sent an email to HR about Watson on November 29, 2018.  But, as stated above, publication to "a small group of persons," such as a few co-workers, does not satisfy the publicity requirement for a false light claim.  Therefore, Watson's additional allegations do not state a claim for false light.

## V.      CONCLUSION

For the reasons above, the Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Counts Two, Three, Four, Five, Eight, and Nine are dismissed against the individual defendants.  Further, Counts Six, Seven, and Eleven are dismissed in their entirety. The remaining claims in this case are the following: Count One (Section 1981 against all Defendants), Count Two (Title VII against Wheeler), Count Three (Title VII against Wheeler), Count Four (Title VII against Wheeler), Count Five (CFEPA against Wheeler), Count Eight (negligent hiring, supervision, and retention against Wheeler), Count Nine (negligent hiring, supervision, and retention against Wheeler), and Count Ten (defamation against Preble).

IT IS SO ORDERED.

                    /s/
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                July 25, 2022