# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

AVERY WATSON,

    *Plaintiff*,

    v.

WHEELER CLINIC, INC., LISA PREBLE, ERICA BALOGA, HEATHER ARDUINI, LISA ROTH, PATRICIA SPEICHER-WERBNER, AND THEODORE ANDERSON DIAZ,

    *Defendants*.

No. 3:21-cv-00503-MPS

## RULING ON MOTION FOR SUMMARY JUDGMENT

Avery Watson brings this employment discrimination action against her former employer, Wheeler Clinic, Inc. ("Wheeler"), and coworkers with whom she worked at Wheeler (collectively, "Defendants"). Defendants move for summary judgment on all of Watson's claims. For the reasons set forth below, I grant summary judgment as to Watson's federal and Connecticut Fair Employment Practices Act claims and decline to exercise supplemental jurisdiction over her remaining state law claims.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Before recounting the facts in this case, I must review the basic rules governing what I may accept as a "fact" for purposes of a summary judgment motion.

### A.   Rules for Summary Judgment Submissions

The Local Rules of this Court require each party to present its version of the facts "in an orderly and structured manner that is designed to allow a judge to ascertain what facts are settled and what facts are in dispute." *Chimney v. Quiros*, 3:21-CV-00321 (JAM), 2023 WL 2043290, at *1 (D. Conn. Feb. 16, 2023). First, the party moving for summary judgment must file an enumerated statement of facts accompanied by specific citations to supporting evidence — the

1

Local Rule 56(a)1 Statement — along with the cited admissible evidence supporting each individual statement of fact. *See* D. Conn. L. Civ. R. 56(a)1, 3. Then, the party opposing summary judgment must submit a responsive statement — the Local Rule 56(a)2 Statement — containing separately numbered paragraphs corresponding to the paragraphs set forth in the moving party's Local Rule 56(a)1 Statement and indicating whether she admits or denies the facts set forth by the moving party in each paragraph. D. Conn. L. Civ. R. 56(a)2.

Each denial in the Local Rule 56(a)2 Statement must include specific citations to an affidavit or other admissible evidence supporting the statement or denial. D. Conn. L. Civ. R. 56(a)3. And each citation must refer to "specific paragraphs when citing to affidavits or responses to discovery requests" and to "specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." *Id.* A denial in a Local Rule 56(a)2 statement that is not supported by citations in this format may be deemed an admission of the corresponding statement of fact in the moving party's Local Rule 56(a)1 statement if the corresponding statement is supported by the evidence. *Id.* Also, the non-moving party is required to submit in its Local Rule 56(a)2 Statement a list of additional facts not included in the moving party's Local Rule 56(a)1 Statement that she contends "establish genuine issues of material fact precluding judgment in favor of the moving party." D. Conn. L. Civ. R. 56(a)2. These additional facts must also be followed by specific citations to admissible evidence. D. Conn. L. Civ. R. 56(a)3. And, of course, the nonmoving party must also submit the admissible evidence supporting each specific citation.

When the party moving for summary judgment is counseled and the nonmoving party is not, the moving party is required to file and serve a notice to self-represented litigant explaining these requirements to the nonmoving party. *See* D. Conn. L. Civ. R. 56(b).

2

Shortly after Defendants filed their motion for summary judgment, they filed the required notice to self-represented litigant concerning motions for summary judgment and served it on Watson. ECF No. 122. This notice provided Watson with the text of Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56. It also cautioned Watson that she must "file evidence," such as sworn affidavits, *id.* at 2, when she filed her opposition to Defendants' motion, and that she must "cite to specific paragraphs when citing to affidavits or responses to discovery requests, and . . . cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length," *id.* The notice warned Watson that if she failed "to comply with these instructions and to submit evidence contradicting the movant's version of the facts, judgment may be entered against [her] if the motion shows that the movant is entitled to judgment as a matter of law." *Id.*

Watson received four extensions of her deadline to respond to Defendants' motion for summary judgment. In sum, these extensions provided her with 89 days in which to prepare her response to Defendants' motion. *See* ECF No. 118 (motion for summary judgment filed October 24, 2022); ECF No. 133 (Watson's response filed January 21, 2023). Yet many of Watson's Local Rule 56(a)2 Statement citations do not comply with Local Rule 56(a)3. Though Watson expresses disagreement with most of the facts represented by Defendants as undisputed, she fails to provide specific citations to admissible evidence to support many of her objections. For example, she often cites entire multi-page exhibits and does not provide a page citation from which I can find the relevant portion of the record. *See, e.g.*, ECF No. 133 at 4-5 ¶ 11 (citing Exhibit E, a 12-page document, in its entirety without providing a page number); *id.* at 10 ¶ 28 (citing the entirety of the 24-page Exhibit K); *id.* at 5 ¶ 11 (citing a single email in the 73-page Exhibit R by providing the date of the email only); *id.* at 10 ¶ 29 (citing "Exh. N Email," where

Exhibit N is a 61-page document consisting of many emails); *id.* at 15 ¶ 45 (citing "Preble depo," presumably the 46-page document containing excerpts from Lisa Preble's deposition submitted by Watson as ECF No. 133-23). Or Watson cites evidence that I cannot identify in the record. *E.g., id.* at 11 ¶ 32 (citing "Email recording from CHRO date"); *id.* at 12 ¶ 34 (citing "Exh. Timeline"). Or Watson cites evidence that is plainly not admissible. *See, e.g.*, ECF No. 133 at 8 ¶ 20 (citing "Exh. C Baloga CHRO," which is filed at ECF No. 133-4 and appears to be an unsigned typed transcript of unknown provenance). Similarly, many of Watson's Local Rule 56(a)2 statements of additional undisputed facts are improperly cited or lack any citation whatsoever. *E.g.*, ECF No. 133-1 at 4 ¶ 16 (stating as fact that "HR produced no ongoing tranings for Management regarding harassment and discrimination" without citation).

I am "under no obligation . . . to perform an independent review of the record to find proof of a factual dispute if the non-moving party fails to designate specific facts showing a genuine dispute of material fact." *Chalco v. Belair*, 738 F. App'x 705, 709 (2d Cir. 2018) (summary order) (internal quotation marks omitted); *accord Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Court not required to assist parties who file deficient Local Rule 56 Statements by conducting "an exhaustive search of the entire record before ruling on a motion for summary judgment"). Because Watson is a pro se litigant, however, I have considered her submissions despite her failure to comply with the Local Rules, to the extent they are supported by admissible evidence that I could locate in the record. More specifically, I treat as admitted the properly supported factual statements in the Defendants' Local Rule 56(a)1 Statement that are met with denials that Watson has not properly supported with evidence in the record. *See* Fed. R. Civ. P. 56(e)(2); D. Conn. L. R. 56(a). I also consider the properly supported

facts gleaned from her submissions. Having done so, I treat the following facts as undisputed unless otherwise indicated.

### B.    The Parties

Wheeler is a company that operates outpatient facilities, including ones in New Britain and Bristol, Connecticut. *See* ECF No. 133 at 2 ¶ 4. Wheeler hired Avery Watson, an African American woman, in December 2017 to work as a Senior Intake Clinician at Wheeler's outpatient facility in New Britain, Connecticut. *Id.* at 1 ¶¶ 1-2. During her employment with Wheeler, Watson was a licensed clinical social worker and a licensed alcohol and drug counselor. *Id.* She applied for promotion to Clinical Supervisor positions three times in a four-month period and was not selected for promotion each time; she applied for a fourth time six months after her third application and was promoted. *See id.* at 5 ¶ 12 (applied November 2018); *id.* at 7-8 ¶ 20 (was not selected for November 2018 position); *id.* at 10 ¶ 29 (applied January 2019 and was not selected); *id.* at 13 ¶ 38 (applied March 2019 and was not selected); *id.* at 16 ¶ 47-49 (applied September 2019 and was selected). Watson resigned from Wheeler effective May 20, 2021. ECF No. 133-12 at 17; ECF No. 118-2 at 4-5.

In February 2018, Wheeler hired Lisa Preble, a Caucasian woman, as a Clinical Supervisor. ECF No. 133 at 2 ¶ 3. At some point in 2018 after Preble was hired, she began supervising Watson. *Id.* Later, in June 2018, Preble was promoted to Program Manager of Adult Outpatient Services, where she managed Clinical Supervisors in that department. *Id.* ¶ 5. Preble resigned from her position at Wheeler on September 6, 2019. ECF No. 133-22 at 21.

Wheeler hired Heather Arduini, a Caucasian woman, in 2015 as a clinician. ECF No. 133 at 2-3 ¶ 6 (Watson admits Arduini was hired at this time but claims without citation that Arduini was hired as an intern, not a clinician); ECF No. 118-2 at 58 (Arduini says in her deposition she

was hired as a clinician). Arduini worked at Wheeler for several years and was promoted to Program Manager of the Medication Assisted Treatment program in November 2018. ECF No. 133 at 2-3 ¶ 6 (Watson disputes without evidence that Arduini was promoted to Program Manager, instead claiming her title was Project Director).

Patricia Speicher-Werbner, a Caucasian woman, was Wheeler's Chief Human Resources Officer from approximately 2011 to 2021. ECF No. 133 at 3 ¶ 7 (Watson denying these dates without citing a paragraph or page number and stating Speicher-Werbner did not become Chief Human Resources Officer until 2019); ECF No. 118-2 at 98-99 (Speicher-Werbner testified that she was the Chief Human Resources Officer while at Wheeler Clinic and that she was there "[a]lmost 10 years" until she retired).

Teodoro Anderson Diaz was Wheeler's Vice President of Adult Outpatient Operations at all times relevant to Watson's suit. ECF No. 133 at 3 ¶ 8 (Watson admitting that Anderson Diaz worked in this role at Wheeler). He is an Afro-Puerto Rican man. *Id.* (Watson denying Anderson Diaz's ethnicity and race because he used some "Spanish words while speaking" and "never represented himself as an Afro or Black man," but citing evidence that does not support this denial); ECF No. 118-2 at 112 (Anderson Diaz testifying that he identifies as Afro-Puerto Rican).

Lisa Roth, a Caucasian woman, was the Site Director at Wheeler's New Britain location during the times relevant to Watson's suit. ECF No. 133 at 4 ¶ 9.

Erica Baloga was the Associate Director of Outpatient Services at Wheeler's New Britain and Bristol locations during the times relevant to Watson's suit, a role which provided her with some supervisory responsibility over Preble. ECF No. 133 at 2 ¶ 4.

### C.      Watson's Performance at Wheeler

Though the bulk of Watson's claims concern the promotions she was denied, she submitted many records documenting her performance at Wheeler in 2018 and 2019. These records are not clearly linked to any of her claims, but I review them below.

### 1.    Performance Evaluations

Watson received some positive performance evaluations during her tenure working at Wheeler. In April 2018, about four months after she was hired, her 90-day review showed that her supervisor at the time, Jeff Velleca, thought she "has shown ability to take criticism/feedback with a positive attitude and reflect the information in her documentation" and that she "is a valued and important team member." ECF No. 133-9 at 6. He also noted that she "has shown ability to seek out guidance and supervision as needed when completing intake assessments." *Id.*

Watson's next review in June 2018 with Preble, about six months after Watson was hired, noted that Watson was "an asset" who has "proven herself as an effective clinician, with great diagnostic and assessment skills." ECF No. 133-9 at 9. But it also noted that Watson "will benefit from being more mindful of her communication style which has been perceived as unprofessional at times in the last year." *Id.* Separately, during this review period a supervision note dated March 14, 2018 recorded Preble reminding Watson "to attend her supervision weekly as scheduled." ECF No. 118-2 at 42. Supervision notes are generally not provided to clinicians. ECF No. 133-22 at 19.

An August 22, 2019 performance evaluation, completed when Watson was supervised by Jennifer Lanza, contained no negative remarks and noted that Watson was "efficient and helpful in regards to supporting clients . . . during the intake process," that she would consult with her

supervisor when necessary, and that "[s]he was always receptive to feedback if something came up to be addressed as a group w/all clinicians." ECF No. 133-9 at 10.

Some of Watson's colleagues wrote notes praising her work at Wheeler. ECF No. 133-8 at 2-10.

### 2.   Communication and Interpersonal Skills

During Watson's employment with Wheeler, undisputed evidence shows that her supervisors were concerned about her communication and interpersonal skills.

First, the same March 14, 2018 supervision note discussed above shows that Preble met with Watson to discuss the "professional code of conduct, with emphasis on appropriate language." ECF No. 118-2 at 41-42. Preble noted that Watson had used the phrase "pass the buck" on March 9, 2018, in a meeting, and that Watson had used "inappropriate and 'abrasive' language . . . on other occasions as well." *Id.* at 42. Preble also wrote that Watson "denied [using] this language . . . in a negative fashion and was unable to identify how she may improve her communication in the future." *Id.* The note records that Watson responded by telling Preble that her "communication style was being targeted due [to] her race" and that she had "heard other clinicians use language [she] would consider abrasive in front of supervisors and they're not being talked to about it." *Id.*

Second, in July 2018, Watson was told in a performance review that "Management has addressed [Watson's] communication style, which has been perceived as argumentative at times over the last year" and that Watson's managers looked forward to working with Watson "on improving her communication style for optimal effective and professional communication." ECF No. 133 at 4-5 ¶ 11; *accord* ECF No. 118-2 at 45 (July 2018 performance evaluation contains

this statement); *id.* at 12 (Watson testifying at her deposition that she was emailed this performance review by Lisa Preble in July of 2018).[1]

Watson also submitted an email from April 2019 where she wrote that she was "apprehensive" about "HR setting up yet another meeting to discuss" her "unfriendly communication style." ECF No. 133-5 at 14.

Arduini testified that she "never thought [Watson was] offensive to [her]." ECF No. 133-10 at 25. But Arduini did recall that she would often greet Watson in the hallways at Wheeler's New Britain site, and Watson would not return her greeting. *Id.* at 26-27, 30-31.

### 3. Emails about Work Performance

Watson submitted as evidence several emails discussing her performance at Wheeler. Many of these emails date from late 2018 and early 2019 and were forwarded by Preble to Speicher-Werbner in Human Resources on May 17, 2019. These emails document Watson's poor work performance in certain areas, including her communication skills, and her managers' responses to these issues.

Watson submitted several emails documenting her unfamiliarity with Wheeler procedures even after she had been with Wheeler for over a year. Preble sent to Speicher-Werbner an email from January 9, 2019 where Watson wrote that she "was made aware of what clinical tasking is yesterday," which Preble tells Speicher-Werbner means that Watson "did not know and did not use the 'clinical tasking' in NextGen, which is not only mandatory, but vital to the organization

---

[1] Watson denies that she was ever told that her communication style needed improvement, but her denial is not supported by the evidence she cites; indeed, the denial primarily discusses issues beyond the scope of the factual statement. *See* ECF No. 133 at 4-5 ¶ 11. The evidence Watson cites that is relevant to her communication style concerns *when* Preble provided Watson with training materials on communication styles, not about whether Watson received this comment in her performance evaluation. *See id.* (Watson citing "Preble Depo 47," ECF No. 133-23 at 26, where Preble answered no when asked if she had given Watson "any performance improvement plans or suggestions, or assigned the Plaintiff any trainings prior to that first application interview promotion that the Plaintiff applied for," and where Preble stated that she "had provided trainings to [Watson] at [her] request regarding communication style" after Watson did not receive a promotion in November 2018).

of notes and records." ECF No. 133-5 at 9. Watson thus did not know 'how to use a required part of [Wheeler's] documentation workflow." *Id.* Preble also sent another email chain from April 3, 2019 to Speicher-Werbner where Watson expressed confusion about completing "IAPs"; in response to Watson's email, Preble told Watson on April 3, 2019 that "Heather gave a very thorough training" about how to complete IAPs and since that training the management team "haven't gotten any further feedback from clinicians regarding IAPs and all reviews since that last training have been completed correctly." *Id.* at 10. Watson expressed a need for additional training on how to complete IAPs. *Id.* Preble characterized this email chain as showing that Watson had "difficulty following instructions in the last 2-3 months" because, "[d]espite continuous staff meetings discussing IAPs, she somehow didn't understand how to complete them correctly" but "no other clinician had the same difficulties." *Id.*

There were other emails documenting Watson's problems with following Wheeler's procedures. Preble sent to Speicher-Werbner an email chain from March 22, 2019, where Watson appears to not know and follow the procedures that Wheeler uses to document outpatient group counseling sessions. *Id.* at 37-38 (Preble writing to Watson that she has "encounters open for clients in your groups with no templates attached," pointing out that "[t]his is very concerning," and offering to help Watson; Watson asking if "attaching a template" is "mandatory on that same day" as the group session, and Preble confirming that it is). And Preble exchanged emails with Watson on March 11, 2019, about Watson's failure to enter time she was away from work for illness into Wheeler's personnel management system. *Id.* at 40-42. These emails show that Watson "assumed call outs were being handled/managed by a superior," though Preble explained to her that clinicians are responsible for doing this themselves, so she would "need to update" the personnel system "to reflect the sick time." *Id.* at 40.

Watson also submitted a chain of emails from April 4, 2019 documenting her failure to conduct an intake on a new client and her evasiveness when questioned about this failure by her supervisors. *Id.* at 53-55. These emails show that Watson was emailed by a customer service representative and told that there was an intake client for her to see at 10:57am. *Id.* at 54. When Watson had not appeared by 11:28am, the customer service representative emailed Preble and Grant. Preble asked Watson to "present for this intake asap" at 11:29am. *Id.* Watson apparently did not do so because Christine Grant emailed her at 11:48am, writing that Watson had not yet presented for the intake and was with someone in her office; Grant asked if Watson was "in session" or needed "any assistance." *Id.* Watson replied at 11:50 am that she "was taking care of something…" *id.* (ellipses in original). Preble then wrote at 4:24pm and said that she saw Watson sitting with someone, that they were not sure who this person was, and that there "wasn't anyone in your schedule so we weren't sure what you were taking care of." *Id.* at 53. Watson replied "Not sure which co worker it was, I spoke to a few of them this morning, could have been any co worker; involving a variety of things." *Id.* Preble responded that she was not "sure what this means" because "[t]he person you were meeting with didn't appear to be a coworker- it was someone with blond hair in dreadlocks. Do you remember what you were working on . . .?" *Id.* Watson responded "[s]omething, it could have been about client, a phone call, looking up something, finishing a note, I don't recall." *Id.* Preble shared this chain of emails with Speicher-Werbner on May 17, 2019, stating that they exemplify Watson's "recent deteriorating presentation, as well as her disrespect towards management" by not answering the questions she was asked. *Id.*

Watson also had problems clearly documenting her encounters with clients. In March 2019, Preble asked her to "proofread [her] formulations" because they required "a lot of

corrections on grammar, punctuations, and re-phrasing to make some areas more understandable," *id.* at 57, and to "review [her] batch errors," *id.* at 61.

Watson submitted other emails documenting performance issues. She shared emails dated June 10, 2019 showing that she was unaware of the location of basic administrative forms. *Id.* at 24-25. And Watson submitted a May 29, 2019, email from Preble to Anderson Diaz and other managers documenting that Watson was the only New Britain clinician who refused to participate in an "assessment to determine the proficiency levels of all clinicians in alternative pain management techniques" that Anderson Diaz requested all clinicians complete. *Id.* at 27. The email records that Watson said "I don't do pain management and I don't understand this" before pushing the assessment questionnaire away. *Id.*

### D.    November 2018 Clinical Supervisor Position

Watson applied for promotion to the position of Clinical Supervisor on or about November 2018. ECF No. 133 at 5 ¶ 12. Christine Grant, a Caucasian woman who was employed by Wheeler as "a Senior Integrated Health Care Clinician, was also a candidate for this position." *Id.*; ECF No. 118-2 at 72 (Baloga testifying that Christine Grant "also appl[ied] for" the Clinical Supervisor position "in November of 2018").[2] It is not clear from the record whether Watson and Grant were both equally "qualified for the position with regard to education and experience." *See* ECF No. 118-3 at 3 ¶ 14 (Defendants citing only Christine Grant's cover letter and resume in support of this proposition); ECF No. 133 at 6 ¶ 14 (Watson denying that she and Grant were both qualified for the position but citing only the entirety of her 24-page exhibit K). But Grant "applied to the position credentialed as a Licensed Professional Counselor" and she

---

[2] Watson denies this, writing that "Grant was not a candidate for the position but rather an applicant as she was not qualified." ECF No. 133 at 5. But she cites only "Resume Grant" in this denial, which I believe refers to the version of Grant's resume Watson submitted at ECF No. 133-14 at 21-24. Christine Grant's resume, without more, does not support Watson's claim that Grant was not a candidate because she was not qualified for this position.

had some supervisory experience. ECF No. 118-3 at 3 ¶ 15 (Defendants claiming that Grant was a Licensed Professional Counselor that had "nearly three years of supervisory experience"); *but see* ECF No. 118-2 at 49-50 (Grant resume showing that she was a Licensed Professional Counselor and that she worked in several clinical positions, but showing only one supervisory position that Grant worked in only from December 2013-July 2014); ECF No. 133 at 6 ¶ 15 (Watson denying Grant's supervisory experience without citation).

"Baloga and Sue Mason, Program Director at Wheeler's Bristol facility, conducted the interviews for both" Watson and Grant. ECF No. 133 at 6 ¶ 16. Preble "was not present for any of the candidates' interviews," *id.* ¶ 17, because she had a "previous professional relationship with Grant," ECF No. 118-3 at 4 ¶ 17; *accord* ECF No. 118-2 at 73 (Baloga testified that "[w]e decided to not have Lisa [Preble] be present for the [November 2018] interviews because she had a previous professional working relationship with Christine [Grant]"); *id.* at 87 (Preble testified that she "did not want to be involved in the interview processes, because [she] knew Christine [Grant] when [they] worked together at a different agency").[3] Baloga and Mason both thought Watson performed well in her interview. ECF No. 133-23 at 21-23.

Preble was, however, "involved in the assessment of each candidate's strengths and areas for growth, particularly because she was the manager of the department, and thus uniquely positioned to provide insight into the individuals placed on the management team." ECF No. 118-3 at 4 ¶ 18; *accord* ECF No. 118-2 at 74 (Baloga testified that the decision not to promote Watson "was a collaborate management decision" and that she relied on her "program managers

---

[3] Watson claims that Preble did not participate in the November 2018 interviews because Preble "could later bully [Baloga] into the decision [Preble] wanted." ECF No. 133 at 6 ¶ 17. But this claim is not supported by the evidence Watson cites. *See* ECF No. 133-23 at 17 (Preble testifying that she sent an email to Baloga with her "opinion on the matter" of Watson's candidacy for the November 2018 promotion, which does not contradict record evidence showing that Preble did not participate in the interviews because she previously worked with Grant).

[e.g., Lisa Preble] who are on the site 40 hours a week to run the program," so she needs "to make sure that they feel supported in who their management team is").[4]

After the interviews for this position occurred, Preble expressed via email to Baloga "her concerns with [Watson's] candidacy for the leadersh[i]p position considering [Watson's] demonstrated poor communication skills." ECF No. 133 at 7 ¶ 19 (Watson admitting Preble sent an email expressing this sentiment but denying without adequate support that she actually had poor communication skills). In this email, Preble wrote that Watson "has consistently demonstrated poor interpersonal skills, poor written and verbal communication skills, and her tone at times has bordered on insubordinate," that Watson "has a reputation for being horribly apathetic and short with clients," and that if Grant is not suitable for the Clinical Supervisor position then it may be better to "just wait a little longer for more applicants" because she "would rather hire nobody than hire [Watson]." ECF No. 118-2 at 39. But Preble also wrote that she thinks if Watson improves her communication skills "she has a good shot at a promotion down the road," and that she would be "happy to share" this opinion of Watson's communication skills with Watson. ECF No. 118-2 at 39. This email was sent only to Baloga and Speicher-Werbner, *id.*, "internal members of management," ECF No. 133 at 17 ¶ 54. Watson testified that Preble sent this email because Preble wanted "to get her friend th[e] position" of Clinical Supervisor, ECF No. 118-2 at 13, but that Preble also "wanted to discriminate against [Watson]," *id.* at 14; *see also* ECF No. 133 at 8 ¶ 21 (Watson writing that her "entire case is built on [her]

---

[4] Watson denies that Preble was involved in assessing all the candidates. ECF No. 133 at 6-7 ¶ 18. But none of her citations support this denial. *E.g.*, *id.* (Watson citing page 42 of Baloga's deposition, ECF No. 118-2, where Baloga answered "No" when asked if Preble sent her "an email about Christine Grant following [her] interview," which does not support Watson's denial that Preble was not involved at all in assessing Grant, a claim supported by the other parts of Baloga's testimony quoted in the text above).

subscribing to being a Black, African American in a workplace where White Americans exercised their racist power to deny her success").

Watson thus asserts that Preble was motivated at least in part by discriminatory animus when she sent this email, and she refers to several occasions where she alleges Preble displayed this animus. *See* ECF No. 133-1 at 6-7 ¶¶ 34-36. But the only one of these occasions mentioned by Watson connected to record evidence is when Preble testified at her deposition that she "liked" an article on Facebook in 2011, ECF No. 133-23 at 8, which appears to contain a staged photo of one African American man punching another African American man, ECF No. 133-13 at 2, 6. It is not clear from the parties' submissions what the topic of this article was or whether it discussed race. My review of the record also reveals that Preble testified at her deposition that she had never hired a "new staff" person who was African American while she was a Program Manager at Wheeler. ECF No. 133-23 at 4.

Ultimately, Grant was hired for the November 2018 Clinical Supervisor position as a "collaborative management decision." ECF No. 118-3 at 4 ¶ 20; *accord* ECF No. 118-2 at 74 (Baloga testified that the decision to hire Grant over Watson "was a collaborative management decision" and that Preble did not "insist that [Baloga] choose [Grant]" but that Preble "had concerns should [Watson] go into that position"); *id.* at 75 (Baloga testified that Preble's "concerns [about Watson] were a part of the deciding factor" to hire Grant because Preble "needed a strong management team, and so her concerns were taken into consideration of who was going to be the supervisor").[5]

---

[5] Watson denies that the decision to hire Grant was a team decision, instead claiming that "Preble unilaterally made the decision." ECF No. 133 at 7-8 ¶ 20. But the only properly cited evidence in her response does not support her denial. *See id.* (citing two pages of Preble's deposition, neither of which contains any evidence supporting Watson's denial: page 137, ECF No. 133-23 at 46, where Preble testified that at least one person has accused her of being a bully and that Baloga was a "good listener" and a "professional"; and page 138, ECF No. 133-23 at 12, where Preble describes Baloga as being "more heartfelt, more empathetic, more sensitive" than Preble but that she does not know

After Grant was hired, Preble met with Watson on November 28, 2018 "to apprise her of the reasons why she was not selected" for the Clinical Supervisor position. ECF No. 133 at 8 ¶ 22. Preble told Watson "once again" that she needed to improve her interpersonal skills. *Id.*; ECF No. 118-2 at 16 (Watson testified that Preble "must have mentioned something about communication" at this meeting, using the words "abrasive" or "aggressive" to describe Watson's communication style); *id.* at 55 (email from Preble dated November 29, 2018 where Preble noted that she had addressed interpersonal skills problems with Watson in the past).[6] Preble wrote to other members of management about this meeting on November 29, 2018, noting that Preble told Watson she was not promoted because of "her poor interpersonal relations with the other clinicians, as well as her abrasive communication style," both issues that "have been addressed with her in the past." ECF No. 118-2 at 55. Preble also wrote that she told Watson she "wanted to provide [Watson] with feedback because I feel that her work ethic is very good and she may have potential for a promotion in the future" if she improves her interpersonal relations and communication style. *Id.* Preble noted that Watson took Preble's feedback "terribly and stated she wished [Preble] never told her why she didn't get the job" because "she would have rather [Preble] just said she didn't get it and left it alone," which concerned Preble because "another thing [she] look[s] for in a good clinical supervisor is the ability to take feedback in a constructive way." *Id.*

---

if other people describe Baloga as having "no backbone" ). The two pages of Preble's deposition are separated by 24 pages in the record because Watson filed the pages of Preble's deposition out of order.

[6] Watson claims that she was not told that "she needed to improve her interpersonal skills before" the November 2018 promotion opportunity became available. ECF No. 133 at 8 ¶ 22 (citing page 47 of Preble's deposition, ECF No. 133-23 at 26). But the evidence Watson cites shows only that Preble did not give Watson "any performance improvement plans or suggestions, or assigned the Plaintiff any trainings prior to" the November 2018 promotion opportunity. ECF No. 133-23 at 26. The uncontradicted record evidence shows that Watson was told she needed to improve her interpersonal skills before November 2018. ECF No. 118-2 at 45 (July 2018 performance evaluation contains this statement); *id.* at 12 (Watson testifying at her deposition that she was emailed this performance review by Preble in July of 2018).

Shortly after this meeting, Watson "had a change of heart" and expressed thanks by email to Preble for the feedback Preble gave her before asking for training materials on communication style. *Id.* Preble sent Watson training material "for employees in management[t]" in response to Watson's request for material about improving her communication skills. ECF No. 133 at 8-9 ¶ 23; ECF No. 118-2 at 16. Watson testified at her deposition that "strong communication skills" are important "in a leadership role." *Id.* at 9 ¶ 25. But Watson did not review this training material. *Id.* ¶ 24 (Watson denying without evidence Defendants' claim that she did not use the provided training materials); ECF No. 118-2 at 17 (Watson testifying that she did not review the training materials because she did not think they contained the information she asked for).

### E.    January 2019 Clinical Supervisor Position

In January 2019, another Clinical Supervisor position became vacant at Wheeler's New Britain facility. ECF No. 133 at 9 ¶ 26. Satina Salce, a Caucasian woman, "applied and interviewed for the position and was subsequently hired for the role." *Id.* at 9-10 ¶ 27.[7] Salce was a Licensed Professional Counselor with approximately ten years of related experience. *Id.* at 10 ¶ 28 (Watson denying only what credentials were "preferred" for the role, not the credentials and experience Salce possessed); ECF No. 118-2 at 54 (Salce's resume showing approximately 10 years of relevant experience). Salce was jointly selected by Preble and Baloga for the January 2019 Clinical Supervisor position. *Id.* at 77 (Baloga testified that she and Preble jointly decided to hire Salce). Salce was selected before Preble knew that Watson had applied for this role. ECF No. 118-3 at 5 ¶ 29; *accord* ECF No. 118-2 at 88 (Preble testified that she "did not receive an application from [Watson] . . . for that second time" Watson applied for a Clinical Supervisor

---

[7] Watson admits that Salce was hired for this role but denies that Salce was interviewed for the Clinical Supervisor position. *See* ECF No. 133 at 9-10 ¶ 27. She cites no evidence for this denial, and the record reveals that Salce was interviewed for this position. ECF No. 118-2 at 77 (Baloga testified that she and Preble interviewed Salce for the open Clinical Supervisor position and then jointly decided to hire her).

position, and that she "learned that [Watson] had applied" during the Connecticut Commission on Human Rights and Opportunities process); ECF No. 118-2 at 15 (Watson testified that she remembered Preble claiming that "she didn't know I applied or something like that").[8] Salce resigned from Wheeler on March 11, 2019, after working there for approximately one week. ECF No. 133 at 10-11 ¶ 30.[9] The day after Salce resigned, Preble "posted the newly vacant position." *Id.* at 11 ¶ 31.

### F.    March 2019 Clinical Supervisor Position

After Preble posted the March 2019 Clinical Supervisor position, she called a recent applicant to Wheeler, Jade Bray, and informed "her a supervisor position had opened if she wanted to apply." ECF No. 118-2 at 40. Bray was a "bi-racial African American and Caucasian woman" who had interviewed earlier in March 2019 for a "Clinician position" at "Wheeler's Hartford facility" and was viewed as a "stellar candidate," but after her interview she withdrew her application for the Clinician position and instead expressed an interest in supervisory roles with Wheeler. ECF No. 118-3 at 5-6 ¶ 32; *accord* ECF No. 118-2 at 40 (emails stating this between Preble and Baloga); *id.* at 104 (Speicher-Werbner testifying that Jade Bray "had applied for" a position as "a clinician," that her interviewer thought she was "a stellar candidate," but that after the interview Bray "decided that she wanted a higher-level position"); *id.* at 81 (Baloga

---

[8] Watson denies that Preble did not know she applied to the January 2019 Clinical Supervisor position before Salce was selected for the role. ECF No. 133 at 10 ¶ 29. But she does not properly cite any evidence in support of this denial, instead citing two 24- and 61-page documents in their entirety. *See id.* And even if this evidence was properly cited, Watson's denial characterizes the evidence as showing that she "applied January 6, 2019." *Id.* She does not suggest that the evidence shows a genuine dispute about Preble's *knowledge* about whether she applied before Salce was selected for the Clinical Supervisor position.

[9] Watson purports to deny Defendants' explanation for why Salce departed: that Salce left "due to the complexity of the job and dissatisfaction with her physical workstation." ECF No. 133 at 10-11 ¶ 30. But she cites only the same evidence that Defendants do in support of her denial. *See id.* And this evidence reveals that Salce left because her first week "was chaotic for her" due to "staff call-outs" and "a stomach bug going around," ECF No. 118-2 at 78, and that Salce "was unhappy that her desk was broken . . . [,] that there was a snack stand in her office" and that "Wheeler had a policy of mandatory tox screens." ECF No. 118-2 at 92. I do not further address this dispute here because it is not material.

testifying that Bray "applied for a clinician position in Hartford," but then withdrew her application to that position and said "should any supervisory roles open up, she would be interested").[10]

Preble encouraged Bray to apply for the Clinical Supervisor position vacated by Salce, and Bray did so; Bray then spoke with Preble about the role over the phone, and on March 18, 2019, Preble offered Bray the position. ECF No. 118-3 at 6 ¶¶ 33-35; *accord* ECF No. 118-2 at 40 (emails between Preble and Baloga noting that Preble called Bray, Bray "applied for the position and sent 3 references," Preble and Bray "spoke over the phone . . . regarding the supervisory role," Grant "spoke with [Bray] regarding the position," Preble checked Bray's references, and then "first thing in the morning" on March 18 Preble offered the Clinical Supervisor role to Bray); *id.* at 81 (Baloga testified that Bray was informed that a supervisor position became available after Salce resigned, that Bray "had an additional follow-up interview over the phone, her references were collected, and then she was offered the position"); ECF No. 118-2 at 68 (Arduini testified that the position was offered to Bray the morning of March 18, 2019).[11] Bray asked to visit a Wheeler facility later that day before she decided whether to accept Preble's offer of employment and visited a Wheeler facility that same day. ECF No. 118-3 at 6 ¶

---

[10] Watson denies that Bray expressed an interest in supervisory positions but cites no evidence in support of her denial. ECF No. 133 at 11 ¶ 32.

[11] Watson denies that Preble encouraged Bray to apply for the Clinical Supervisor position. ECF No. 133 at 12 ¶ 33. But she cites no evidence supporting her denial, instead claiming that Preble and Grant "falsified application cover letters" for Bray because Grant and Bray's letter both state "thank you for your time," "end with sincerely," and "have no date." *Id.* Watson also denies without an adequate evidentiary citation that Bray applied for the Clinical Supervisor position and spoke with Preble about it. *See id.* ¶ 34. And Watson denies that Preble offered the Clinical Supervisor position to Bray on the morning of March 18, 2019, again doing so without an adequate evidentiary citation. *See id.* ¶ 35. None of these denials comply with Local Rule 56(a)3, and the evidence in the record supports the version of events I recount above.

36; *accord* ECF No. 118-2 at 40 (emails between Baloga and Preble documenting this timeline).[12]

Watson's application for the March 2019 Clinical Supervisor position was received by Preble and Baloga on the afternoon of the same day that Preble offered the position to Bray: March 18, 2023. ECF No. 118-3 at 6 ¶ 38; *accord* ECF No. 118-2 at 40 (emails between Preble and Baloga noting that Watson's application "came through" on "March 18th at 12:41pm"); ECF No. 133-22 at 34 (email showing that Preble received Watson's application on March 18, 2019 at 12:41pm). Watson denies that Preble received her application on March 18, instead claiming that she "submitted her application in-house on March 13, 2019." ECF No. 133 at 13 ¶ 38. Though she does not cite it, the record contains her application dated March 13, 2019. ECF No. 133-14 at 3. But an email dated March 18, 2019 shows that her application was *actually received* by Preble on March 18, 2019 at 12:41pm; that Preble forwarded the application to Arduini, Baloga, and Grant and wrote "Is this a joke? I'm assuming this is a joke"; and that Arduini told Preble on that day "Im not joking about this….I think you should tell [Watson] that you just made an offer this morning." ECF No. 133-22 at 34 (ellipses in original). Watson refers without adequate citation to an "email from Preble on Mar 21," which appears to be referring to the email dated March 21, 2019 where Preble told Watson that "we made an offer to someone on Monday morning, just before I received your application." *Id.* at 25. Despite the unprofessional nature of the communications between Arduini, Grant, Baloga, and Preble, there is thus no genuine factual dispute about the time at which Preble and Baloga received Watson's application for the March 2019 position; it was after they had already offered the position to Bray. And despite her

---

[12] Watson denies that Bray asked to visit a Wheeler facility on March 18, 2019 after receiving the job offer from Preble and visited such a facility. ECF No. 133 at 12 ¶ 36. Her denial is inadequate because she cites no evidence supporting it, and Defendants have cited evidence supporting their factual contention.

unsupported denial, Watson does not offer or provide evidentiary support for an alternative timeline of events in her Local Rule Statements or memorandum of law. *See* ECF No. 133 at 11-14 ¶¶ 32-42 (no mention of alternate timeline); ECF No. 133-1 at 6 ¶ 28 (same); ECF No. 133-3 at 4 (same).

Preble contacted Wheeler's human resources department, after she had already offered Bray the Clinical Supervisor position, to determine "if she was required to interview" Watson given the timing and that "she was not an appropriate candidate, based on her areas of improvement"; Preble was told she was not required to interview Watson. ECF No. 118-3 at 6 ¶ 39; *accord* ECF No. 118-2 at 40.[13] Watson was not interviewed for the March 2019 Clinical Supervisor position. ECF No. 118-3 at 6 ¶ 40; *accord* ECF No. 118-2 at 69 (Arduini acknowledging at her deposition that Watson was not interviewed for the position).[14] Bray accepted the position on March 21, 2019. ECF No. 118-3 at 7 ¶ 41; *accord* ECF No. 118-2 at 40

---

[13] Watson denies that Preble contacted human resources and was told she did not have to interview Watson. ECF No. 133 at 13 ¶¶ 39-40. But much of the evidence she cites in support of this denial is related to the interview she attended for the November 2018 Clinical Supervisor position. Indeed, the date on one of the emails she cites is in November 2018*, see id.* ¶ 39 (citing "Exh. N 11/13/19 Preble to Plaintiff, cc Baloga" as evidence that Watson was "scheduled . . . for that interview"; but this citation appears to refer to emails between Preble, Watson, and Baloga from November 13, *2018* that Watson submitted in Exhibit N, ECF No. 133-22 at 24; these emails document Preble's inviting Watson to interview for the November 2018 position), and the pages from Preble's deposition she cites refer to the November 2018 Clinical Supervisor position, *see id.* (citing pages 160-161 of Preble's deposition, ECF No. 133-23 at 12-13, which discuss the November 2018 promotion). The evidence Watson cites dating from an appropriate period does not contradict Defendants' record evidence supporting their factual statement. For example, Watson references the email from March 18, 2019 at 12:41pm telling Preble that Watson applied to the position and a later email from March 21, 2019 where Preble told Watson that she offered the March 2019 Clinical Supervisor position to someone else before receiving Watson's application. *See id.* at 13-14 (referring to ECF No. 133-22 at 34 and ECF No. 113-22 at 25). Neither of these emails say anything about Preble's contact with human resources. Watson thus fails to point to any evidence disputing Defendants' statement about information Preble received from human resources, which is supported by Defendants' cited record evidence.

[14] Watson also denies that she was not interviewed for the March 2019 Clinical Supervisor position. ECF No. 133 at 13-14 ¶ 40. Her denial explanation is not related to the factual statement, and the evidence to which she refers in that explanation does not support her denial. *See id.* Also, Watson acknowledged at Arduini's deposition that Watson was not interviewed for this position by asking Arduini "what was the reason I wasn't interviewed for this position," referring to the March 2019 Clinical Supervisor position. ECF No. 118-2 at 69. Watson's denial is unsupported by the record.

(On "March 21st" 2019, Bray "called [Preble] and formally accepted the position").[15] The

process by which Bray was ultimately hired — "filling vacant job positions by candidate

recommendation, based on an individual's prior positive interview" — is customary and

encouraged at Wheeler. ECF No. 118-3 at 6 ¶ 37; ECF No. 118-2 at 103 (Speicher-Werbner

testified that Wheeler would generally "encourage feedback on the [interviewed] candidates" so

that if a candidate was not selected but might be a good applicant for another position, Wheeler

"recruiters could forward [the candidate's materials] or make sure the hiring manager knew that

someone had interviewed [the candidate] and they did well in the interview").[16]

### G.      Watson's CHRO Complaint

On April 12, 2019, Watson "dual-filed a complaint with the Connecticut Commissio[]n

on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity

Commission ("EEOC")" alleging that "she was discriminated against and denied promotional

opportunities on the basis of her race and color." ECF No. 133 at 14 ¶ 42 (Watson admitting the

complaints were filed alleging claims on this basis, but inexplicably citing her Third Amended

Complaint, ECF No. 105, and framing the Third Amended Complaint as a denial of Defendants'

factual statement about the CHRO and EEOC complaint). Watson's complaint "was the first

formal complaint human resources received from Watson regarding her allegations of unlawful

discrimination." ECF No. 118-3 at 7 ¶ 43; *accord* ECF No. 118-2 at 101 ("[t]he first formal

complaint we received from [Watson] was being notified by CHRO" of Watson's complaint).

---

[15] Watson disputes that Bray accepted the position on March 21, 2019. ECF No. 133 at 14 ¶ 41. She cites evidence that shows an offer was made to Bray on March 18, 2019. *E.g.* ECF No. 118-2 at 68-69 (Arduini testified the offer was made on that date). None of the evidence Watson refers to suggests that Bray accepted an offer on any day other than March 21, 2019.

[16] Watson denies that Wheeler encouraged filling vacant positions by candidate recommendation and prior positive interview, but she cites a "CHRO CD" that is not in the record and, in any event, her citation does not comply with Local Rule 56(a)3 because it cites the entire CD instead of specifying what portions of the material on the CD are relevant to her denial. ECF No. 133 at 12-13 ¶ 37.

Watson denies this but cites no evidence suggesting she had earlier communicated a complaint to human resources. *See* ECF No. 133 at 14-15 ¶ 43. Watson does, however, refer to an email she sent to Baloga on April 5, 2019 that she claims Baloga said was sent to human resources. *Id.* ("Plaintiff complained by email to Associate Director, Erica Baloga on April 5, 2019 subject: FOLLOW UP Erica said she then forwarded to HR but now both Preble and Baloga deny knowing Plaintiff's about email complaint"). Though Watson did not cite this email as required by Local Rule 56(a)3, I have located it in the record.

In this email dated April 5, 2019 that Watson sent Baloga, Preble, and Grant, Watson wrote that she was "feeling bullied and belittled" after an "impromptu" April 3, 2019, meeting with Baloga, Preble, and Grant because the meeting included "a sudden attack of what felt like an investigation of a few tasks" assigned to Watson, and Watson felt that these tasks "would normally be addressed in a supportive more humane approach . . . [f]or example like in passing, a quick email or in a supervision." ECF No. 133-22 at 22. Watson also wrote in her email that "immediately following the impromptu meeting, I began to receive several emails noting simple fixes; which carried over in to the next morning." *Id.* Together, these events made Watson "feel that with this sudden shift, that this is an attempt to force me out or maybe set me up to try to justify as to why I was over looked 3x's for a supervisor position. I'm just not sure yet it is very unsettling and it makes for a hostile environment. I beg of you to please allow me a workable environment." *Id.* Watson claims that Baloga told her this email was sent to human resources, but Watson does not refer to anything in the record that supports this claim. *See* ECF No. 133 at 14-15 ¶ 43. The portion of Preble's deposition Watson cites discussing this email also does not show that it was sent to human resources. ECF No. 133-23 at 45 (when asked whether she was questioned by human resources about the April 5, 2019 email, Preble answered "[n]ot that I

recall"). Even had this email been sent to human resources, there is no evidence that the
forwarding of an email to human resources by a supervisor would constitute a formal
complaint.[17]

After Wheeler's human resources department received Watson's CHRO complaint, it
investigated the claims in it, ECF No. 118-3 at 7 ¶ 44, and "did not find that Lisa Preble did
anything that she should not have done; she operated within the scope of her position," ECF No.
118-2 at 107.[18] Prior to the CHRO complaint, Speicher-Werbner did "not recall any formal
complaint about Lisa Preble." ECF No. 118-2 at 101. Nor did Baloga, during her time as
Associate Director of Wheeler's New Britain facility, recall any "concerns or complaints" about
Preble other than the one submitted by Watson. *Id.* at 79.[19]

### H.      September 2019 Promotion to Clinical Supervisor

In July 2019, Speicher-Werbner informed Watson about two Clinical Supervisor
vacancies at other Wheeler sites. ECF No. 133 at 15-16 ¶ 46. These sites were 21 and 25 miles
from her home; the New Britain site was 14 miles from her home. *Id.* Watson did not apply to

---

[17] Watson also claims in her Local Rule Statement that she "contacted HR to ask for help due to hostile environment
from their EAP Program," but she cites no evidence substantiating this contact except for "Letter 3/1/19 from EAP'
Provider." ECF No. 133 at 14-15 ¶ 43. Though Watson does not tell me where in her 420-page submission this letter
is filed, I located it and it shows only that a therapist determined that Watson was "having some stress related issues
and needs 5-7 days off for rest and recovery." ECF No. 133-19 at 2.

[18] Watson denies that human resources investigated the issues in her CHRO complaint, saying that "HR did no
investigation as to [Watson] complaining about the treatment she was enduring." ECF No. 133 at 15 ¶ 44. In support
of this denial, she cites only pages 56-59 of Preble's deposition. *Id.* Watson filed the pages of this deposition out of
order. *See* ECF No. 133-23 (for example, the first 5 pages are ordered 141, 142, 55, 167, 168; after some pages
numbered higher than 168, pages 78-89 appear before pages 63-60 appear in reverse order, followed by pages 46,
47, 42, 43, 93, 92, 178, etc.). I have attempted to locate pages 56-59 of Preble's deposition in the record and have
found all pages but page 58. The located pages show that Preble testified that she did not recall being "questioned by
HR about [Watson's] email of April 5, 2019," *id.* at 45, and that Preble did "not have any memory of HR contacting
. . . us specifically about that e-mail" but that "HR was involved on a number of levels, but the questions that you're
– answering, me, the answer is no to these questions" about the April 5, 2019 email, *id.* at 43. So the portions of
Preble's deposition cited by Watson do not support her denial. Indeed, Preble's response that human resources was
involved on a number of levels suggests the opposite of Watson's denial.

[19] Watson denies that Speicher-Werbner and Baloga made these statements, but her denial does not provide a
specific citation to any evidence. *See* ECF No. 133 at ¶ 45 (citing only "Baloga notes CHRO" and "Preble depo."). I
was unable to determine what portions of the record to which she might be referring in support of her denial.

either of these positions. *See* ECF No. 118-2 at 9 (Watson testifying that she "didn't feel I

needed to change my dynamic of my life to go to another site"). But in September 2019, Watson

applied to another Clinical Supervisor position at Wheeler's New Britain facility. ECF No. 133

at 16 ¶ 47. Watson was interviewed by Anderson Diaz, Arduini, and another member of

management, Mara Mcdermott. *Id.* ¶ 48. Her interviewers met with Speicher-Werbner, discussed

Watson's application, and then promoted Watson to the September 2019 Clinical Supervisor

position in October 2019. *Id.* ¶ 49. This promotion occurred after Watson filed her CHRO

complaint. *Id.* at 17 ¶ 51.

## I.      MAT-PDOA Meetings

After her promotion, Watson oversaw the Medication Assisted Treatment-Prescription

Drug and Opiate Addiction ("MAT") team. ECF No. 133 at 17 ¶ 50. This was part of Watson's

"role as Supervisor," and not a separate role that Watson held. ECF No. 118-3 at 8 ¶ 50; *accord*

ECF No. 118-2 at 115-16 (Roth testified that Watson also assisted and ran the MAT program

because she was "a supervisor, a clinician" and the person who "oversaw the MAT program,"

but she was not the "project director" for MAT, as Roth was "not aware of [that] as a Wheeler

position").[20] As part of this work, Watson worked with Arduini and attended MAT meetings. *See*

---

[20] Watson disputes this, claiming that her position as supervisor was distinct from her work overseeing the MAT program and that "HR forced [Watson] to work two full-time positions which they perpetrated as one on paper" because "[t]hese were two separate positions with their unique payrolls." ECF No. 133 at 16-17 ¶¶ 49-50. To support her denial, she refers without adequate citation to three documents: "Exh. G MAT PDOA Job Descriptions; Integrated Clinical Supervisor Job Descriptions," "CEO Assurance of Compliance," and "MAT Budget Narrative pg 1-4." *Id.* I located and reviewed these documents, and they do not support Watson's claim that she held two separate roles. The "CEO Assurance of Compliance" appears to refer to a document signed by the President and CEO of Wheeler Clinic that promises that Wheeler Clinic will comply with various federal civil rights laws as a condition of receiving federal financial assistance. ECF No. 133-15 at 4. The "MAT Budget Narrative pg 1-4" lists and describes personnel positions associated with the MAT program. *Id.* at 5-8. Baloga is listed as the "Associate Director" of the MAT program. *Id.* at 5-7. No one is listed as occupying the "Project Director" position, and Watson is not listed as occupying any position in the budget narrative. *Id.* And the "Exh. G MAT PDOA Job Descriptions; Integrated Clinical Supervisor Job Descriptions" describes the job duties of positions associated with the MAT program, *id.* at 9-12, and the job duties of an "Integrated Care Supervisor" at Wheeler, *id.* at 13-16. This evidence suggests that there could exist two separate positions, as Watson claims, but Watson points to no evidence — and I have not located any — establishing that there is a genuine dispute about whether Watson was required to work two distinct

ECF No. 133 at 17 ¶ 52. Watson testified that these MAT meetings were scheduled by Arduini, who had left for "maternity leave sometime in July of '20," and when she returned, she "tried to put together all these meetings" about the MAT program. ECF No. 118-2 at 23. Arduini did not directly criticize Watson, or ask others to criticize her, at these meetings. *See* ECF No. 133 at 17 ¶ 52; ECF No. 118-2 at 29 (Watson testifying that instead "[s]he tried to get others to do it). But Arduini did invite other members of management to the MAT meetings, ECF No. 133 at 17 ¶ 52, and Watson testified at her deposition that she thought Arduini invited them "because she knew the level of their positions, to get to me, to try to embarrass me, try to break me down," ECF No. 118-2 at 28.

Watson felt that the "nature of the [a]genda and [s]ubject of the meetings" made it clear that the meetings were targeted at her. ECF No. 133 at 17 ¶ 52; ECF No. 118-2 at 29 (Watson testifying that Arduini "badgered" and "harassed" Watson, and "retaliated" against her, by scheduling these staff meetings because "she knew the senior management that was involved in this meeting in hopes to break me down and kill me"). For example, Arduini created an agenda for a MAT meeting that included on it the words "be kind to one another, be respectful to each other, active listening," which Watson testified she understood to be targeted at her because it was "on an agenda in which I have to attend the meeting" and was thus meant to "convince other people there's something so wrong." ECF No. 118-2 at 29-30.

Watson also testified at her deposition that Arduini "conjured up a meeting and had the audacity to put on the agenda that [Watson] can't give any directives . . . to the team," which

---

full-time positions as a MAT Project Director and an Integrated Clinical Supervisor. Indeed, the testimony Watson elicited from Roth suggests that Watson was not occupying two separate positions even if two positions existed. *See* ECF No. 118-2 at 115-16 (Roth testifying that Watson was a supervisor and clinician, but not the MAT project director). Watson's dispute is thus not supported by the cited evidence available in the record.

Watson thought was trying to "make it look like [Watson] was [an] incompetent of some sort," when before Arduini returned from maternity leave Watson "had been running this [MAT] program[,] . . . [s]o she did all of this to kill [Watson] basically." ECF No. 118-2 at 24. At this meeting, Arduini told Watson and the rest of the MAT team that the team members "were not [Watson's] subordinates." *Id.* at 26. But Watson testified that she believed she was the manager of the team based on the paperwork from the federal grant that funded the MAT program. *Id.* (the team "did report to [Watson], according to that grant").[21]

Watson testified that she believed Arduini's intent in implementing meetings in this way was racially discriminatory. She testified that Arduini did not need to have the meetings because the MAT team was "making numbers" and "meeting quotas," yet Arduini still wanted "to talk about some non-issue of communication" between members of the MAT team. *Id.* at 24. Watson also testified that Wheeler was "trying to spin" the nature of her work on the MAT program, saying she "know[s] why" they are doing so, but when asked why Watson stated "[t]hat, I don't have to share." *Id.* at 26. Roth testified that management began attending the MAT meetings because "there was concerns about communication and the way people spoke to one another, for kindness, is why we were -- that's why the invitees, such as Teo Anderson, Dr. Eleck and Tina Loarte-Rodriguez were involved at that level." ECF No. 133-17 at 3. The concerns about kindness were directed at "[t]he way that one another would speak to each other as a team." *Id.* The four other grant programs with periodic meetings that Roth was involved in did not have the same members of management attending them — the "medical director, the vice president of adult outpatient, the vice president of nursing, and so on" — as the MAT meeting. *Id.* at 2.

---

[21] I discuss this paperwork in more detail above and find that there is no genuine dispute supported by the record about Watson's role at Wheeler after her promotion. *See supra* note 20. The grant paperwork submitted as evidence by Watson does not show Watson as a supervisor or director of the MAT team; indeed, it does not even contain Watson's name. *See* ECF No. 133-15 at 5-8.

Despite these meetings and Arduini's greater role in monitoring Watson's work, Watson "was never assessed any discipline or verbal or written warning as a result" of this monitoring. ECF No. 133 at 17 ¶ 53. Indeed, aside from an incident that occurred at a CVS, Watson was not "issued any form of discipline" during her employment at Wheeler. ECF No. 118-2 at 24-25.

Anderson Diaz assumed direct supervision of Watson on April 29, 2021, ECF No. 133-12 at 18, after Watson complained that Arduini was treating her badly as her supervisor, ECF No. 118-2 at 15. Watson then submitted a resignation letter to Anderson Diaz on May 14, 2021, resigning from Wheeler effective May 20, 2021. ECF No. 133-12 at 17; ECF No. 118-2 at 4-5.

## II.    LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party

because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III.     DISCUSSION

In addition to Wheeler, Watson sues Lisa Preble, Erica Baloga, Heather Arduini, Lisa Roth, Patricia Speicher-Werbner, and Teodoro Anderson Diaz. Watson alleges that Defendants discriminated against her on the basis of race and color in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Watson also brings state law claims. After my ruling on Defendants' motion to dismiss, the following claims remain in this case: Watson's § 1981 claims against Wheeler, Speicher-Werbner, Preble, Baloga, Roth, Arduini, and Anderson Diaz; Title VII discrimination, retaliation, hostile work environment, and constructive discharge claims against Wheeler; a claim under the Connecticut Fair Employment Practices Act ("CFEPA"), Connecticut General Statutes § 46a-60(b)(1), against Wheeler; negligent hire, supervision, and retention claims against Wheeler; a defamation claim against Preble; and a battery claim against Roth. *See* ECF No. 106 at 44. I will first discuss Watson's Title VII claims, Counts Two through Four of the operative complaint, before analyzing her § 1981 and CFEPA claims.

### A.     Title VII Discrimination Claims (Count Two)

Title VII of the Civil Rights Act of 1964, as relevant here, provides that it is an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] color." 42 U.S.C. § 2000e–2(a)(1). "[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment

practice, even though other factors also motivated the practice." *Id.* § 2000e–2(m). "An employment decision, then, violates Title VII when it is based in whole or *in part* on discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (emphasis in original) (internal quotation marks omitted).

Race and color discrimination claims under Title VII are analyzed under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (race); *Jones v. Carolina Freight Carriers Corp.*, CIV.3:94CV2095(AHN), 1997 WL 911827, at *3 (D. Conn. Mar. 24, 1997), *aff'd*, 152 F.3d 918 (2d Cir. 1998) (color). Under *McDonnell Douglas*, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination." *Holcomb*, 521 F.3d at 138. "If the plaintiff [establishes a prima facie case], the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Holcomb*, 521 F.3d at 138 (internal quotation marks omitted). "If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (internal quotation marks omitted).

"Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Holcomb*, 521 F.3d at 137 (internal quotation marks omitted). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

(citation omitted); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) ("Summary judgment is appropriate even in discrimination cases [because] . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation") (internal quotation marks omitted). If a plaintiff meets her burden to establish a prima facie case and the defendant satisfies its burden to demonstrate a legitimate, non-discriminatory reason, the plaintiff's ultimate burden of persuasion "may be carried by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence . . . [or] it may often be carried by reliance on the evidence comprising the prima facie case, without more." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) (internal quotation marks and citations omitted).

## 1. Prima Facie Case

Watson alleges in her complaint that she was discriminatorily "subjected . . . to various adverse employment actions." ECF No. 105 at 54. But the only adverse employment action specifically identified in her complaint with supporting factual allegations is Wheeler's "failure to promote her on at least three occasions." *Id.*[22] "To establish a prima facie case for

---

[22] Watson states in the discrimination counts of her complaint that Wheeler was "paying her less than similarly situated non-basis employees, doubling her workload[, and] denying her vacation." ECF No. 105 at 54. She also alleges that Wheeler "failed to provide adequate training to their subordinate employee," *id.* at 55, and "failed to promulgate, maintain, and enforce adequate meaningful and effective policies and procedures for employees to complain of violations of their right," *id.* at 57. She makes similar conclusory allegations in her § 1981 count. *E.g.*, *id.* at 52 (training, failure to have policy). There are no supporting factual allegations in Watson's complaint for these statements. Nor does Watson include any properly supported statements in her Local Rule 56(a)2 statement about these allegations. *See, e.g.*, ECF No. 133-1 at 4 ¶ 16 (stating HR produced no ongoing trainings regarding harassment without any citation). And my review of the record has not revealed any evidence supporting such allegations. Also, in her response to Wheeler's motion for summary judgment, Watson only discusses Wheeler's decisions not to promote her. *See* ECF No. 133-3 at 4-5. I thus find that though Watson's "*pro se* complaint could be construed to raise [these] claim[s]," her failure to "describe in her papers or Rule [56(a)2] statement" anything about these claims or to offer any "evidence in support of [these] claim[s]" renders them "merely conclusory, and [they] cannot survive summary judgment." *Zerilli-Edelglass v. New York City Transit Auth.*, 07CV2478(NG)(LB), 2010 WL 475314, at *4 (E.D.N.Y. Jan. 29, 2010), *aff'd sub nom. Zerilli-Edelglass v. New York City Transit*, 418 Fed. Appx. 35 (2d Cir. 2011) (unpublished).

discriminatory failure to promote, a plaintiff must demonstrate that: 1) he is a member of a protected class; 2) he applied for promotion to a position for which he was qualified; 3) he was rejected for the position; and 4) the employer kept the position open and continued to seek applicants." *Mauro v. S. New Eng. Telecomm., Inc.*, 208 F.3d 384, 386 (2d Cir. 2000). When the position has been filled, the fourth element changes and a plaintiff must instead demonstrate that the circumstances of the failure to promote "give rise to an inference of discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). Wheeler does not dispute that Watson was a member of a protected class, was minimally qualified for the positions to which she applied, and was rejected from the first three Clinical Supervisor positions to which she applied. Instead, Wheeler disputes whether the decisions to not promote Watson to the three Clinical Supervisor positions that became available in November 2018, January 2019, and March 2019 — before she was eventually promoted to the position that opened in September 2019 — were motivated at least in part by discriminatory animus.

A plaintiff can establish an inference of discrimination by showing disparate treatment, that is, by showing "that the employer treated him or her less favorably than a similarly situated employee outside of the protected group." *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (internal quotation marks omitted). Wheeler concedes that the record shows that Wheeler promoted two comparators outside of Watson's protected group instead of Watson: Grant and Salce. *See* ECF No. 118-1 at 19. But it argues that there is "no evidence even remotely suggesting that any of the comparators she lists were similarly situated in all material respects" to Watson, specifically claiming that "the record is devoid of any evidence or inference suggesting that" Grant or Salce "had a similar background of poor interpersonal and communication skills." *Id.* Wheeler also notes that the third person selected for promotion

instead of Watson, Bray, is "a biracial woman who also identifies in part as African American" and so is a member of Watson's protected class, which it argues negates any inference of discrimination. *Id.* Separately, Wheeler argues that there is no direct evidence of racial animus. *See id.* at 19-20. But "the evidence necessary to satisfy [the plaintiff's] initial burden [is] minimal and *de minimis.*" *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotation marks omitted). Recognizing that Watson is a pro se litigant as well as the non-moving party, meaning that I must construe the record in her favor and view the facts in the light most favorable to her, I will assume without deciding that Watson has made out a prima facie case and move to the second stage of the analysis.

### 2. Nondiscriminatory Reasons

At the second stage, Wheeler has sustained its burden by submitting evidence of legitimate, nondiscriminatory reasons for declining to promote Watson to the three Clinical Supervisor positions that became available in November 2018, January 2019, and March 2019. Wheeler notes that Watson did not have the communication and interpersonal skills necessary to supervise other employees, and that Watson applied to the January and March opportunities after offers had been made to other candidates. ECF No. 118-1 at 20-21. At this stage, I must determine whether Wheeler has introduced evidence that, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993) (emphasis in original). "The determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment." *Id*.

Specifically, Wheeler first points to evidence showing that it had repeated concerns about Watson's poor communication skills and interpersonal relations with other clinicians, which

contributed to its decision not to promote Watson. ECF No. 118-1 at 20-21. Watson met with Preble in March 2018 — about three months after Watson was hired by Wheeler — and was counseled on Wheeler's "professional code of conduct, with emphasis on appropriate language." ECF No. 118-2 at 41-42. This meeting was occasioned by Watson's use of the phrase "pass the buck" in a meeting, along with "inappropriate and 'abrasive' language . . . on other occasions as well." *Id.* at 42. Then in July 2018, about seven months after Watson was hired by Wheeler, Watson was told in her performance review that "Management has addressed [Watson's] communication style, which has been perceived as argumentative at times over the last year" and that she needs to work "on improving her communication style for optimal effective and professional communication." ECF No. 133 at 4-5 ¶ 11. Emails sent by Preble to other members of management during the period in which candidates were being interviewed for the November 2018 Clinical Supervisor position show that Preble thought Watson had "consistently demonstrated poor interpersonal skills, poor written and verbal communication skills, and her tone at times has bordered on insubordinate" and that Watson "ha[d] a reputation for being horribly apathetic and short with clients."  ECF No. 118-2 at 39. Preble then met with Watson shortly after Grant was hired for the November 2018 role and counseled Watson "once again" that she needed to improve her interpersonal skills, ECF No. 133 at 8 ¶ 22, and told Watson that she was not promoted because of "her poor interpersonal relations with the other clinicians, as well as her abrasive communication style," ECF No. 118-2 at 55. Later, Watson wrote in an April 2019 email that Wheeler's Human Resources department had set up multiple meetings to discuss her "unfriendly communication style." ECF No. 133-5 at 14. The evidence shows that Wheeler's management was concerned about Watson's communication and interpersonal skills before and during the period in which she applied for and was denied promotion.

Wheeler also submits uncontradicted evidence that Watson applied to the January 2019 and March 2019 Clinical Supervisor positions after other candidates had been offered each job. Preble had already selected Salce for the January 2019 position before she knew that Watson had applied for it. ECF No. 118-3 at 5 ¶ 29. Indeed, Preble testified at her deposition that she "did not receive an application from [Watson] . . . for that second time" Watson applied for a Clinical Supervisor position, and that she "learned that [Watson] had applied" during the CHRO process. ECF No. 118-2 at 88. Similarly, Watson's application was processed and sent to Preble by Human Resources after she and Grant had already offered the March 2019 position to Bray. ECF No. 118-3 at 6 ¶¶ 33-35, 38. Wheeler's explanation that Watson applied to positions after offers had already been made to other candidates, combined with the evidence documenting its concerns about Watson's communication and interpersonal skills, is sufficient to discharge its burden of articulating a nondiscriminatory reason Watson was denied the first three promotions.

### 3.   Pretext

Where, as here, the employer has carried its burden of articulating a nondiscriminatory reason for the adverse employment actions, the plaintiff must come forward with admissible evidence "to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [adverse] [employment actions]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.* "Conclusory and substantially unsupported assertions of pretext are inadequate." *Henderson v. Gen. Elec. Co.*, 469 F. Supp. 2d 2, 13 (D. Conn. 2006).

Watson offers no admissible evidence from which a reasonable juror could infer that Wheeler's managers were motivated in whole or in part by discriminatory animus when they decided not to promote her to the three Clinical Supervisor positions. Instead, she offers only *allegations* that Wheeler acted with discriminatory intent when they declined to promote her three times in a five-month period until her eventual promotion in September 2019. For example, Watson argues in her memorandum of law that Wheeler "is a place were black people were nowelcomed into management and managemt would do all they could to keep them out," but she does not cite any evidence for this proposition. *See* ECF No. 133-3 at 2. Watson then asserts that "Wheeler hires Black people but their ethnicity or culture does not subscribe to African Americans as I do," but does not explain what she means by this statement. *Id.* She also argues without any citation that there were procedural irregularities in the hiring of Bray for the March 2019 position that indicate discriminatory intent, but I have not found any record evidence supporting this argument and Watson does not cite any. *Id.* at 4.

Watson also asserts that she "was in a climate where management resented African Americans and viewed black men as deplo[rable][] and to the contrary white men as model citizens even when fistfighting," and that Preble "demonstrates the use of her power when she was asked about hiring any Black/African to which she answers affirmatively." ECF No. 133-3 at 2. The first assertion apparently refers to Preble's testimony at her deposition that she "liked" an article on Facebook in 2011. ECF No. 133-23 at 8. Watson claims that the article Preble "liked" is the article that she provided in her submissions containing a staged photo of an African American man punching another African American man. ECF No. 133-13 at 2, 6. But Watson has not submitted a complete, legible version of the article or any method I could use to review the entire text of the article (such as the URL of the article). The single legible page Watson

submitted states that an unidentified group are "kicking ass," "called criminals" and "good at fighting," "because they have poor impulse control and anger management," whereas "civilized and successful parents and homeowners and taxpayers" are unlikely to be "good at fighting," a fact that "is thus reflected in our curriculum." *Id.* at 6. Without more, I cannot determine the topic of this article, and so cannot infer any discriminatory animus from it even when it is viewed in the light most favorable to Watson. Nor would a single social media "like" by Preble from 2011 — 6 years before Preble had any interactions with Watson — suffice to establish discriminatory intent not to promote Watson in 2018 and 2019 because of her race or color given the remoteness of the event. ECF No. 118-3 at 4 ¶ 20.

Watson's second assertion refers to Preble's testimony at her deposition that she did not hire any "new staff" who were "black or African American" while she was a Program Manager at Wheeler. ECF No. 133-23 at 4. This testimony is in tension with Preble's hiring of Bray, who is a "bi-racial African American and Caucasian woman." ECF No. 118-3 at 5-6. But I find that the conflict between these two assertions is not a material one. Even when the conflict is resolved in Watson's favor and I assume that Preble never hired any African American person while she was a Program Manager at Wheeler, this is insufficient to allow a reasonable jury to find discriminatory intent. Preble worked as a Program Manager at Wheeler for only 15 months. *See* ECF No. 133 at 2 ¶ 5 (promoted to Program Manager June 2018); ECF No. 133-22 at 21 (resigned from Wheeler September 2019). Watson points to no evidence about Preble's role in hiring generally or about any other positions for which Preble was involved in hiring during this brief period other than the evidence about the three Clinical Supervisor positions that Watson applied for while Preble worked at Wheeler. Nor is there evidence about any African American candidates for those three positions other than Watson (and, potentially, Bray). Even when

37

viewed in the light most favorable to Watson, a reasonable jury could not infer discriminatory intent from Preble stating she had never hired an African American employee while working as a Program Manager because Watson has failed to provide the evidence necessary to contextualize this statement. On this record, it is possible that Preble hired for no other positions or that there were no other African American candidates; a reasonable jury could not infer from Preble's deposition testimony and the other record evidence that there were other positions for which Preble was involved in hiring, that African American candidates applied to any such positions, or that Preble did not hire them at least in part because of their race.

Instead, there is ample evidence that Wheeler was motivated by concerns about Watson's communication and interpersonal skills when they denied her promotion to a supervisory role in November 2018. Wheeler's managers expressed concern about Watson's capabilities in these areas within Watson's first few months of working at Wheeler and about eight months before Watson first applied to a Clinical Supervisor role in November 2018. ECF No. 118-2 at 41-42 (March 2018, four months after Watson started working at Wheeler and eight months before her first application for promotion). Watson's poor communication and interpersonal skills were documented again in July 2018, ECF No. 133 at 4-5; in November 2018, ECF No. 118-2 at 55; and several times in 2019, *see* ECF No. 133-5 at 14 (Watson writing that HR set up several meetings to discuss her "unfriendly communication style"). Watson also submitted emails between her and various supervisors at Wheeler documenting other problems with her work at Wheeler, including her evasiveness when communicating with her managers, *see* ECF No. 133-5 at 53-55 (emails where Watson would not explain what she was doing for several hours at work, instead writing that she "was taking care of something"), and her struggles to write clear client notes, a facet of communication skills, *e.g.*, *id.* at 57. Watson also submitted evidence that, even

when viewed in the light most favorable to her, demonstrates that she responded abrasively when asked to do something with which she disagreed. *See id.* at 27 (all New Britain clinicians were asked to complete an assessment questionnaire about pain management techniques at a meeting; Watson, the only one who refused to participate, stated during the meeting that "I don't do pain management and I don't understand this" before pushing the questionnaire away). Watson has also failed to submit any evidence disputing Wheeler's admissible evidence showing that her applications for the January and March 2019 promotions were received after a candidate had already been selected for the positions.[23]

A thorough review of Watson's submissions thus reveals no evidence of discriminatory intent other than Watson's conclusory assertions. Because Watson has "failed to produce any evidence, other than conclusory statements unsupported by the record, to rebut the legitimate, nondiscriminatory reasons offered by [Wheeler], let alone evidence that could reasonably support a verdict in [her] favor," *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 99 (2d Cir. 2001), I find that Defendants are entitled to summary judgment on Watson's Title VII discrimination claims.

### B.    Title VII Retaliation Claim (Count Three)

Watson also alleges that Wheeler retaliated against her after she filed her CHRO complaint on April 12, 2019 by "heighten[ing] [its] unlawful conduct." ECF No. 105 at 59. Title

---

[23] Watson's assertion that "she was easily the most qualified candidate" for each Clinical Supervisor opening, ECF No. 105 at 55, does not help her here, both because she has pointed to no evidence in the record to support it and because, in any event, the relative qualifications of the candidates (provided they were all at least minimally qualified) was a judgment for Wheeler, not this Court, to make. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates . . . . [To resist summary judgment in a discrimination case based on qualifications alone,] the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.") (internal quotation marks and citations omitted). Especially given Wheeler's documented concerns about her communication and interpersonal skills, Watson cannot show on this record that she was "so superior . . . that no reasonable person . . . could have chosen" the other candidates over her. *Id.*

VII makes it unlawful "for an employer to discriminate against any of [its] employees ... because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *see also McMenemy v. City of Rochester*, 241 F.3d 279, 284 (2d Cir. 2001) ("Title VII protects an employee from any employer . . . who retaliates against h[er] because of h[er] prior or ongoing opposition to an unlawful employment practice or participation in Title VII proceedings.") (emphasis omitted).

Title VII retaliation claims are also analyzed under the *McDonnell Douglas* framework. *Ya-Chen Chen v. City U. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). To establish the prima facie case, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted). "[I]n the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (internal quotation marks omitted). This definition "covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII." *Id.*

Wheeler does not dispute that Watson participated in protected activity by filing a CHRO complaint and that it knew of this protected activity. Wheeler instead argues that Watson did not suffer an adverse employment action after she filed her CHRO complaint and that Watson cannot show a causal connection between her protected activity and any adverse employment action. I agree.

Watson does not address her retaliation claim in her memorandum of law, and she does not point to any direct evidence of retaliatory intent. *See* ECF No. 133-3 at 1-9. Her complaint also does not describe in its Title VII retaliation count any concrete actions Wheeler took to retaliate against her after she filed her CHRO complaint, instead only stating that Defendants increased their "unlawful conduct." *See* ECF No. 105 at 59-60. Nevertheless, Watson does seem to suggest that Arduini's management of the MAT team and its meetings after Arduini returned from maternity leave in late 2020 or early 2021 — the record is unclear — constituted excessive scrutiny intended to retaliate against her for the CHRO complaint she filed in April 2019. *See* ECF No. 133-3 at 7 (disconnected paragraph in Watson's memorandum of law alleging negative acts by Arduini); ECF No. 118-2 at 23 (when asked how she was "retaliated against," Watson testified that Arduini left for "maternity leave sometime in July of '20," and when she returned she "put together all these meetings" about the MAT program); *id.* at 24 (when asked if there were any other forms of retaliation besides MAT meetings, Watson testified "[o]f course, but I don't — I don't recall right now"). Watson thus claims that over a year after she filed her CHRO complaint, and after she was promoted to Clinical Supervisor, she was retaliated against through excessive scrutiny of her work on the MAT program.

Although the standard for adverse employment action is more lenient in the retaliation context, *Vega,* 801 F.3d at 90, "[t]o qualify as an adverse employment action [for purposes of a retaliation claim], excessive scrutiny must be accompanied by unfavorable consequences," *Chacko v. Connecticut*, 3:07-CV-1120 (CFD), 2010 WL 1330861, at *13 (D. Conn. Mar. 30, 2010) (internal quotation marks omitted). "Embarrassment or anxiety are not sufficient to constitute adverse action," and "District Courts within the Second Circuit have often found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse

employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Id.* (internal quotation marks omitted). Watson "was never assessed any discipline or verbal or written warning as a result" of the allegedly excessive scrutiny. ECF No. 133 at 17 ¶ 53. Nor has she clearly stated that she suffered any concrete, negative results from this scrutiny; she makes only a vague statement that the meetings were intended to "make it look like [Watson] was [an] incompetent of some sort" and "to kill [Watson] basically." ECF No. 118-2 at 24. She thus has not pointed to any unfavorable consequences accompanying the excessive scrutiny that could dissuade a reasonable worker from engaging in Title VII protected activity.

But Watson seems to believe she suffered an unfavorable consequence arising from the excessive scrutiny related to her claimed managerial responsibility over the MAT team. Watson asserts that she was the "Project Director" of the MAT team, ECF No. 133-3 at 7, and testified in her deposition that she "had been running this [MAT] program" while Arduini was on leave, ECF No. 118-2 at 24. Watson also testified at her deposition that after Arduini returned from maternity leave, Arduini told the other members of the MAT team that they were not Watson's subordinates, which Watson interpreted as Arduini removing her rightful managerial authority. ECF No. 118-2 at 26; *see* ECF No. 133-3 (Watson asserting that Arduini "took away her authoritative responsibilities" when she "had been Director"). Even if such conduct was enough to dissuade a reasonable worker and so amount to an adverse employment action, Watson's assertions fail to raise a genuine factual dispute warranting a trial on her retaliation claim.

First, Watson has failed to establish a causal connection between her protected activity, filing a CHRO complaint, and the alleged adverse employment actions related to the MAT meetings. She does not offer any explanation in her memorandum of law or other filings about

how the MAT meetings were connected to her CHRO complaint, and I have found no evidence

of this connection. Further, the CHRO complaint and MAT meetings are not close temporally.

The MAT meetings that Watson identifies as retaliatory began after Arduini returned from

maternity leave. ECF No. 118-2 at 23. Though it is unclear exactly when Arduini returned to

Wheeler, Watson testified at her deposition that she *left* for "maternity leave sometime in July of

'20." *Id.* Watson filed her CHRO complaint on April 12, 2019. ECF No. 133 at 14 ¶ 42. The

period between Watson's filing of her CHRO complaint and the beginning of the allegedly

retaliatory meetings was thus more than 15 months. While "there is no bright line to define the

outer limits beyond which a temporal relationship is too attenuated to establish a causal

relationship" between protected activity and "an allegedly retaliatory action," *Abrams v. Dept. of

Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014), a period of 15 or more months, with no other

evidence of causation, is too distant to show a causal connection, *see Clark Cty. Sch. Dist. v.

Breeden*, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months later suggests, by itself, no

causality at all."); *Joiner v. Chartwells and Compass Group N.A.*, 500 F. Supp. 2d 75, 85 (D.

Conn. 2007) (periods of five months, eight months, and over a year, were, "[a]bsent direct

evidence of a causal connection . . . too great for a rational jury to infer a causal connection");

*Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 366 (S.D.N.Y. 2006), *aff'd*, 629 F.3d 276 (2d

Cir. 2010) (where employee's complaint preceded employer's providing negative references to

recruiter by more than one year, and preceded reprimand by almost a year, these events were too

remote to establish causal connection based on timing alone); *Booker v. Fed. Reserve Bank of

New York*, No. 01 CIV. 2290 (DC), 2003 WL 1213148, at *16 (S.D.N.Y. Mar. 17, 2003)

(temporal proximity between employee's complaints and subsequent demotion — eight months

and one year — too remote to support retaliation claim).

Second, as I discussed above, Watson's assertion that she was the "Project Director" of the MAT team to whom the other members of the team were subordinate is not supported by the record. *See supra* note 20. Indeed, Watson undermines her claim to have been the MAT Project Director by describing Arduini's position at Wheeler as of "late 2018" as being "Project Director of MAT PDOA" in her Local Rule 56(a)2 statement. ECF No. 133 at 3 ¶ 6. Watson lists no other position that Arduini occupied after the MAT position. *Id.* The only evidence I found supporting Watson's claim that she was the MAT Project Director is her assertion during her deposition that she held that position at some point, ECF No. 118-2 at 28, and her calling herself the Project Director in her letter resigning from Wheeler, ECF No. 133-12 at 17. But at her deposition, Watson stated that she believed she was the Project Director based on the MAT grant paperwork. ECF No. 118-2 at 26. The grant paperwork submitted by Watson does not show that Watson was the MAT Project Director. *See* ECF No. 133-15 at 5-7 (no one is assigned as the Project Director on the MAT grant paperwork; the person occupying the position is marked "TBH"). And all the other undisputed evidence on this point shows that Watson was not the Project Director. *E.g.*, ECF No. 118-2 at 115-16 (Roth testified that Watson was a supervisor and clinician, not the MAT Project Director). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Vega v. Rell*, 611 Fed. Appx. 22, 25–26 (2d Cir. 2015) (unpublished).

Even if the evidence established that Watson was the Project Director, allegations that she was "stripped of supervisory duties," without evidence establishing what these supervisory duties were and that the loss of them amounted to a "materially adverse change in the terms and conditions" of Watson's employment, are insufficient at the prima facie stage to establish an

adverse employment action and withstand summary judgment on a Title VII retaliation claim.

*Rodriguez v. Nassau Cnty.*, No. 16CV2648SFJARL, 2019 WL 4674766, at *14 (E.D.N.Y. Sept.

25, 2019), *aff'd sub nom. Rodriguez v. Cnty. of Nassau*, 830 Fed. Appx. 335 (2d Cir. 2020)

(unpublished) (only supervisory duty identified by plaintiff was monitoring staff attendance,

removal of which was not an adverse employment action); *see Pierson v. Columbus McKinnon

Corp.*, No. 02-CV-0917E(SR), 2005 WL 1123754, at *10 (W.D.N.Y. May 10, 2005) (allegation

that plaintiff was retaliated against because her "supervisory role diminished," without evidence

that "role as supervisor was . . . a material responsibilit[y] of her position" or that loss of role

resulted "in a decrease in wage or a demotion" insufficient to withstand summary judgment on

Title VII retaliation claim) (internal quotation marks omitted, alteration in original). Watson has

failed to proffer evidence about her claimed managerial duties as a Project Director, and so, even

if I assume that they were taken away, she has not established that this would dissuade a

reasonable worker from making or supporting a charge of discrimination and thus qualify as an

adverse employment action.

For these reasons, Watson has failed to raise a genuine dispute of material fact to warrant

a trial on her Title VII retaliation claim, and Wheeler is entitled to summary judgment.

### C.    Title VII Hostile Work Environment Claim (Count Four)

Watson also alleges in her complaint that Wheeler subjected her "to intentional

harassment, objectively severe that a reasonable person would have found hostile or abusive"

and that "the conduct complained about was sufficiently extensive to render [Watson's] work

environment hostile or abusive." ECF No. 105 at 61. Specifically, she identifies Wheeler

managers "calling her out in meetings without basis in the presence of her coworkers and

subordinates, and labeling her as combative, disorderly, consistently demonstrating poor

interpersonal skills, poor written and verbal communication skills, and that her tone at times bordered on insubordinate\ion\...she also has the reputation to be horribly apathetic and short with clients" as being the acts that created a hostile work environment. *Id.* While Watson's other discrimination claims "scrutinize discrete harms such as [the failure to promote her], a hostile work environment claim analy[z]es a workplace environment as a whole to discover whether it is abusive." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d. Cir. 2001) (internal quotation marks omitted).

A hostile work environment claim requires the plaintiff to show "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). The plaintiff must also show that the harassment occurred because of her race and/or color. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic.").

To satisfy the first requirement, a plaintiff must demonstrate "that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano*, 294 F.3d at 373-74. "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (internal quotation marks omitted). As a general rule, "incidents must be more than episodic; they must be sufficiently continuous and

concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* A court must look "at all the circumstances" when assessing an allegedly hostile work environment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

### 1.   Severity and Pervasiveness

Watson does not point to any specific incidents supported by evidence in the record to support her hostile work environment claim. *See, e.g.*, ECF No. 133-3 at 9 (memorandum of law states legal standard for hostile work environment claim followed only by the word "Info"). Her complaint and Local Rule 56(a)2 statement suggest that she believes the incidents supporting her hostile work environment claim consist of the feedback she received on her communication and interpersonal skills and the way the MAT meetings were managed after Arduini returned from maternity leave. *See* ECF No. 105 at 61 (hostile work environment count of complaint mentions only "calling her out in meetings" and communication and interpersonal skills)*; see* ECF No. 133-1 at 6 ¶¶ 30-33 (unsupported proposed additional facts about harassment focus on Arduini and the MAT program).

All of Watson's hostile work environment allegations share a flaw. Though I must interpret the evidence in the light most favorable to her, Watson has failed to provide evidence establishing specific details about the alleged harassment, such as the quantity of incidents, when they occurred in the approximately three years she was employed at Wheeler, where they occurred, and who was present for most of the incidents. It is her burden to produce admissible

evidence — not conclusory assertions — to withstand summary judgment on this claim, and she has not met this burden.

The record contains evidence documenting four specific occasions when Watson received direct criticism of her interpersonal and communication skills. ECF No. 118-2 at 41-42 (March 2018 supervision note); *id.* at 45 (July 2018 performance evaluation); *id.* at 55 (November 28 2018 feedback after Watson not promoted); ECF No. 133-5 at 57 (March 2019 email noting poorly written formulations). On each occasion, the evidence shows that this criticism was given in professional terms as part of regular employment counseling. *E.g.,* ECF No. 118-2 at 41-42 (March 2018 supervision note documented discussion of "professional code of conduct, with emphasis on appropriate language"); *id.* at 45 (July 2018 annual performance review documented problems with "communication style"). There were possibly other occasions when this concern was discussed with Watson. *See* ECF No. 133-5 at 14 (Watson writing in an April 2019 email that HR set up multiple meetings to discuss her communication style). But Watson has failed to provide evidence showing the number, length, content, or any other details of these occasions, let alone that they involved any "discriminatory intimidation, ridicule, [or] insult." *Alfano*, 294 F.3d at 373-74. Watson also submitted many emails, some of which relate to aspects of her work at Wheeler involving communication and interpersonal skills. *See, e.g.,* ECF No. 133-5 at 57 (Preble asking Watson to proofread her writing to make it more understandable); *id.* at 53-55 (emails where Watson provided evasive answers and would not explain what she was doing for several hours at work). She has not connected these emails to her hostile work environment claim. Even when I consider them with her other allegations, they are not sufficient to show pervasive and severe conduct. "[C]ourts in this Circuit have consistently held that [a]llegations of even constant reprimands and work criticism by themselves are not sufficient to

establish a hostile environment claim." *Spaulding v. New York City Dept. of Educ.*, 12CIV3041KAMVMS, 2015 WL 12645530, at *58 (E.D.N.Y. Feb. 19, 2015), *report and recommendation adopted,* 12 CIV. 3041 KAM VMS, 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015) (collecting cases, internal quotation marks omitted, alteration in original).

Similarly, while the record reflects that the MAT meetings occurred on a regular basis, that members of management were invited to some of them, and that Watson disliked how Arduini ran some of the meetings, Watson has provided no details about the meetings, such as what month they began, what was usually discussed at them (and whether Watson had a speaking role), how many of these meetings occurred (and of the meetings that occurred, how many of them involved alleged harassment), and how many of the meetings were attended by extra members of management. At best, I can infer that Watson believes two of these meetings involved harassment: the meeting where Arduini put on the agenda that all MAT team members should "be kind to one another, be respectful to each other," ECF No. 118-2 at 29-30, and the one where Arduini told the MAT team that Watson cannot give them any directives, *id.* at 24. Watson also testified that Arduini would steal her ideas and "smirk" at her at MAT meetings "more than twice"; this may have happened at the two meetings specifically identified or at different meetings. *Id.* at 30. But Arduini did not single out Watson at the MAT meetings or cause anyone to criticize her. ECF No. 133 at 17 ¶ 52.

These kinds of incidents, viewed together with the criticism of Watson's communication and interpersonal skills and the other evidence in this case, are not sufficient to establish objectively that Watson's workplace was permeated by severe and pervasive discrimination. Watson has proffered evidence for her hostile work environment claim of "middling performance reviews and a handful of annoyances," and these "performance reviews and

annoyances made [Watson] unhappy at work, but they do not objectively rise to the level required to establish a hostile work environment." *Zoulas v. New York City Dept. of Educ.*, 1:18-CV-2718-GHW, 2021 WL 3932055, at *22 (S.D.N.Y. Sept. 1, 2021). Even if I assume that the incidents identified by Watson were harassment, a small number of unpleasant minor incidents over several years of employment are not sufficient to state a hostile work environment claim. *See Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 Fed. App'x. 41, 48 (2d Cir. 2018) (unpublished) (affirming summary judgement and finding that eleven incidents over a five-year period were not hostile or abusive); *Husser v. New York City Dept. of Educ.*, 137 F.Supp.3d 253, 259, 276 (E.D.N.Y. 2015) (granting summary judgment as to hostile work environment claim and finding "the twelve cited remarks and events over the course of a three-year period are not sufficiently pervasive").

## 2.   Connection to Race or Color

Watson must also proffer evidence establishing that the incidents giving rise to a hostile work environment happened because of her race and/or color. All the documented incidents mentioned by Watson were facially neutral; she points to no remarks about her race or about African Americans in general supported by the record. *See* ECF No. 133-1 at 6-7.[24] Though

---

[24] In her statement of additional facts, Watson alleges four separate remarks or incidents that could be construed as racially tinged, but none of her allegations are supported by the evidence she cites. *See* ECF No. 133-1 at 6-7 ¶¶ 34-36 (note that Watson numbered two paragraphs 35). First, Watson claims that "Preble would call the police on black clients but not the white ones as she showed on her Facebook that she looked at black men as criminals and worthless in society by pressing 'Like' on Cracked Magazine on her Personal Facebook Page." *Id.* ¶ 34 (citing "(Preble Depo.168-169,173)(Exh. ___)"). Pages 168, 169, and 173 of Preble's deposition, ECF No. 133-23 at 6-7, 11, concern how she "liked" an article from Cracked; as I discussed above, Preble's "like" of the article Watson mentions is not evidence of racial animus. Page 168 of Preble's deposition also reveals that Preble did not recall making an unspecified statement to Whitney Boon at Wheeler, evidence that is related — but uncited — to an additional proposed fact that I discuss below. Watson's cited evidence thus does not support her claim that Preble would "call the police on black clients but not the white ones." ECF No. 133-1 at 6 ¶ 34. Second, Watson alleges that she was reprimanded for "not taking a lockdown seriously after Preble had called the police on one of Wheeler's clients (black male)", but that "Beluga and Preble said they didn't discipline plaintiff because of her upbringing and the neighborhood she grew up in." *Id.* ¶ 35 (this citation refers to the first paragraph 35). But Watson cites no evidence except for "CHRO CD-Baloga," which as I noted above is not in the record. *Supra* note 16. Third, Watson alleges that she "was so overwhelmed and hurt by the situation where she felt helpless for these clients who

"[f]acially neutral incidents may be included . . . among the totality of the circumstances that courts consider in any hostile work environment claim," a "reasonable fact-finder" must be able to "conclude that they were, in fact, based on" the protected characteristic. *Alfano*, 294 F.3d at 378 (internal quotation marks omitted). "This requires some circumstantial or other basis for inferring that incidents []neutral on their face were in fact discriminatory." *Id.* So when "a plaintiff relies on facially neutral incidents, he must offer some additional evidence from which a reasonable jury could infer that these acts were, in fact, discriminatory." *Blake v. Developmental Services*, 278 F. Supp. 3d 519, 534 (D. Conn. 2017), *aff'd sub nom. Blake v. Dept. of Developmental Services*, 750 Fed. Appx. 54 (2d Cir. 2019) (unpublished) (internal quotation marks omitted). Watson has not submitted any evidence from which a reasonable juror could infer that the facially neutral incidents she identifies were motivated by discriminatory animus. She asserted speculatively at her deposition that any criticism of her "[c]ommunication style" is "discriminatory within itself." ECF No. 118-2 at 12. She also testified that the MAT meetings were harassment targeted at her because she was "a black woman," and Arduini did not "want [her] to succeed," ECF No. 118-2 at 31. But Watson has provided no evidence supporting these contentions, such as evidence showing that anyone at Wheeler ever made a discriminatory

---

were mistreated," but cites nothing at all in support of this contention. *Id.* at 7 ¶ 35 (this citation refers to the second paragraph 35). Fourth, Watson alleges that "Preble told Whitney (Black) front desk that letters behind a name doesn't mean the same thing adding 'anyone can take a test'. (Preble Depo.) Whitney (black/African American went and found Plaintiff and told her what Preble had said." *Id.* ¶ 36. Though Watson does not provide a specific citation (or any citation other than "Preble Depo."), I located the relevant portions of Preble's deposition. Watson asked Preble "[b]ut isn't it true that you told Whitney, the letters behind your name don't mean anything because anybody can pass a test," and Preble replied "I don't know the context that you're referring to, but I have used those words before. So I know that I have said that before." ECF No. 133-23 at 5. But when Watson tried to link this phrase to anything that happened at Wheeler, Preble testified that she had no "recollection of this conversation that [Watson is] talking about," that she did not "know that [she had] ever said i[t] at Wheeler Clinic," and — after Watson described the circumstances of the alleged conversation with Boon — that she had "absolutely no recollection of a conversation with Whitney Boon around what [Watson is] describing." *Id.* at 5-6. Watson could have submitted evidence, such as an affidavit from Whitney Boon, supporting her allegation that this conversation happened in the manner she alleges. But Watson has not submitted any such evidence, and the record thus does not support her allegation that Preble made a derogatory comment about the qualifications of Watson, Boon, or anyone else at Wheeler Clinic.

comment about her or any other employee. Indeed, at her deposition she testified at one point

that at least some of Arduini's alleged harassment was not because of her race; it was "just her

behavior." ECF No. 118-2 at 30. Because Watson fails to point to any evidence of discrimination

that could connect the facially neutral incidents she identifies as contributing to a hostile work

environment to her protected characteristic under Title VII, she has failed to establish any

genuine disputes of material fact warranting a trial on the hostile work environment claim.[25]

### D.      CFEPA and Section 1981 Claims (Counts One and Five)

Watson brings claims under the CFEPA. ECF No. 105 at 62-66. CFEPA claims are

analyzed using the same standards as Title VII claims. *Johnson v. Connecticut*, 798 F. Supp. 2d

379, 386 (D. Conn. 2011) ("The intent of the Connecticut legislature in adopting the CFEPA was

to make the statute coextensive with Title VII; therefore, Connecticut courts look to federal case

law for guidance in interpreting this provision of the CFEPA . . . [and] this Court will analyze the

Title VII claim and the CFEPA claim simultaneously.") (quotation marks omitted).

Watson also brings § 1981 claims for discrimination, hostile work environment,

retaliation, and constructive discharge. ECF No. 105 at 49 (discrimination); *id.* at 51-52 (hostile

work environment); *id.* at 51 (retaliation, constructive discharge). "Hostile work environment,

disparate treatment, and retaliation claims are analyzed in the same manner and under the same

tests under both Title VII and Section 1981." *Cadet v. All. Nursing Staffing of New York, Inc.*,

632 F. Supp. 3d 202, 222 (S.D.N.Y. 2022) (citing *Littlejohn* v. *City of New York*, 795 F.3d 297,

---

[25] Watson also brings a claim for constructive discharge based on her hostile work environment. ECF No. 105 at 57 ("the defendants selectively enforced rules, custom, practices, procedures. And requirements for employee conduct against the plaintiff and caused her to effect constructive discharge"). A hostile-environment constructive discharge claim is "graver . . . than its lesser included component, hostile work environment." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004). Because Watson has "failed on her hostile work environment claim," she cannot "survive summary judgment on her constructive discharge claim, which requires evidence of even more severe conditions." *Chenette v. Kenneth Cole Productions, Inc.*, 345 Fed. Appx. 615, 620 (2d Cir. 2009) (unpublished).

312, 315-16, 320-21 (2d Cir. 2015)); *accord Belton v. Borg & Ide Imaging, P.C.*, 512 F. Supp.

3d 433, 447 (W.D.N.Y. 2021) ("Section 1981 discrimination claims are analyzed under the same

substantive standard applicable to Title VII discrimination claims, as are Section 1981 retaliation

claims") (internal citation and quotation marks omitted). The same is true of constructive

discharge claims, *Norris v. Metro-N. Commuter R. Co.*, 522 F. Supp. 2d 402, 414 (D. Conn.

2007) ("[i]n light of the conclusions, *supra,* that summary judgment is granted on Plaintiff's

hostile work environment and constructive discharge claims, these theories are no more tenable

when recast as violations of § 1981"), and discriminatory failure to promote claims, *id.*

("[s]imilarly, those aspects of his Title VII promotion denial . . . claims which fail to survive

summary judgment suffer the same fate here" when brought under § 1981).

     All of Watson's Title VII claims of discrimination, retaliation, hostile work environment,

and constructive discharge did not survive summary judgment. Her claims under the CFEPA and

§ 1981 are premised on the same facts and involve the same alleged wrongs. *See* ECF No. 105 at

49-54 (§ 1981), 62-66 (CFEPA). Accordingly, for the reasons discussed above, Defendants are

entitled to summary judgment on Watson's CFEPA and § 1981 claims.

## E.    Remaining State Law Claims

     As all claims over which I have original jurisdiction have been dismissed, I decline to

exercise supplemental jurisdiction over Watson's remaining state law claims and dismiss them

without prejudice. *See Cellular Tech. Servs. Co. v. TruePosition, Inc.*, 609 F. Supp. 2d 223, 247

(D. Conn. 2009) ("[I]n the usual case in which all federal-law claims are eliminated before trial,

the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial

economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction

over the remaining state-law claims.") (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)).

## IV.    CONCLUSION

For the reasons above, I grant the motion for summary judgment (ECF No. 118) as to Watson's federal and CFEPA claims and decline to exercise supplemental jurisdiction over Watson's remaining state law claims, which I dismiss without prejudice. The Clerk is directed to close this case.

IT IS SO ORDERED.


_____
/s/
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        September 14, 2023